**Rian Peck** (they/them), OSB No. 144012
RPeck@perkinscoie.com
**Thomas R. Johnson** (he/him), OSB No. 010645
TRJohnson@perkinscoie.com
**Misha Isaak** (he/him), OSB No. 086430
MIsaak@perkinscoie.com
**Nathan Morales** (he/him), OSB No. 145763
NMorales@perkinscoie.com
PERKINS COIE LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Telephone:  503.727.2000
Facsimile:  503.727.2222

**Shane Grannum** (he/him), *pro hac vice* pending
SGrannum@perkinscoie.com
**Sarah Mahmood** (she/her), *pro hac vice* pending
SMahmood@perkinscoie.com
PERKINS COIE LLP
700 13th Street, NW, Suite 800
Washington, D.C.  20005-3960
Telephone:  202.654.6200
Facsimile:  202.654.6211

**Zachary Watterson** (he/him), *pro hac vice* pending
ZWatterson@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone:  650.838.4300
Facsimile:  650.838.4350

**Kelly K. Simon** (she/her), OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone:  503.227.6928

*Attorneys for Plaintiffs*

COMPLAINT

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **CHRISTOPHER WISE**, **MICHAEL MARTINEZ**, **CHRISTOPHER DURKEE**, and **SAVANNAH GUEST**, individuals, | Case No. 3:20-cv-01193 |
| | **COMPLAINT** |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| v. | |
| **CITY OF PORTLAND**, a municipal corporation; **OFFICER STEPHEN B. PETTEY**, in his individual capacity; **JOHN DOES 1-60**, individual and supervisory officers of Portland Police Bureau; **U.S. DEPARTMENT OF HOMELAND SECURITY**; **U.S. MARSHALS SERVICE**; **JOHN DOES 61-100**, individual and supervisory officers of the federal government, | |
| Defendants. | |

COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Plaintiffs Christopher Wise, Michael Martinez, Christopher Durkee, and Savannah Guest allege as follows:

## NATURE OF THE ACTION

1.      This is a civil rights action brought on behalf of protest medics who have been providing care and comfort to the hundreds of people protesting nightly in downtown Portland against white supremacy, police violence generally, and police brutality against Black lives specifically.

2.      Plaintiffs are protest medics who, in the face of tear gas, rubber bullets, and other munitions, exercise their rights to free speech through their service to the cause of equal treatment and absolute equality under the law, but more fundamentally, they exercise their rights by creating a safer environment for citizens to continue to express their desire for change.

3.      As the protests continue, these protest medics have put their safety at risk in order to keep protesters safe. They share a strong belief that the protests are necessary to effectuate change in our community, and our country, and that their service as protest medics is an expression of their commitment to these ideals.

4.      The police and federal law enforcement officers, however, have engaged in violent tactics in an effort to suppress the protests advocating massive changes in the way we police in America. Despite clear expression to the police and federal officers that these protest medics are there to assist others, and are not violent in any way, the police and their federal counterparts have targeted medics with rubber bullets, shoved them, sprayed tear gas at close range, arrested them, and taken their property.

5.      Plaintiffs seek monetary damages and prospective injunctive relief so that they can continue their efforts to aid protesters.

1-    COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

# PARTIES

6.    Plaintiff Michael Martinez is an individual residing in Multnomah County, Oregon. He is a graduate student at Oregon Health & Sciences University ("OHSU"), pursuing his doctorate degree in Medical and Molecular Genetics. He serves as a protest medic at the Portland Protests.

7.    Plaintiff Christopher Wise is an individual residing in Washington County, Oregon. He maintains a full-time day job and, at night, uses his skills as a former emergency medical technician ("EMT") to render medical aid to protesters in Portland.

8.    Plaintiff Christopher Durkee is an individual residing in Lane County, Oregon. He is a mental-health professional and trained EMT. He, with his partner Plaintiff Guest, serves as a volunteer medic at many protests throughout Oregon, including the Portland Protests.

9.    Plaintiff Savannah Guest is an individual residing in Lane County, Oregon. She maintains a full-time day job and, with her partner Plaintiff Durkee, serves as a volunteer medic at many protests throughout Oregon, including the Portland Protests.

10.    Defendant City of Portland is a municipality incorporated in the State of Oregon. As a local governmental entity, the City of Portland is a juridical entity under 42 U.S.C. § 1983. The Portland Police Bureau is a department or division of the City.

11.    Officer Stephen B. Pettey is a police officer with the Portland Police Bureau. Upon information and belief, he is the officer who wrongfully arrested Plaintiff Martinez. He is sued in his individual capacity.

2-   COMPLAINT

12.    Defendants John Does 1-20 are police officers employed by the City who directly assaulted Plaintiffs. They are sued in their individual capacity.

13.    Defendants John Does 21-30 are supervisory officials whose liability could include their own culpable action or inaction in the training, supervision, or control of their subordinates, their acquiescence in the constitutional deprivations alleged here, or conduct showing a reckless or callous indifference to the rights of Plaintiffs. They are sued in their individual capacity.

14.    Defendants John Does 31-60 are individual and supervisory officers of other law enforcement agencies, including but not limited to: the Clackamas County Sheriff's Office; Clark County Sheriff's Office; Multnomah County Sheriff's Office; Washington County Sheriff's Office; Port of Portland Police; Gresham Police; Vancouver Police; Washougal Police; Oregon State Police; and the Oregon National Guard, who are working under the Portland Police Bureau's direction and control pursuant to Portland Police Bureau Directive 635.10 § 7 ("The Bureau may request assistance from other law enforcement agencies . . . The Bureau [Incident Commander] shall maintain the authority to determine tactical objectives; direct the overall police response (all agencies); and determine, when objectively reasonable, how and when force may be used and when to deploy less lethal munitions to address civil disturbance and/or disperse the crowd."). Does 31-60 are acting in concert with and agents of the City and Does 1-30. They are sued in their individual capacity.

15.    The Municipal Doe Defendants[1] (which includes Does 1-60) have concealed their identities and their names or they are not yet fully known to

_____

[1]    Plaintiffs refer to Does 1-60 as the "Municipal Doe Defendants." The Municipal Doe Defendants, Defendant City of Portland, and Defendant Pettey are collectively referred to as the "Portland Police."

3-   COMPLAINT

Plaintiffs. On information and belief, Does 1-60 are responsible for the conduct alleged herein.

16.    Defendant U.S. Department of Homeland Security ("DHS") is a federal agency of the United States. DHS contains the United States Customs and Border Protection, Immigration and Customs Enforcement, the Transportation Security Administration, the Coast Guard, and the Federal Protective Service. On information and belief, federal officers from these parts of DHS perpetrated some of the injuries alleged below.

17.    Defendant U.S. Marshals Service ("USMS") is a federal agency within the United States Department of Justice.

18.    Defendants John Does 61-80 are individual and supervisory law-enforcement officers employed by USMS and DHS who directly assaulted Plaintiffs and otherwise violated their rights as articulated below. They are sued in their individual capacity.

19.    Defendants John Does 81-100 are supervisory officials whose liability could include their own culpable action or inaction in the training, supervision, or control of their subordinates, their acquiescence in the constitutional deprivations alleged here, or conduct showing a reckless or callous indifference to the rights of Plaintiffs. They are sued in their individual capacity.

20.    The Federal Doe Defendants (which includes Does 61-100)[2] have concealed their identities and their names or they are not yet fully known to Plaintiffs. On information and belief, Does 61-100 are responsible for the conduct alleged herein.

---

[2]    Plaintiffs refer to Does 61-100 as the "Federal Doe Defendants." The Federal Doe Defendants, Defendant USMS, and Defendant DHS are collectively referred to as the "Federal Defendants."

4-  COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

# JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over Plaintiffs' claims that Defendants have violated Plaintiffs' federal constitutional rights under 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' causes of action arise under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202.

22.    Venue is proper in the U.S. District Court for the District of Oregon under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Oregon and because Defendants are subject to personal jurisdiction in the District of Oregon.

# ALLEGATIONS

**A.    Minneapolis police officer Derek Chauvin murdered George Floyd, sparking worldwide protests against systemic racism in American policing.**

23.    On May 25, 2020, Minneapolis police officer Derek Chauvin kneeled on George Floyd's neck for 8 minutes and 46 seconds, as Mr. Floyd repeatedly pleaded for his life: "I can't breathe." "I can't breathe."  "I can't breathe."  "I can't breathe." More than twenty times. Officer Chauvin's colleagues stood by and did nothing to intervene. Mr. Floyd's murder was caught on video, and that footage quickly circulated nationally and internationally.

24.    Mr. Floyd's murder occurred around two months after police officers in Louisville, Kentucky burst into Breonna Taylor's home and murdered her, shooting her eight times while she laid in her own bed. Ms. Taylor was an EMT and aspiring nurse.

25.    Ms. Taylor and Mr. Floyd were the latest among many dozens of Black people murdered or wrongfully killed by America's police in just the last few years. Widely-known victims include Michael Brown, Sandra Bland, Eric Garner, Philando

5-   COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Castile, Freddie Gray, Tamir Rice, Elijah McClain, and more. There also are victims whose names and stories are not amplified enough—primarily Black women and Black transgender Americans—such as India Kager, Aiyana Stanley-Jones, Layleen Polanco Xtravaganza, Tanisha Anderson, Monika Diamond, Rekia Boyd, Miriam Carey, Tony McDade, and Darnisha Harris. The names continue.

26.    Of course, death is not the only potential consequence Black Americans disproportionately face in America's criminal legal system: Nationally, and in Portland specifically, Black, Indigenous, and People of Color, are more likely to be profiled, stopped, arrested, charged, convicted, and imprisoned, and they often receive longer and harsher sentences.

**B.    In the wake of George Floyd's murder, protesters in Portland have maintained a vigilant effort against police brutality in any form.**

27.    The protest movement that erupted after George Floyd's murder has served as an indictment of racist and brutal policing practices, and it has forced states, cities, and non-Black citizens to reckon—in many cases, for the first time—with their history of participating in, and perpetuating, white supremacy. Indeed, in the words of Black-studies educator and writer Walidah Imarisha, "Oregon was founded as a racist white utopia."[3]

28.    The history of this State is steeped in racism, having been founded as a whites-only territory. Oregon's founders implemented Black exclusionary laws designed to prevent Black people from living here. When Oregon became a state, these Black exclusionary laws—which provided that Black people outside Oregon were not permitted to "come, reside, or be within" the State, prevented Black

---

[3]    Tiffany Camhi, *A Racist History Shows Why Oregon Is Still So White*, Or. Public Broadcasting (June 10, 2020 11:12 AM), https://www.opb.org/news/article/oregon-white-history-racist-foundations-black-exclusion-laws/.

6–    COMPLAINT

Oregonians from owning land or entering contracts, and prescribed punishment for those who, employed, "harbor[ed]," or otherwise helped them—were enshrined in the Oregon Constitution. They remained in the Oregon Constitution until 2002— only 18 years ago—and even then, around 30% of Oregonians voted to *keep* the racist clause.

29.     By their conduct, the Portland Police are no exception to the systemic racism inherent in policing nationwide, as local police officers have committed disproportionate violence against Black lives. In 2003, Portland police officers shot 21-year-old Kendra James during a traffic stop. In 2004, they shot James Jahar Perez. In 2006, they beat James Chasse Jr. to death while he was experiencing a mental-health crisis in their custody. In 2010, they shot 25-year-old Aaron Campbell. In 2011, Darris Johnson. In 2017, they shot 17-year-old Quanice Hayes. And in 2018, they shot 27-year-old Patrick Kimmons.

30.     The protests in Portland came within days of Mr. Floyd's murder. Protesters took to the streets of Portland in large number, beginning on May 29, 2020. They have continued every night since—or for more than 50 days, as of the date of filing this Complaint. The protesters are dedicated to real change and show no sign of being deterred by the police violence described herein. In fact, the police violence only serves to strengthen their resolve, as is memorialized in the familiar protest chant: "No Justice? No Peace!"

31.     Protests have primarily occurred at places symbolic of Oregon's racist history, specifically as it relates to criminal justice and police brutality. Though demonstrations have taken place at the Portland police-union headquarters in North Portland and the Multnomah County Sheriff's Office in East Portland, they have for the most part been held downtown in Chapman and Lownsdale Squares,

7-   COMPLAINT

City parks surrounded by institutions of governance: Multnomah County Justice Center, Mark O. Hatfield Federal Courthouse, Portland City Hall, and the Multnomah County Courthouse.

32.    For nearly as many nights as the protests have occurred, the Portland Police have responded with outsized displays of force that affect hundreds, and sometimes thousands, of peaceful protesters. Figure 1 depicts the Portland Police, ready to face protesters on a typical night of peaceful protests.



*Figure 1: Portland Police officers in riot gear and a cloud of tear gas, taken by John Rudoff on June 19, 2020.*

33.    Clad in riot gear, the Portland Police bull-rush crowds of people, shoving protesters to the ground, and hitting them with clubs and other instruments until, in spite of pain or injury, they get up. Videos:

- https://twitter.com/MrOlmos/status/1284417770973626371?s=20

8-   COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

- https://twitter.com/tuckwoodstock/status/1284734198926852097?s=20

34.    They shoot protesters with rubber bullets and other impact munitions. They beat them with truncheons. They pull their masks down and spray bear mace in their eyes at dangerously close ranges.

35.    The Portland Police have perpetrated many of these assaults after they already have drenched protesters, and much of their surrounding area, in thick clouds of tear gas.

36.    The Portland Police's indiscriminate use of pepper spray, bear mace, and tear gas is especially concerning in light of the COVID-19 pandemic. That is because those weapons all are designed to make peoples' eyes water and burn, to make people spit, cough, choke, retch, vomit, and to make mucous pour from their noses. Those are all ways COVID-19 can spread.

37.    The Portland Police drive riot vans with officers lined on running boards around downtown Portland, collecting slower (often injured) protesters and arresting them without probable cause.

38.    The Portland Police also tackle protesters riding their bikes away from the protest area in broad daylight, running up and giving them a knee to the gut for extra measure. Video:

https://twitter.com/DanMcKATU/status/1283748895600721920?s=20

## C.    The President deploys federal officers, including the Federal Defendants, to "quell" Portland protests.

39.    About a month after the protests began, President Trump issued an Executive Order on Protecting American Monuments, Memorials, and Statues and

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Combating Recent Criminal Violence (the "Executive Order").[4] In it, he vilified the protesters' political views, stating that many of them "have explicitly identified themselves with ideologies — such as Marxism — that call for the destruction of the United States system of government."

40.    Incredibly, the President also declared that state and local governments had, in the face of mass protests, "lost the ability to distinguish between the lawful exercise of rights to free speech and assembly and unvarnished vandalism." The President of the United States also asserted that State and local governments' sometimes brutal and militaristic police response to the protests had so far been inadequate, representing an "abdication of their law enforcement responsibilities in deference to [the protesters' alleged] violent assault" and a "surrender[] to mob rule."

41.    Purportedly acting under color of the Executive Order, DHS and the USMS deployed or operationalized special forces in Portland. Upon information and belief, this occurred soon before the July 4 protests.

42.    The agencies for whom these forces worked was initially a mystery to many in Portland. Upon information and belief, they are rapid response teams that include members of the USMS, as well as DHS's Customs and Borders Protection (CBP), Immigration and Customs Enforcement (ICE), the Transportation Security Administration (TSA), the Coast Guard, and the Federal Protective Service (FPS). They include specially trained tactical units such as the Border Patrol Tactical Unit (BORTAC), which is normally tasked with investigating violent drug smuggling organizations.

---

[4]    https://www.whitehouse.gov/presidential-actions/executive-order-protecting-american-monuments-memorials-statues-combating-recent-criminal-violence/

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

43.     The majority of DHS's and USMS's teams wear either black or camouflage military garb, without clear identification of the agency with which they are associated. There also is no discernible identifying information about the officers. They stand, upon arrival, ready only for combat. (*See* Figure 2.)



*Figure 2: Federal Officers brandish their weapons at protesters, taken by John Rudoff on June 16, 2020.*

44.     DHS's and USMS's officers use many of the same weapons against protesters that the Portland Police deploy.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

45.     Some also carry AR-15 rifles, stocked with what appears to be live ammunition.



*Figure 3: Federal Officer on left is carrying an AR-15 with what appears to be live ammunition. Photo by John Rudoff.*

46.     When DHS's and USMS's federal troops arrived, they turned the Mark O. Hatfield Federal Courthouse into a quasi-bunker. They built walls surrounding the front courthouse windows and most doors. The walls have functioning cut-out doors, as well as eye-level retractable cut-outs from which they can shoot weapons or direct the long-range acoustic device (LRAD)—a speaker system and sound energy weapon developed in the early 2000s for use by the U.S. military in foreign wars—at Oregonians. An LRAD has a maximum range of 8,900 meters. At 20 meters, it has an output of 110-130 dB, which can cause pain. At 1 meter, it has an output of 162 dB. Hearing loss, prolonged pain, and ringing have been reported as a

12-  COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

result of LRAD use. Video depicting the sound:

https://twitter.com/MrOlmos/status/1282194215481430016?s=20

47.     Those, such as Plaintiffs, who have been subjected to the federal tear
gas describe it as "spicier" than the Portland Police's tear gas. Regardless, DHS's
and USMS's officers use a lot of it, engulfing city blocks in opaque, chemical clouds.
A video from this week's protests:

https://twitter.com/tuckwoodstock/status/1285482965707837440?s=20

48.     They also have creative, medieval-seeming ways of distributing tear
gas across large groups of protesters seeking to have their voices heard. Video:

https://twitter.com/tuckwoodstock/status/1284017726487314433?s=20

49.     Protesters exposed to the Federal Defendants' tear-gas attacks have
complained of long-lasting effects beyond the immediate physical symptoms. There
have been reports of persistent mental fog, drowsiness, grogginess, nausea,
diarrhea, loss of appetite, sustained asthma flare-ups, and increased or interrupted
menstrual cycles—many of which symptoms Plaintiffs themselves have
experienced.

50.     On the night of July 11, following one such tear gas attack, several
individuals began walking back toward the federal courthouse to continue the
protests. The Federal Defendants remained on guard outside. A 26-year-old named
Donavan La Bella stood on the City sidewalk in front of the federal courthouse and,
with two arms, raised a boom box above his head. Federal officers shot a tear gas
canister in his direction. He tried to lightly kick it away from his immediate vicinity
and, when his kick proved too gentle, he tossed it away with insufficient force to
come anywhere near the federal officers. As he raised his stereo again, an officer of
one of the Federal Defendants shot him in the head with an impact munition. Mr.

13-  COMPLAINT

La Bella has been hospitalized since. He suffered catastrophic injury as a result of the officer's action, requiring facial reconstruction surgery, and potentially suffering permanent brain damage.



*Figure 4: La Bella, one week after recovery.*

51.    Days later, reports began surfacing of federal officers in unmarked uniforms in unmarked vehicles abducting suspected protesters who were walking away from the protest area on the sidewalk. *See* Declaration of Mark Pettibone, Rosenblum v. John Does 1-10 et al, No. 3:20-cv-01161 (D. Or. July 20, 2020), ECF No. 7 ("Pettibone Decl.") ¶¶ 2-3. At least one of the abductees had his hat pulled over his eyes as he was placed by two officers of the Federal Defendants into the unmarked van and whisked away. He was taken somewhere for questioning and

14-  COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

then released. Video:

https://twitter.com/sparrowmedia/status/1283436911307218948?s=20.

52.    Aside from the bizarre vehicular kidnappings, DHS's and USMS's officers also violently tackle and arrest protesters suspected of minor offenses and drag them into the federal courthouse. On information and belief, these arrests are not supported by probable cause, given the number of protesters, the lack of light, and the general bustle of the crowd. Video:

https://twitter.com/LindseyPSmith7/status/1282237570475155456?s=20

**D.    The Municipal and Federal Defendants' stated justification for their violence.**

53.    The Portland Police has attempted to justify their treatment of the protesters, and Plaintiffs (as Protest Medics), by claiming that protesters have thrown objects, including soda cans and small rocks, at its officers.

15-  COMPLAINT

54.     Acting Secretary of Homeland Security Chad Wolf has also published the Federal Defendants' supposed rationale for waging war on Portland's citizens protesting widespread police brutality. Those reasons: graffiti, more graffiti, and protesters tossing "animal seed" (pig feed) at riot-gear clad officers. Figure 5 depicts some highlights from the Federal Defendants' justifications.[5]



*Figure 5: Screenshot of a since-deleted Tweet from Acting Secretary Wolf dated July 17, 2020.*

**E.      Protest medics play a central role in the ongoing protests.**

55.     Amid the nightly violence wrought by the Portland Police and Federal Defendants, protest medics like Plaintiffs play a vital role in giving voice to the

---

[5]       https://www.dhs.gov/news/2020/07/16/acting-secretary-wolf-condemns-rampant-long-lasting-violence-portland

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

protesters. In the face of often violent police action, these medics deliver medical care in furtherance of the anti-racist ideals at the core of the protests.

56.    Protest medics offer a range of services, among them: distributing eye wash and eye wipes to protesters in anticipation of tear gas attacks, offering personal protective equipment so that protesters can observe COVID-19 physical distancing protocols, ensuring that protesters remain adequately hydrated and fed, and rendering direct care when police injure protesters.

57.    Protest medics have different degrees of first-aid training and a variety of backgrounds. Some are nurses, others graduate students, others medical residents, and others still are people who hold day jobs and have basic first-aid training or former EMT experience. The protest medics coordinate with one another to discern who has credentials to provide higher levels of care, and they ensure that they only provide the care they are qualified to provide.

58.    The protest medics view what they do as an act of protest, and a form of speech and expression. By their presence, they send a message to all protesters, journalists, and neutral legal observers that someone will be there to care for them, even when the Portland Police and the Federal Defendants are actively harming them. The protest medics work to prevent all who attend the demonstrations from developing illness or injury, so they can continue protesting, documenting the protests, or providing legal observation at the protests.

59.    The protest medics' aid is necessary to provide a relatively safer environment for protesters to exercise their rights to free speech. The police-inflicted injuries that protest medics have treated include, among other things:

        a.    traumatic brain injuries;

        b.    trauma-induced seizures;

17- COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

    c.  five lacerated scalps;

    d.  a lacerated hand with a visible tendon;

    e.  broken bones, including a finger, a pinkie toe, and metatarsals;

    f.  a lacerated foot;

    g.  abrasions and avulsions;

    h.  contusions;

    i.  an ankle sprain;

    j.  eye and skin irritation;

    k.  and asthma attacks.

60.    Given the degree of risk that merely attending a protest presents to protesters, journalists, neutral legal observers, and even other protest medics, on nights when there are few or no protest medics, many would-be protest attendees choose not to participate, or leave earlier than they wish to, for fear that they will not have access to care in the likely event the police hurt them.

61.    Aside from coordinating about their relative training levels at the beginning of each night, the protest medics work to communicate with one another on a regular basis throughout the protest. Many of them carry walkie-talkies so they can call for help and let each other know where they are needed. They also use a "buddy system" whenever possible, not necessarily always working together, but at least keeping track of their "buddy's" whereabouts and remaining in the same general vicinity as one another. They work to share supplies and different techniques they develop as the protests go on.

**F.    The police's pattern of intentionally targeting and retaliating against the protest medics.**

62.    While they work as protest medics, Plaintiffs often are left in the impossible position of complying with the orders of law enforcement while rendering

18- COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

aid to injured protesters, journalists, and legal observers. Since the beginning of the protests, the Portland Police have indiscriminately attacked, and at times have specifically targeted protest medics, including Plaintiffs, during their service to the protests.

63.    Since the Federal Defendants arrived in Portland, they have done the same thing.

64.    The Portland Police's and Federal Defendants' conduct has intimidated medics or otherwise worn them so thin that they feel they cannot continue attending protests with the frequency required to protect the health and safety of protesters. Defendants' conduct is part of a longstanding pattern of assaulting and threatening protest medics to prevent them from rendering aid to protesters, journalists, neutral legal observers, and their fellow protest medics.

### 1.    The Portland Police repeatedly injure Plaintiff Wise.

65.    Plaintiff Wise is a former EMT and one of the few Black men serving as a protest medic in Portland. He has attended the Portland Protests nearly every night since May 29, with the exception of Sundays and days on which he was too injured by police to continue to render adequate aid.

66.    When serving as a protest medic, Plaintiff Wise wears, and has always worn, a black, waxed denim jacket with the words "medic" and the medic symbol painted in red across the back, as well as brightly colored duct-taped medic symbols on both upper arms and the chest. He quite openly carries medical supplies on his person at all times.

67.    He does not interfere with the police or federal agents when he is at the protests, either when he is rendering aid or standing by "on call" for a medical need to arise. At times, he directs jokes at officers to diffuse tension between

19-  COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

protesters and officers—he has found that making protesters laugh can give them a sense of calm in otherwise fraught moments.

68.    Plaintiff Wise often renders aid by attempting to prevent injury altogether. He tries to clear paths for cars to drive safely through protest areas. He advocates for protesters to not throw objects toward officers in retaliation to the officers' actions. In other words, he practices a form of "preventive medicine" by working to promote civil disobedience and peaceful assembly.

69.    Nevertheless, the Portland Police and Federal Defendants have severely injured him multiple times and have threatened him with physical harm essentially every night he has attended the protests.

### a.    The Portland Police shoot Plaintiff Wise with a rubber bullet.

70.    Plaintiff Wise served as a protest medic in his usual medic garb, on June 2, a night later referred to by protesters as "Tear Gas Tuesday."

71.    While standing close to the sidewalk near a group of protesters in the road, Plaintiff Wise saw a tear gas canister on the ground in the middle of the road and then a cloud of tear gas appeared. During this tear-gas attack, Plaintiff Wise attempted to pull a fallen protester out of the cloud of tear gas and helped move the protester to safety on a nearby bench. Plaintiff Wise then examined the protester's minor injuries.

72.    As Plaintiff Wise tended to the protester, one of the Municipal Doe Defendants (a Portland Police officer) shot him in the shin with a rubber bullet. The bullet penetrated his skin through his pants, all the way to his shin bone.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

73.    Plaintiff Wise cleaned his wound, but it later became infected. He sought medical attention and took a seven-day course of antibiotics. To date, the wound still has not closed, let alone healed.

 

*Figure 6: An image of Wise's leg taken immediately after his injury was sustained on June 2, 2020 (left), and an image of Wise's leg taken June 29, 2020 after the resulting infection cleared following a 10-day course of antibiotics (right).*

### b.    The Portland Police throw a flash-bang grenade at Plaintiff Wise's foot.

74.    Plaintiff Wise also served as a protest medic on June 21, again dressed in his medic attire.

75.    As he stood in a tear-gas filled street with both hands raised, one of the Municipal Doe Defendants (a Portland Police officer) threw a flash bang that struck his foot.

76.    It burned a hole through his shoe and sock and sprained his foot.

21-  COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

### c.   The Portland Police spray bear mace in Plaintiff Wise's eyes.

77.   Plaintiff Wise served as a protest medic on June 28, wearing his medic clothes as usual.

78.   Plaintiff Wise witnessed a wall of protesters develop in front of police officers. He then saw police officers push the wall of protesters back. As the protesters reluctantly complied with the officers' requests, Plaintiff Wise witnessed police officers begin to bear mace protesters and hit them with batons.

79.   After 10pm that evening, Plaintiff Wise watched a Portland Police officer, at close range, spray a protester's eyes with bear mace. Plaintiff Wise rushed to the protester to pull them out of harm's way and administer necessary medical aid to the protester.

80.   As Plaintiff Wise reached the protester, one of the Municipal Doe Defendants (the Portland Police officer) turned the bear mace on Plaintiff Wise, spraying him directly in the eyes at a distance of no more than 6 inches. As he felt his eyes burn, and struggled to see, Plaintiff Wise sought shelter with the help of others and flushed his eyes for 45 minutes. Thereafter, despite the injuries to his face and body, Plaintiff Wise continued his service to the protests later that night.

### d.   The Portland Police "bull rush" Plaintiff Wise.

81.   Plaintiff Wise also served as a protest medic at the protests in downtown Portland on the evening of July 4, a night a of explosive violence perpetrated by the Portland Police. Upon information and belief, federal USMS agents also participated in crowd-control activities that evening and contributed to the violence.

82.   A few protesters, out of around 1,000 protest attendees, shot fireworks in the area, including at nearby buildings. The Portland Police declared a "riot,"

22-  COMPLAINT

tear gassed the crowd, and formed a riot line and began pushing protesters away from the Justice Center to the north, toward East Burnside.

83.    Plaintiff Wise stayed toward the front of the protest line, about two or three rows back from the riot line. He walked backward, facing the police, to watch for any potential injuries.   That day, as he did each time he served as a protest medic, Plaintiff Wise displayed a brightly colored cross on the back, chest, and both sleeves of his jacket, and wore medical supplies around his waist.

84.    Plaintiff Wise noticed that one officer had Number 67 in place of a name tag. He made a joke directed at Officer No. 67 (one of the Municipal Doe Defendants in this Complaint), to the effect of the officer not understanding why kids like the delicious taste of Cinnamon Toast Crunch.

85.    Suddenly, and without any notice or provocation, Officer No. 67 brushed past two protesters and charged at Plaintiff Wise from a distance between 10 and fifteen feet.  At speed, Officer No. 67 forcefully shoved Plaintiff Wise to the ground.

86.    Plaintiff Wise's glasses flew off his face and his cell phone, which remained in his back pocket, shattered from the force of his impact to the ground.

87.    Plaintiff Wise suffered a sprained shoulder and a wound the size of a quarter on his palm. For the rest of the evening, he was hindered from providing medical aid because he was profusely bleeding from one hand and had reduced mobility in his shoulder.

88.    As a result of the shoulder injury, Plaintiff Wise was unable to go to his regular job for over a week.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

### e.  Some of the Federal Doe Defendants shoot Plaintiff Wise with pepper balls.

89.    Plaintiff Wise served as a protest medic at the Portland protests on July 14.

90.    When the Portland Police began "kettling" the protest attendees—tear gassing protesters at all angles, thereby eliminating paths for them to escape—Wise stood in the middle of Lownsdale Square to watch for any potential medical complications protesters might experience from tear gas, such as severe asthma attacks.  Lownsdale Square is not on, and does not contain, any federal property.

91.    As he stood there, some of Federal Doe Defendants repeatedly shot him in the legs with pepper balls.

92.    Plaintiff Wise experienced temporary pain from the pepper balls, which hit him in the shin above guards that Wise tied around his leg to protect the open wound that was still present from a month and a half earlier.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

f.    **The remaining police violence blurs together.**

93.    Aside from those more severe injuries, the Portland Police and Federal Defendants have thrown or shot flashbang grenades and teargas canisters directly at Plaintiff Wise.



*Figure 7: Wise, with hands raised, nearly hit with a tear gas canister shot in his direction.*

94.    On at least one of those occasions, Plaintiff Wise had not had the opportunity to don his gas mask, and the tear gas caused him to have a severe asthma attack.

95.    On another night, the Portland Police used the LRAD at full volume and at an improper distance from where Plaintiff Wise and other protest attendees were.

25-  COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

**2.** **The Portland Police wrongfully arrest Plaintiff Martinez.**

96.     Plaintiff Martinez is a graduate student at OHSU, pursuing a doctorate degree in Cellular and Molecular Genetics. Specifically, he studies gene editing for phenylketonuria (PKU), an inborn error of metabolism that results in decreased metabolism of the amino acid phenylalanine. Infants are tested for PKU shortly after birth and there currently is no genetic cure.

        **a.** **Plaintiff Martinez first attended the protests as a "civilian" protester, and then determined he needed to use his skills, voice and affiliation with OHSU to serve as a protest medic.**

97.     Plaintiff Martinez began attending the Portland protests as a "civilian" protester on June 2, Tear Gas Tuesday. He participated in the protests that night with another OHSU graduate student.

98.     The June 2 protest began in Pioneer Square and was peaceful, with the crowd chanting and a few people addressing the protesters on a megaphone. Around 9:10 p.m., the protesters marched as a group a couple of blocks east to Third Avenue.

99.     Portland Police met them in full riot gear around 9:25 p.m. The police formed lines surrounding the protesters to the east and south.

100.    Plaintiff Martinez was not engaged in any conduct that presented a danger or threat to public safety, and he also did not see any other protesters engaged in conduct in any way threatening to any police officer.

101.    The protest had been peaceful up to this point. Given the stark contrast between the peaceful protest, and the officers in full riot gear, the protesters chanted: "Take off your riot gear! We don't see no riot here!"

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

102.   Suddenly—and only within about five minutes of their arrival to the demonstration—the Portland Police began indiscriminately shooting tear gas and munitions into the crowd, for no apparent reason.

103.   After ingesting the tear gas, Plaintiff Martinez had difficulty breathing and seeing, his eyes burned, and he suffered from confusion and general grogginess, among other symptoms.

104.   The Portland Police struck Plaintiff Martinez's OHSU colleague, with a rubber bullet or similar munition on her upper thigh, causing her pain and extensive bruising that lasted for days.

105.   The police violence Plaintiff Martinez witnessed—and experienced firsthand—strengthened his belief that protesting police brutality was necessary and important. So, after recovering from Tear Gas Tuesday, he resumed attending the protests on June 5, at the Justice Center.

106.   That night, the Portland Police used the "kettling" tactic to tear gas the peaceful protesters from all angles—cutting off any path for escape. Among the protesters he saw trying to escape the police violence that night was a mother with her baby in a stroller near the Multnomah County Courthouse. The mother could not move quickly enough away from the police and sought shelter near the courthouse wall. Yet again, witnessing this strengthened Plaintiff Martinez's belief that the police were not protecting the City or its citizens from anything—they were just retaliating against protesters for decrying their violent policing tactics.

107.   Every night thereafter, the Portland Police alleged some minor violation of the law to declare an "unlawful assembly" and, based on those supposed "infractions," weakly justify the discharging of tear gas and other "less lethal" munitions at Plaintiff Martinez and the hundreds of other protesters.

27-  COMPLAINT

108.    The Portland Police used tear gas against the protesters nearly every night until this Court entered an injunction in the Don't Shoot PDX case on June 9, 2020.

109.    The same week that Plaintiff Martinez was attending the protests as an active protester, some graduate students and faculty members at OHSU organized a group of volunteers to regularly serve as protest medics.

110.    Plaintiff Martinez decided to join this group of protest medics, because it was important for him to take a tangible stand against the nightly police brutality he was witnessing and experiencing.

111.    He also believed that a large group of protest medics affiliated with OHSU, one of the most respected teaching hospitals in the nation, would lend credibility to the protests and help people who were not attending them understand that they were not full of "violent anarchists" and lawless "mobs," as Defendants falsely portrayed them to be.

112.    Plaintiff Martinez also wanted to send a message that protesters have a right to protest safely and without fear of police violence. And, because he had witnessed many nights of Defendants freely discharging  tear gas or "less lethal" munitions against protesters, he wanted to do his part as a participant in the protests by helping to ensure that injured protesters had the ability to obtain basic first aid and other healthcare, and to suffer as little harm as possible from Defendants.

113.    By his presence, he also wanted to express to protesters that someone was there for them and they would have access to care if they needed it.

28-  COMPLAINT

### b.    The OHSU volunteer medic group is organized.

114.    To that end, Plaintiff Martinez began serving as a protest medic with the OHSU group on June 8.

115.    For the first couple of nights, the group carried backpacks and distributed food and water to protesters.

116.    Eventually, on June 11, they set up a table in Chapman Square. The table was clearly marked as a medics' station—it had a banner draped across it displaying the OHSU logo and was under a tent marked with a medic symbol and other first-aid signs.

117.    The protest medics clearly marked the space as an OHSU medic's station for a few reasons. First, they wanted people to be able to find the medics quickly. Second, they wanted to be visible to provide the protesters with some assurance that help was close at hand. Finally, the medics wanted the police to be able to identify who they were, so that the police understood the medics were there to render aid to people in need of urgent medical attention.

118.    The OHSU medics kept (and still keep) a variety of supplies at the OHSU medics' station. This includes medical supplies such as gauze, bandages, antibiotic ointments, tape, ear plugs, and over-the-counter pain medications. They also offer wipes and saline solution or other eye wash to help rinse peoples' eyes following a tear gas attack.

119.    Beyond medical supplies, the OHSU medics keep the table stocked with snacks and water to ensure that protesters remain sufficiently nourished.

120.    And given the current pandemic, they offer personal protective equipment such as masks, gloves, and hand sanitizer—so that protesters and other medics can observe recommended safety measures.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

121.    Their supplies are largely donated from community members and local businesses.

122.    As the OHSU volunteer group became more organized, they developed roles for two different kinds of medics: (1) those who stay at the table and hand out supplies to other medics and protesters, and (2) those who go "into the field" to provide support to other medics or direct care to protesters wherever that care is needed.

123.    The medics also came to learn that the Portland Police were recommending that ambulances not enter the protest area, even when someone was seriously wounded and needed to be treated at a hospital. So, on nights that police are expected to be particularly violent, OHSU volunteer medics turn their personal cars into makeshift ambulances.

124.    Plaintiff Martinez has basic first-aid training, so he typically does not provide direct physical care to protesters. Instead, he assists other medics who have higher levels of training by making sure they have adequate supplies. He also makes sure that protesters have eye wipes, eye solution, and other supplies they need to feel safe when the police begin using force.

       **c.**    **The Portland Police arrest Plaintiff Martinez for standing at the OHSU medics' station and unlawfully seize the OHSU medics' supplies.**

125.    On June 13, Plaintiff Martinez worked as a protest medic at the OHSU station beginning around 9:00 p.m.

126.    The medics' station was at its usual location near the corner of Fourth Avenue and Madison Street in Chapman Square.

127.    The crowd of protesters was mainly congregated in front of the federal courthouse, adjacent to Chapman Square.

30-  COMPLAINT

128.    Around 10:30 p.m., the Portland police used the LRAD to make an announcement. The LRAD was positioned around Second Avenue and Main Street, which was not in direct earshot of Plaintiff Martinez or the other OHSU volunteer medics. They could not quite hear the announcement until the LRAD repositioned.

129.    Plaintiff Martinez eventually was able to discern their announcement: The Portland police had declared an "unlawful assembly" and were ordering protesters to disperse or else be subject to crowd-control munitions, tear gas, or arrest.

130.    In the past, the police had typically given protest attendees about a 30-minute warning before using crowd-control munitions. Plaintiff Martinez and the other OHSU volunteer medics therefore spent about five minutes handing out eye wash and wipes to as many protesters as they could, in anticipation of the likely imminent tear-gas attack. They then began packing up they supplies, which usually took them around 20 minutes. About five minutes after they started packing their supplies, the Portland Police stormed the crowd.

131.    Plaintiff Martinez saw a line of police coming directly towards the OHSU medics' tent, so he started filming the scene. Filming police encounters was a safety protocol recommended for all OHSU volunteer medics. The OHSU medics' tent was still standing and it was clear that it was a medics' station. Plaintiff Martinez stood in front of the tent, closest to the police, while the other OHSU volunteers moved quickly to break down the station. When the police approached, the OHSU medics explained that they were packing up their supplies, after which they would immediately clear the area. The police told them to leave without their supplies and directed them to move west.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

132.    Plaintiff Martinez still stood between the officers and the OHSU volunteers, continuing to film, as the volunteers began complying with the officers' orders. Plaintiff Martinez also began complying with the officers' orders, moving to the west, and walking backwards to keep the camera trained on the officers. After he started to walk, an officer pointed at him and said, "Arrest that guy. Arrest him."

133.    An officer (who Plaintiff Martinez later learned was Defendant Officer Stephen B. Pettey) then arrested him. Zip ties were placed around his wrists. Plaintiff Martinez did not resist arrest and, in fact, told the officers that one of the zip ties had slipped off his wrist because they hadn't tightened it enough. Plaintiff Martinez was wearing a CamelBak backpack, and the police cut the straps to remove it from his person.

134.    They then took him to the Justice Center, where he was detained until the National Lawyers Guild arranged with the PDX Defense Fund for bail to be posted on his behalf. The Portland Police released Plaintiff Martinez from the Justice Center at approximately 5:30 a.m.

135.    As Plaintiff Martinez was being arrested, the Portland Police ordered the other OHSU volunteer medics to continue moving to the west, leaving behind their supplies. The Portland Police confiscated their tent, table, medical and other supplies, and banner.

136.    Though the Portland Police denied having confiscated their supplies, and even told the volunteer medics that they should have known their supplies would be "stolen" because the area was a "war zone," the OHSU volunteer medics eventually recovered their table and supplies from the Portland Police Bureau's outgoing trash. To this day, they have not received their tent or banner. They have since had a new banner made, but they operate without a tent now.

32- COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

### d. Plaintiff Martinez and the OHSU medics change their practices to avoid further police brutality.

137.   Following Plaintiff Martinez's arrest, the OHSU volunteer group was forced to limit its operations to protect the medics' safety from police violence and arrest.

138.   For example, they usually would start packing up their tent and supplies by 11:00 p.m., because, in their experience, the police tended to declare an "unlawful assembly" and began using tear gas and making arrests around 11:30 pm. On some nights, however, the police would surprise them and begin exerting aggressive crowd-control tactics even earlier than expected, forcing them to stop providing services to the protesters, pack up their tent and supplies, and leave much earlier than they wanted.

139.   Given the message of support the medics were trying to give to the protesters (and public at large), they would have stayed much later on those nights and continued offering services to the protesters if they did not fear physical violence or arrest by the police.

140.   They also started keeping roll of all OHSU volunteer medics and instituted a buddy system for medics to watch over one another.

141.   Plaintiff Martinez, especially, has dramatically decreased his attendance at the protests since the night of his arrest, as a direct result of his interactions with the Portland Police.

142.   In the weeks leading to his arrest, he had attended the protests nearly every night. After June 13, he scaled his service as a medic to only two or three nights a week.

143.   He also has to be much more alert when he attends the protests, to avoid police interaction. This is out of fear that another (wrongful) arrest could

33-  COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

detract from the OHSU volunteer medics' credibility as a group and complicate Plaintiff Martinez's defense against his pending criminal charges.

### 3. The Federal Defendants beat Plaintiffs Durkee and Guest for trying to render medical aid.

144.    Plaintiffs Durkee and Guest live in Lane County and initially participated in the 2020 Black Lives Matter protests in Eugene. Those protests have included essentially no police violence.

145.    Plaintiff Durkee is trained as an EMT and is also a mental-health professional.

146.    Plaintiff Guest is a former emergency medical services (EMS) volunteer.

147.    While they were participating in the Eugene protests, Plaintiffs Durkee and Guest watched live-stream footage and followed other social-media updates about the Portland protests. They were appalled by the repeated police violence they saw, especially considering that the protesters themselves appeared to be demonstrating peaceably.

148.    Plaintiffs Durkee and Guest decided to get involved in the Portland protests as protest medics, not only because they felt strongly that systemic racism exists and has repeatedly led to police brutality against Black people, but also because they knew that their medical training could assist both the protesters and the larger movement.

149.    When they attend the protests, and with the intent of clearly identifying themselves as protest medics, they wear dark-colored clothes with high-gloss, red duct tape in the shape of crosses on their front and back. They also wear dark backpacks and helmets with the same red crosses, and wear shoulder patches

34-  COMPLAINT

with red crosses.  The crosses are identifiable during the day and at night and can be seen from any angle.

        **a.**    **The Portland Police and Federal Defendants tear gas and physically assault Plaintiffs Durkee and Guest.**

150.    Their first night serving as medics at the Portland protests was July 4.

151.    Upon information and belief, both the Portland Police and Federal Defendants engaged in law-enforcement activities associated with the protests that night.

152.    That night, the Portland Police and Federal Defendants employed violence indiscriminately, including against members of the press, legal observers, and medics.

153.    One of the Municipal Doe Defendants or Federal Doe Defendants shot Plaintiff Guest with a projectile and another officer checked her in the shoulder with his baton. During both those incidents, Plaintiff Guest was complying with the officers' orders to disperse and was not interfering with law-enforcement activities.

154.    The Portland Police forcibly pushed both Plaintiffs Durkee and Guest, again, while they were attempting to comply with the officers' orders to disperse.

155.    Finally, the Portland Police or Federal Defendants deployed tear gas indiscriminately that evening. Because Plaintiffs Durkee and Guest position themselves near the police line to keep a watchful eye for potential injured protesters, they experienced the brunt of the tear gas. Although they could not see and had difficulty breathing, they tried to remain calm to avoid creating a panic. They were concerned that if protesters saw medics panicking, then they too would start panicking.

35- COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

    **b.**    **The Federal Defendants assault Plaintiffs Durkee and Guest for attempting to render medical aid.**

156.    Plaintiffs Durkee and Guest also served as protest medics on the night of July 11 and into the morning of July 12. They wore their usual medics' gear.

157.    That night, one of the Federal Doe Defendants shot Donavan La Bella in the head. Plaintiff Durkee was one of the first responders, and he stayed with Mr. La Bella, applying pressure to his head and maintaining him in the recovery position until an ambulance arrived. Plaintiff Durkee's hand is visible in this video, applying pressure to Mr. La Bella's head:

https://twitter.com/sparrowmedia/status/1283869468658147336?s=20

158.    Despite the horrific injury the Federal Defendants inflicted on Mr. La Bella, they fired impact munitions at protesters later that night.

159.    Plaintiffs Durkee and Guest cared for people who had extensive injuries from rubber bullets that prevented them from walking. As they moved injured people out of the protest and away from the activity, they had to walk toward federal agents, who were approaching from multiple directions. Some of the Federal Doe Defendants responded by firing pepper balls at Plaintiffs Durkee and Guest, as well as the injured protesters they were attempting to help.

160.    Additionally, as Plaintiff Guest was clearly kneeling down to help an injured protester, she locked eyes with another Federal Doe Defendant.  That Defendant then threw a tear gas canister at her and the injured protester. It landed on the ground near them. Plaintiff Guest then lightly kicked the tear gas canister away from her and the injured protester, at which point the Defendant began shooting her with rubber bullets. They hit her several times, leaving abrasions and bruises on her feet and ankles.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

161.    That night, the Federal Defendants tear gassed the area on Third Avenue in front of the federal courthouse, including Lownsdale Square and surrounding streets, at least five or six separate times. Each time, the protesters would clear the area until the tear gas dissipated, and then return to continue their demonstrations.

162.    Around 2:00 a.m. on July 5, the Federal Defendants made a large push to clear the area and keep protesters away for good. They deployed so much tear gas that Lownsdale Square became engulfed in an essentially opaque cloud.

163.    Nearly simultaneously, the Portland Police brought their LRAD to the corner of Third Avenue and Main Street and announced that protesters needed to clear the area. They began pushing protesters in the same direction as the federal agents were directing them.

164.    Plaintiffs Durkee and Guest were on Southwest Broadway, between Main and Salmon streets, when they heard someone yell for a medic from across Broadway.

165.    As they crossed the street to provide aid, they noticed several protesters attempting to carry a person who appeared to be houseless—and not a protester—to safety. The protesters stayed with the person until Plaintiffs Durkee and Guest reached them.

166.    Before Plaintiffs Durkee and Guest even had time to check on the person, some of the Federal Doe Defendants began rushing them. Plaintiff Guest said loudly enough for the Defendants to hear that a civilian, and not a protester, was injured and needed assistance. The civilian appeared to have been severely negatively affected by tear gas exposure.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

167.    Those federal agents continued to move toward Plaintiffs Durkee and Guest, who raised both hands and continued to plead with the agents to allow them to provide medical care to the clearly ailing person. The agents refused, instructing them to move to the north, toward Pioneer Square.

168.    Plaintiff Durkee walked backwards heading north, while Plaintiff Guest faced frontwards. This is a tactic they use for all movement, to ensure they have eyes on all things surrounding them.

169.    As Plaintiff Durkee walked backwards with his arms raised, one of the Federal Doe Defendants forcefully shoved him, causing both him and Plaintiff Guest to fall. Plaintiff Guest struck her arm on the ground. Some of the Federal Doe Defendants then beat both of them with truncheons multiple times. Video: https://twitter.com/stoggrd/status/1282432033533210625?s=20

170.    Their resulting injuries prevented them from serving as protest medics the next evening, even though they wished to do so.

171.    As Plaintiff Durkee and Plaintiff Guest reflected on that evening, they understood that simply attending a protest, no matter what conduct you engage in, is to put your life at grave risk. They did not attend another Portland protest until July 18, after they were able to purchase helmets and other protective gear.

**G.    Plaintiffs are suffering and will continue to suffer irreparable harm.**

172.    Plaintiffs fear for their safety from the Portland Police's violence. Protest medics who attend and provide medical aid at the protests are at risk of being hit with tear gas, rubber bullets, police batons, arrested, and more. Even medics who remain at medical stations or at the rear of crowds are at risk of injury and arrest. Those medics who do remain at the rear of crowds cannot provide

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

medical assistance without injury because the police use strategies like the "kettling" employed against Plaintiffs on June 5, July 14, and many other nights.

173.    For these same reasons, Plaintiffs fear for their safety from the Federal Defendants' violence. Since President Trump ordered federal agents to go to Portland to quell protests, the Federal Defendants have been coordinating with the Portland Police to violently disperse demonstrators, neutrals, and medics standing behind a medical-supply table. The Federal Defendants use the same types (or worse) of force—chemical irritants, rubber bullets, batons—as the Portland Police. And they have emerged from unmarked vehicles clad in unmarked uniforms to abduct suspected protesters.

174.    Plaintiffs wish to continue attending protests to provide medical treatment when Defendants indiscriminately injure protesters, journalists, and neutral legal observers. They want to offer support and comfort that when the outpouring of violence from the police begins, those present will be cared for. Defendants have prevented Plaintiffs and other medics from providing aid when police have dispersed protesters and have repeatedly told medics that they will be arrested and assaulted if they fail to stop administering first aid to injured demonstrators, journalists, and neutral legal observers.

175.    On information and belief, countless others would serve as protest medics and volunteer their time to provide medical assistance, but for fear that they would be subject to violence from Defendants, have chosen to stay away.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

176.   There are no signs that the violence showcased towards Plaintiffs will end. As long as demonstrations persist, and Defendants continue to use the same levels of force, Plaintiffs and other medics will need to administer medical aid. In fact, Acting Secretary Wolf has said on several occasions that the Federal Defendants "will never surrender" and that they "will prevail" against "violent extremists" and "violent anarchists."   *See* Figures 8 and 9 below.



*Figure 8: Acting Secretary Wolf's since-deleted Tweet from Portland visit, July 17, 2020.*

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222



*Figure 9: Acting Secretary Wolf's since-deleted Tweet from Portland visit, July 17, 2020.*

177.    No matter how peaceful the protests are, Defendants will remain in Portland and Plaintiffs will be at risk of injury. President Trump declared that if the protests start[] again, we'll quell it again very easily. It's not hard to do if you know what you're doing."[6] Defendants' use of force has and will continue to cause irreparable harm to Plaintiffs.

178.    Plaintiffs fear for their safety from police violence because they have been attacked and injured repeatedly and without warning throughout the last approximately 50 days. Plaintiffs, as protest medics, are at risk of being hit with

---

[6]        https://www.cbsnews.com/news/portland-protests-tear-gas-oregon-officials-call-for-federal-authorities-to-leave/.

41-   COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

tear gas, rubber bullets, truncheons, arrest, and more. Even protest medics who remain apart from the crowd cannot carry out their humanitarian mission without serious risk of harm because officers specifically target them and their property.

179.    Plaintiffs wish to continue supporting the protests by serving as protest medics. They wish to continue treating protester injuries and doing their part to create a safer protest environment. They do so because they believe in the anti-racism message at the heart of the protests, and because they believe creating a safer environment will amplify that message.

180.    The protests in Portland are growing in size and strength in opposition to the growing presence of anonymous federal troops on the streets of Portland.[7] Groups not traditionally associated with confronting police violence have begun to form. For example, a group of women recently stood before the Portland Justice Center with locked arms and chanted: "Feds stay clear. Moms are here."[8]

181.    Targeting protest medics limits their ability to support protesters with medical care. Even a temporary deprivation of the Fourth and First Amendment freedoms, including the right to free speech, unquestionably constitutes irreparable injury.

---

[7]     *See Violent protest clashes turned Portland into a 'right-wing' boogeyman. Here's how it happened*, Washington Post, July 21, 2020, https://www.washingtonpost.com/nation/2020/07/21/portland-feds-protests/ (describing de-escalation by late June, and swelling of protest size in direct response to presence of federal officers in early July).
[8]     *From Antifa to Mothers in Helmets, Diverse Elements Fuel Portland Protests*, New York Times, July 19, 2020, https://www.nytimes.com/2020/07/19/us/portland-protests.html (describing disparate groups of families, businesspeople, political leaders, and young people)

42-  COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## (Violation of the First Amendment, 42 U.S.C. §1983, Against the Portland Police Officially and the Municipal Doe Defendants Individually)

182.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

183.    Plaintiffs engaged in constitutionally protected speech, as active participants in the Black Lives Matter protests in Portland, Oregon. Plaintiffs sought to protest in support of Black lives and against systemic racism and police brutality.

184.    Plaintiffs engaged in constitutionally protected expressive conduct through their works as protest medics, by creating a safer environment for protesters. Plaintiffs provided medical services, supplies, and treatment to fellow protesters. Plaintiffs intended to convey a particularized message that protesters have a right to engage in constitutionally protected speech without fear of violence, and Plaintiffs served as protest medics to take a stand against federal and law enforcement officials who have injured protesters. The likelihood is great that Defendants understand Plaintiffs' particularized message, since Plaintiffs established themselves as medics with clearly-identifiable statements, clothing, equipment, and insignia.

185.    Defendants' physical violence and deployment of chemical irritants and munitions against Plaintiffs and other protesters would chill a person of ordinary firmness from continuing to participate in protests as demonstrators and medics. Defendants' actions caused grave, physical injuries and psychological trauma to Plaintiffs.

43-  COMPLAINT

186.    Defendants indiscriminately unleashed chemical irritants, deployed munitions, and engaged in physical violence against Plaintiffs, establishing that Plaintiffs' protected activities—and their overall message against police brutality— were a substantial motivating factor in Defendants' conduct.

187.    Given that Defendants' actions would chill a person of ordinary firmness from engaging in constitutionally-protected speech, and that Plaintiffs' protected activities were a substantial motivating factor in Defendants' conduct, Defendants retaliated against Plaintiffs in violation of the First Amendment to the U.S. Constitution.

188.    As a direct result of harm that Plaintiffs have suffered, they seek prospective injunctive relief against the Portland Police and damages in an amount to be proven at trial against the individual Municipal Doe Defendants.

### SECOND CAUSE OF ACTION

### (Violation of the Fourth Amendment, 42 U.S.C. §1983, Against the Portland Police Officially and the Municipal Doe Defendants Individually)

189.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

190.    Plaintiffs were seized by the Portland Police when their officers intentionally, through chemical irritants, bullets, and physical force terminated their freedom of movement.

191.    Plaintiffs were present at the protests to provide medical assistance. Plaintiffs did not commit any crimes, pose any threat to any officers or any other person, or resist arrest.

192.    Using chemical weapons, semi-lethal projectiles, and riot batons against parties who are not engaged in criminal activity and pose no threat to

44-  COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

anyone's safety is an unconstitutionally excessive use of force. The Portland Police's seizure of Plaintiffs, thus, was objectively unreasonable. The Portland Police, under color of state and federal law, subjected or caused Plaintiffs to be subjected to the deprivation of rights secured by the Fourth Amendment to the United States Constitution.

193.    The Portland Police seized Plaintiffs' property when officers confiscated from Plaintiffs their medical supplies and medics' table materials, including a tent, banner, and table, without a warrant.

194.    Plaintiffs used the medical supplies and medics' table materials to provide injured protesters with medical care.

195.    The Portland Police had no probable cause to associate the medical supplies and medics' table materials with criminal activity. The Portland Police's seizures of Plaintiffs' property, thus, was objectively unreasonable. Under color of state and federal law, the Portland Police subjected or caused Plaintiffs to be subjected to the deprivation of rights secured by the Fourth Amendment to the United States Constitution.

196.    It was the City of Portland's policy, practice, or custom, as well as its failure to train and supervise its employees and agents and issue corrective instructions after violations were brought to light, that caused the Fourth Amendment violations.

197.    The City of Portland's failure to supervise and train its employees and agents with respect to the Fourth Amendment rights of Plaintiffs, including a failure to investigate and discipline officers for Fourth Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

198.    The pattern of similar constitutional violations against Plaintiffs demonstrates the City of Portland's deliberate indifference to Plaintiffs' Fourth Amendment rights.

199.    In light of the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the City of Portland demonstrated its deliberate indifference to the need for such training and supervision.

200.    Plaintiffs reasonably fear further retaliation in the future in violation of the Fourth Amendment if they continue to participate in constitutionally protected activity.

### THIRD CAUSE OF ACTION

### (Violation of the First Amendment Against the Federal Doe Defendants in their Official and Individual Capacities)

201.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

202.    This action arises under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

203.    Regardless of the existence of an implied cause of action under *Bivens*, the federal courts have inherent authority to grant injunctive relief to direct compliance of the federal government and individual federal officials with the First Amendment.

204.    Plaintiffs have a constitutionally protected right under the First Amendment, which prohibits the federal government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." When the

46-  COMPLAINT

federal government violates that right, the victim is entitled to sue the responsible officers. *Mendocino Environmental Center v. Mendocino County*, 14 F.3d 457, 464 (9th Cir. 1994).

205.   Plaintiffs provide medical services to protesters as an act of expression and a form of speech. By their presence, they send a message to all protesters, journalists, and neutral legal observers that someone will be there to care for them, even when the Portland Police and Federal Defendants (who have their own medics that exist only to assist their own), and their agents, are actively harming them. The likelihood is great that the Federal Doe Defendants understand Plaintiffs' particularized message, since Plaintiffs established themselves as medics with clearly-identifiable statements, clothing, equipment, and insignia.

206.   The Federal Doe Defendants, acting under color of federal authority, which includes, but is not limited to, the Executive Order, violated Plaintiffs' rights under the First Amendment, by intentionally abridging through violence and intimidation, the abilities of Plaintiffs to express themselves as described above.

207.   For example, the Federal Doe Defendants intentionally violated Plaintiffs' First Amendment rights as alleged above, by, among other things, firing tear gas and pepper balls specifically at Plaintiffs Durkee and Guest, while those Plaintiffs moved injured protesters out of the way and to safety.  They also forcefully shoved Plaintiff Durkee while he walked backwards with his arms raised, causing both him and Plaintiff Guest to fall. Some of the Federal Doe Defendants then beat both of them with truncheons multiple times.

208.   The Federal Doe Defendants also fired tear gas and rubber bullets directly at Plaintiff Guest, while she attempted to provide first aid to a protester.

47-  COMPLAINT

209.    And with respect to Plaintiff Wise, the Federal Doe Defendants shot him in the legs with pepper balls, as he stood in clearly marked "red-cross" clothing in a park that did not contain any federal property.

210.    Each of those constitutional violations caused Plaintiffs direct harm, including, but not limited to, respiratory damage, abrasions, and bruising.

211.    Each of the Plaintiffs would like to continue to render aid to protest participants in future protests.  Each of them is in fear that the Federal Defendants will take actions and perform operations to violate their First Amendment rights, as they have been doing night after night.

212.    Any available statutory remedy that the Plaintiffs might have to redress their harm does not provide a meaningful remedy.

213.    Therefore, Plaintiffs are entitled to damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

## (Violation of the Fourth Amendment Against the Federal Doe Defendants in their Official and Individual Capacities)

214.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

215.    This action arises under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

216.    Regardless of the existence of an implied cause of action under *Bivens*, the federal courts have inherent authority to grant injunctive relief to direct compliance of the federal government and individual federal officials with the Fourth Amendment.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

217.    Plaintiffs have a constitutionally protected right under the Fourth Amendment, which guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." That right includes freedom from excessive force by federal law enforcement officers.

218.    The Federal Doe Defendants, acting under color of federal authority, which includes, but is not limited to, the Executive Order, violated Plaintiffs' rights under the Fourth Amendment, by using excessive force.

219.    For example, the Federal Doe Defendants intentionally violated Plaintiffs' Fourth Amendment rights as alleged above, by, among other things, firing tear gas and pepper balls specifically at Plaintiffs Durkee and Guest, while those Plaintiffs moved injured protesters out of the way and to safety. They also forcefully shoved Plaintiff Durkee while he walked backwards with his arms raised, causing both him and Plaintiff Guest to fall. Some of the Federal Doe Defendants then beat both of them with truncheons multiple times.

220.    The Federal Doe Defendants also fired tear gas and rubber bullets directly at Plaintiff Guest, while she attempted to provide first aid to a protester.

221.    And with respect to Plaintiff Wise, the Federal Doe Defendants shot him in the legs with pepper balls, as he stood in clearly marked "red-cross" clothing in a park that did not contain any federal property.

222.    Each of those constitutional violations caused Plaintiffs direct harm, including, but not limited to, respiratory damage, abrasions, and bruising.

223.    Each of the Plaintiffs would like to continue to render aid to protest participants in future protests. Each of them is in fear that the Federal Defendants will take actions and perform operations to violate their Fourth Amendment rights, as they have been doing night after night.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

224.    Any available statutory remedy that the Plaintiffs might have to redress their harm does not provide a meaningful remedy.

225.    Therefore, Plaintiffs are entitled to damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

## (Administrative Procedures Act ("APA") Against the Federal Defendants)

226.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

227.    As authorities of the United States Government, the Federal Defendants are "agencies" as defined under the federal APA.

228.    Under the APA, the Federal Defendants are prohibited from acting in ways that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "contrary to constitutional right."  5 U.S.C. § 706.

229.    The Executive Order authorizes the Federal Defendants to provide law-enforcement services in Oregon, solely for the purpose of "providing assistance for the protection of federal monuments, memorials, statues, and property."

230.    Additionally, ORS 133.245 authorizes federal law enforcement officers to "arrest a person" in Oregon for violations of state law.

231.    Notwithstanding the limitations of the Executive Order and ORS 133.245, the Federal Defendants have adopted a policy and have given direction to federal officers to engage in generalized anti-protest law enforcement, including dispersal of crowds with uses of force such as deployment of chemical irritants and munitions to quell protest activity.  Federal officials' public statements indicate that the anti-protest law enforcement authorized and directed pursuant to these policies

50-  COMPLAINT

and directives are without regard to the location or other nexus with federal monuments, memorials, statues, and property.

232.    Through the above-described policies and directions, and with implementation of those policies and directions against the individual Plaintiffs and others, the Federal Defendants have acted arbitrarily and capriciously, abused their discretion, and not in accordance with the Executive Order and ORS 133.245.

233.    Plaintiffs have suffered a legal wrong because of the Federal Defendants' actions; they have been adversely affected or aggrieved by those actions; and they will continue to be adversely affected by them night after night. Plaintiffs are thus entitled to judicial review thereof and injunctive relief.

234.    Therefore, Plaintiffs request that the Court hold the Federal Defendants' actions unlawful, pursuant to the APA, and grant all appropriate relief.

## SIXTH CAUSE OF ACTION

### (Declaratory Judgment)

235.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

236.    Plaintiffs intend to continue rendering aid to protest attendees in Portland as a show of their solidarity and support for the protesters' message, the Black Lives Matter movement, and for their own message to Defendants that their violence will not deter Oregonians from exercising their free speech rights. Plaintiffs are fearful, however, that they will be subjected to police violence or dispersed without reason. Plaintiffs are also fearful that the police will continue to use "kettling" tactics against protesters that sweep in all protest attendees.

237.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant issuing a

51-  COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

declaratory judgment that threatening Plaintiffs with arrest, arresting them, and targeting them for uses of force, while they were engaged in constitutionally protected acts of speech and expressive conduct during protests, including rendering first aid to protest attendees, violates the First Amendment.

238.   As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant issuing a declaratory judgment that threatening Plaintiffs with arrest, arresting them, and targeting them for uses of force, while they were engaged in constitutionally protected acts of speech and expressive conduct during protests, including rendering first aid to protest attendees, violates the Fourth Amendment.

239.   A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights to engage in constitutionally protected acts of speech and expressive conduct during protests, including rendering first aid to protest attendees.

240.   Plaintiffs are entitled to a declaratory judgment that Defendants may not threaten them with arrest, arrest them, or target them for uses of force, while they are engaged in constitutionally protected acts of speech and expressive conduct during protests, including rendering first aid to protest attendees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief against Defendants as follows:

A.   Declaratory relief;

B.   Injunctive relief;

C.   Compensatory damages;

D.   Punitive damages;

E.   An award of pre-judgment interest;

52- COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

F.     An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and

the Equal Access to Justice Act;

G.     Any other relief the Court deems proper.


DATED:  July 22, 2020                                PERKINS COIE LLP


                                                     By: */s/ Rian Peck*
                                                     _____
                                                     **Rian Peck**, OSB No. 144012
                                                     **Thomas R. Johnson**, OSB No. 010645
                                                     **Misha Isaak**, OSB No. 086430
                                                     **Nathan Morales**, OSB No. 145763
                                                     **Shane Grannum**, *pro hac vice* pending
                                                     **Sarah Mahmood**, *pro hac vice* pending
                                                     **Zachary Watterson**, *pro hac vice* pending
                                                     PERKINS COIE LLP

                                                     **Kelly K. Simon**, OSB No. 154213
                                                     AMERICAN CIVIL LIBERTIES UNION
                                                     FOUNDATION OF OREGON

                                                     *Attorneys for Plaintiffs*


53-  COMPLAINT