**Rian Peck** (they/them), OSB No. 144012
RPeck@perkinscoie.com
**Thomas R. Johnson** (he/him), OSB No. 010645
TRJohnson@perkinscoie.com
**Misha Isaak** (he/him), OSB No. 086430
MIsaak@perkinscoie.com
**Nathan Morales** (he/him), OSB No. 145763
NMorales@perkinscoie.com
PERKINS COIE LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Telephone: 503.727.2000
Facsimile: 503.727.2222

**Shane Grannum** (he/him), *pro hac vice* pending
SGrannum@perkinscoie.com
**Sarah Mahmood** (she/her), *pro hac vice* pending
SMahmood@perkinscoie.com
PERKINS COIE LLP
700 13th Street, NW, Suite 800
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211

**Zachary Watterson** (he/him), *pro hac vice* pending
ZWatterson@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350

**Kelly K. Simon** (she/her), OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: 503.227.6928

Attorneys for Plaintiffs

MARTINEZ DECLARATION IN SUPPORT OF
PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **CHRISTOPHER WISE, MICHAEL MARTINEZ, CHRISTOPHER DURKEE,** and **SAVANNAH GUEST,** individuals,<br><br>    Plaintiffs,<br><br>v.<br><br>**CITY OF PORTLAND,** a municipal corporation**; OFFICER STEPHEN B. PETTEY,** in his individual capacity**; JOHN DOES 1-60,** individual and supervisory officers of Portland Police Bureau**; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. MARSHALS SERVICE; JOHN DOES 61-100**, individual and supervisory officers of the federal government,<br><br>    Defendants. | Case No. 3:20-cv-01193-IM<br><br>**Declaration of Michael Martinez in Support of Plaintiffs' Motion for Temporary Restraining Order** |

MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

I, Michael Martinez, declare as follows:

1. I live in Portland, Oregon, and am 28 years old. I have personal knowledge of the facts described in this declaration.

2. I have been a graduate student at Oregon Health & Sciences University since the fall of 2019. I am in OHSU's doctoral program for Medical and Molecular Genetics.

3. After Minneapolis police officer Derek Chauvin murdered George Floyd in late May of this year, I began attending the Black Lives Matter protests in downtown Portland as a non-medic protester, to express my support for the Black Lives Matter movement and to protest systemic racism, especially as it pertains to policing and police violence.

4. I first attended a protest on Tuesday, June 2, with another OHSU graduate student, Adrian Baris.

5. The protest began in Pioneer Square and was peaceful, with the crowd chanting and a few people addressing the protesters on a megaphone. Sometime around 9:00 p.m., we marched as a group a couple of blocks east to Third Avenue.

6. About fifteen minutes later, Portland police officers appeared in full riot gear. The police formed lines surrounding the protesters to the east and south.

7. Neither Adrian nor I were engaged in any conduct that presented a danger or threat to public safety, and I also did not see any other protesters engaging in conduct that would rise to that level. From my observations, the protest had been peaceful up to this point. Given that there was no riot—and in fact the crowd was peaceful—we chanted at the police officers: "Take off your riot gear! We don't see no riot here!"

1- MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

8. I was shocked when, without warning and only about five minutes after they arrived, Portland police suddenly began shooting tear gas and munitions into the crowd, for no apparent reason.

9. Like most of the protesters, Adrian and I were both negatively affected by the tear gas that the police shot at us—we had difficulty breathing and seeing, burning eyes, and feelings of grogginess and confusion. Indeed, given the enormous amount of tear gas the Portland police deployed on the protesters on June 2, that day became known as "Tear Gas Tuesday."

10. Fortunately, the munitions that the police shot into the crowd missed me. But the police hit Adrian with a rubber bullet or similar munition on her upper thigh, causing her pain and extensive bruising that lasted for days.

11. The police violence I witnessed—and experienced firsthand—strengthened my belief that protesting police brutality was necessary and important. So, after recovering from Tear Gas Tuesday, I began attending the protests again on June 5, and nearly every night after that, at Chapman Square in front of the Multnomah County Justice Center.

12. The night I returned to the protests, on the evening of June 5, the Portland police used a "kettling" tactic against the peaceful protesters. As I understand it, "kettling" is a technique in which police officers form a line, require protesters to move in a certain direction in accordance with the officers' orders, and tear gas them from all angles, cutting off any meaningful path for escape. By definition, there is nowhere to disperse, because the tear gas surrounds the crowd on all sides. It is intended to inflict pain by maximizing exposure to tear gas.

13. Among the protesters I saw trying to escape the police violence that night was a mother with her baby in a stroller near the Multnomah County

2- MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

Courthouse. The mother couldn't move quickly enough away from the police and sought shelter near the courthouse wall. Yet again, this strengthened my belief that the police were not protecting the City or our citizens from anything—they were just retaliating against protesters for decrying the police's own misconduct.

14. For the first several weeks of the protests, the Portland Police placed a fence between Chapman Square and the Justice Center and ordered the protesters not to touch it. However, given the number of people participating in the protests, the relatively small size of Chapman Square, and the level of emotion involved—of protesters wanting the police and the disproportionately Black, Indigenous, and Brown population of prisoners inside the Justice Center to hear their voices—it was nearly impossible for the protesters to avoid touching the fence.

15. On most nights, the police alleged some violation of the "no-fence-touching" order (from someone shaking it to merely touching it) to declare an "unlawful assembly" and, allegedly based on such "infraction," would then begin indiscriminately discharging tear gas and other "less lethal" munitions at me and the hundreds of other protesters. Portland Police used tear gas against us protesters nearly every night until this Court entered an injunction in the Don't Shoot PDX case on June 9.

16. As the nights went on, I became increasingly angry at how the police were taking an "us vs. them" mentality toward peaceable protests aimed at amplifying the message that Black Lives Matter and attempting to hold police accountable for their disproportionate violence toward Black lives. Somewhat ironically, the police's conduct essentially proved the points we were trying to make.

17. The police have justified injuring hundreds of people based on alleged minor violations of their orders (*e.g.*, touching the fence or throwing empty water

3- MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

bottles at the riot-gear clad police) that have not caused injury or presented any meaningful danger. Instead of just arresting the few outlier protesters who may have posed a safety risk, I repeatedly saw the police shoot tear gas at the whole crowd of peacefully congregated children and adults, beginning on Tear Gas Tuesday and continuing on the other nights I attended.

18. In total, I attended the protests as a non-medic protester between five and ten times.

19. While I was still attending the protests as a non-medic protester, some graduate students and faculty members at OHSU began organizing a group of volunteers to serve as protest medics. As OHSU personnel, they have access to medical supplies that other people do not have. I decided to join them, because it was important for me to take a tangible stand against the nightly police brutality I was witnessing and experiencing. I wanted to send a message—to both police and protesters—that protesters have a right to protest safely and without fear of police violence, and that journalists also have the right to report on any police violence that occurs without the fear of police violence. And, because I had witnessed many nights of the police freely discharging tear gas or "less lethal" munitions against protesters, journalists, neutrals, and legal observers alike, I wanted to do my part to help ensure that protesters the police injured had the ability to obtain basic first aid and other healthcare, and would suffer as little harm as possible, so they could continue exercising their rights to freedom of assembly and free speech. By my presence, I also wanted to convey to protesters that someone was there for them and they would have access to care if they needed it—something I hope will make protesters and journalists feel safer to participate.

4- MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

20. The work I am doing in furtherance of the protests is especially important now, when those exercising their First Amendment right to protest face the dangers of the COVID-19 pandemic, which are then exacerbated by tear gas, pepper spray, and other police violence. Indeed, during the many nights I have been at the protests, I have witnessed the police on many occasions, rather than protecting the protesters, actively harm them not just by inflicting pain, but also by instructing ambulances not to enter the protest area.

21. As a rough estimate, I have attended the protests as a medic on approximately 15–20 different dates.

22. I began serving as a protest medic with the OHSU group on June 8, 2020. Our first couple of nights, Adrian Baris and I carried backpacks and distributed food and water to protesters. Eventually, on June 11, we set up a table in Chapman Square. The table was clearly marked as a medics' station—it had a banner draped across it displaying the OHSU logo and was under a tent marked with a medic symbol and other first aid signs. We were clearly marked for a few reasons, including that we wanted people to be able to find us quickly. As I mentioned, we also wanted to be visible to provide the protesters with some assurance that help was close at hand.

23. We kept (and still keep) a variety of supplies at the OHSU medics' station. This includes medical supplies such as gauze, bandages, antibiotic ointments, tape, ear plugs, and over-the-counter pain medications. We also offer wipes and saline solution or other eye wash to help rinse peoples' eyes following a tear gas attack. Beyond medical supplies, we keep the table stocked with snacks and water to ensure that protesters remain sufficiently nourished. And given the current pandemic, we offer personal protective equipment such as masks, gloves,

5- MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

and hand sanitizer—so that protesters and other medics can observe recommended safety measures. Our supplies are donated from community members and local businesses.

24. We typically have our OHSU medics' station set up from 8:00 p.m. to 11:00 p.m. Though we pack up our station around 11:00, we have someone who comes to pick them up, and then the medics keep on working on the ground at the protest. We stay for as long as we need to—however long it takes for us to feel that the protest attendees are no longer in danger of being hurt by police. Most nights, we are there until at least 2:00 a.m. and, sometimes, even until 4:00 a.m.

25. As our OHSU volunteer group became more organized, we had two different kinds of medics: (1) "tablers," or those who stay at the table and hand out supplies to other medics and protesters, and (2) "runners," or those who go "into the field" to provide support to other medics or direct care to protesters wherever that care is needed.

26. I have basic first aid training, so I typically am a "tabler" and do not provide direct physical care to protesters. Instead, I assist other medics who have higher levels of training by making sure they have adequate supplies. I also make sure that protesters have eye wipes, eye solution, and other supplies they need to feel safe when the police begin using force.

27. It is better to provide these supplies directly to protesters, because there are not enough medics to care for the large crowds of people injured by the police's tear gas and other "less lethal munitions." Injuries from tear gas include vomiting, coughing, eye irritation, and grogginess for up to several days. And given that the Portland police and Federal Officers deploy so much of it that it coats

6- MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

entire city blocks, there is no way protest medics could attend to the hundreds of affected people.

28.     The strategy of providing supplies directly to protesters also allows protest medics to focus on protest attendees who may require a higher level of care. Medics have, for example, provided care to at least a dozen protesters shot in the head by Portland Police and Federal Officers. We have also seen bleeding and lacerations, burn wounds from flashbangs and tear gas canisters being thrown too closely to people, a variety of sprains from people tripping when trying to move quickly and comply with the officers' orders or from the police tripping them. Just this week, I assisted a medic who was treating yet another head wound from a rubber bullet. The person was in and out of consciousness and bleeding heavily, and we had to carry them several blocks away to a car that could transport them to a hospital.

29.     Protest medics also treat bystanders who are not protest participants. For instance, OHSU medics have assisted with helping care for a houseless person who appeared to be experiencing an opioid overdose. Following that incident, the OHSU medics (including me) now carry naloxone nasal spray so we are prepared for these types of situations. There are many houseless individuals who spend time near the protest area, because there has been an effort to provide all manner of humanitarian aid there. There is a barbecue restaurant that serves anyone who is hungry. There are people who help anyone who wants to fill out job applications and write resumes. There are sometimes barbers there to give free haircuts. Thus, the care that street medics provide is only one piece of the puzzle when it comes to community support for protesters and non-protesters alike.

7- MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

30. I have at times directly assisted protesters by helping wash out their eyes after they have been exposed to tear gas or apply bandages to minor wounds. When providing this care, I do not interfere with police officers and do my best to stay out of their way.

31. Although I am with the OHSU volunteer medics' group, I am familiar with many of the other groups that serve as protest medics. We coordinate with each other to understand the services one another provides—food and water, mental health crisis support, trauma care, etc. This ensures that we can best serve the protest attendees and non-protesters who are at the protests. For instance, Plaintiff Chris Wise coordinates with the OHSU group very often. We often share supplies with him and we will talk about particular police strategies we have seen, as they relate to any injury trends or safety concerns that we can be proactive to watch out for.

32. While serving as a protest medic, I have, among other things, been shoved, shot at, and tear gassed by both Portland Police and Federal Agents. I have witnessed other protest medics from the OHSU group, and from other groups, suffer the same (or even worse) treatment. For instance, Plaintiff Chris Wise is injured often. If I don't see it happen directly, I will still often see his wounds as they are healing. I was at the protest when a federal officer shot a tear gas canister at Chris's head. Although I did not see the incident itself, I was there to support him with any care he needed.

33. The night of June 13 is a particularly memorable one for me. That night, I worked as a medic at the OHSU station beginning around 9:00 p.m. We were stationed near the corner of Fourth Avenue and Madison Street in Chapman Square and had set up a table with water, food, and personal protective equipment

8- MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

to protect against Covid-19 and police munitions. The protesters were mainly congregated in front of the federal courthouse, adjacent to Chapman Square.

34. That night at around 10:30 p.m., I was standing at the OHSU medic station when I heard the Portland police using their long-range acoustic device (LRAD) sound system to make an announcement. I was not in direct earshot of the LRAD, which was positioned around Second Avenue and Main Street, so I could not quite hear what the police were saying for about five minutes. I eventually was able to discern their announcement: They had declared an "unlawful assembly" and were ordering protesters to disperse or else be subject to "crowd control" munitions, tear gas, or arrest. In the past, the police had typically given about a 30-minute warning before attacking the protesters using crowd control munitions. We at the OHSU medics' station therefore spent about five minutes handing out eye wash and wipes to as many protesters as we could and then began packing up our supplies, which we knew from experience usually takes us around 20 minutes.

35. About five minutes after we started packing our supplies, the police stormed the crowd. I saw a line of police coming directly towards our tent, so I started filming the scene using Adrian Baris's phone. Our tent was still standing and it was clear that it was a medics' station. I stood in front of the tent, closest to the police, while the other OHSU volunteers were moving quickly to break down the station. When the police approached, we explained that we were packing up our supplies.

36. The police told us to leave and directed us to move west. The police further stated that if we did not comply, we would be arrested.

37. I stood between the officers and the OHSU volunteers, continuing to film, as the volunteers began complying with the officers' orders. I also began

9- MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

moving to the west, walking backwards to keep the camera trained on the officers.

38. After I had taken two or three steps, an officer pointed at me and said, "Arrest that guy. Arrest him." An officer (who I later learned was Officer Stephen B. Pettey) then arrested me, placing zip ties around my wrists.

39. I did not resist arrest and in fact told the officers that one of the zip ties had slipped off my wrist because they had not tightened it enough. I was wearing a CamelBak backpack, and the police cut the straps to remove it.

40. They then took me to the Justice Center, where I was detained until the National Lawyers Guild arranged for bail to be posted on my behalf. I was released from the Justice Center at approximately 5:30 a.m.

41. Although I was under arrest and not there at the time, I have learned from the other OHSU protest medics that the police confiscated our tent, table, medical supplies, and banner. An OHSU faculty member later found our table and a small portion of our medical supplies in the Portland Police Bureau's outgoing trash, but to this day, we have not received our tent, banner, or most of our medical supplies. We have had a new banner made, but we operate without a tent now.

42. Following my arrest, the OHSU protest medic group was forced to limit its operations to protect our safety from police violence and arrest. For example, we usually would start packing up our tent and supplies by 11:00 p.m., because, in our experience, the police tended to declare an "unlawful assembly" and begin using tear gas and making arrests around 11:30 p.m. On some nights, however, the police would surprise us and begin exerting aggressive "crowd control" tactics even earlier than expected, forcing us to stop providing services to the protesters, pack up our tent and supplies, and leave much earlier than we wanted. Given the message of support we were trying to give to the protesters (and public at

10- MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

large), I would have stayed much later and continued offering services to the protesters if I did not fear physical violence or arrest by the Portland Police or Federal Agents. We also started keeping roll of all OHSU volunteer medics and instituted a buddy system for medics to watch over one another. Finally, we have a communications team that, from home, watches live streams of the protests and keeps an eye on other relevant social media posts to keep the protest medics apprised of any potential issues. If any protest medics do not check in with the communications team after a certain period of time, we have a protocol in place for checking on the protest medic's safety.

43. Although I would like to continue attending the protests as frequently as I had prior to my arrest to demonstrate to the police and federal that the protests will continue despite their violent response, I have dramatically decreased my attendance. In the weeks leading to my arrest, I had attended the protests nearly every night. After June 13, I scaled back to attending only two or three nights per week. I do not want to be arrested again. And, as I know from first-hand experience, the police do not need a justifiable reason to arrest any medic—or shoot any medic in the head. In fact, I believe that the police are deliberately taking headshots and attempting to maim and injure medics and protesters as much as possible, to prevent them from coming back.

44. I did attend the protests on July 4, a night that I and many medics expected could be an especially brutal one, given the historic significance of how Independence Day is not, in fact, a day of independence for all. A couple of the OHSU protest medics were so concerned about potential police violence that they turned the back seat of their car into a makeshift ambulance, doing things like

11- MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

covering the seats in sheeting and equipping the car with as many trauma supplies as would fit.

45. On the days I do still attend the protests, I've observed the police violence getting progressively worse and worse. Just this week, I saw the federal officers throw flash bang grenades and fire tear gas and pepper balls at a group of non-threatening, suburban mothers who had formed a line at the front of the protest to form a "human shield" for the other protesters. In short, the police response has been completely disproportionate, and the escalation of their violence in the face of growing support for the protests only goes to show that the police are not concerned for safety of persons or property; they simply view these protests as an affront to them personally and take it out on protest attendees accordingly.

46. I intend to continue going to the protests and serving as a medic for as long as they are happening and for as long as police violence—or the threat of police violence—continues. Showing up for protest attendees in that way is my form of protest, and the Portland police's and federal officers' actions have only served to confirm that doing so is necessary.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

DATED this 23rd day of July 2020 at Portland, Oregon.

> */s/ Michael Martinez*
> Michael Martinez

12- MARTINEZ DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222