ETHAN P. DAVIS
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
DAVID M. MORRELL
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel
JEFFREY A. HALL
KERI BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 616-5084
Fax:    (202) 616-8470

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| CHRISTOPHER WISE, *et al.*, | Case No. 3:20-cv-01193-IM |
| Plaintiffs, | **FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| CITY OF PORTLAND, *et al.*, | |
| Defendants. | |

FEDERAL DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 3

I.    Recent Destruction of Federal Property and Assaults on Federal Officers in Portland ...............................................................................................3

II.    Legal Authority to Protect Federal Property .................................................8

STANDARD FOR EMERGENCY RELIEF ............................................................ 11

ARGUMENT ................................................................................................. 12

I.    Plaintiffs Lack Standing to Obtain an Injunction Against Federal Defendants .................12

II.    Plaintiffs Are Not Likely to Succeed on the Merits Because They Will Not Suffer a First or Fourth Amendment Violation, and the Injunction They Seek is Legally Improper ....................................................................................19

    A.    Plaintiffs have not demonstrated that Federal Defendants violated their constitutional rights or will continue to do so....................................... 19

        1.    Plaintiffs fail to show that the lack of special privileges for "protest medics" is First Amendment retaliation ....................................19

        2.    Plaintiffs have not shown that Federal Defendants used excessive force. ....................................................................................24

    B.    The legally improper injunction Plaintiffs seek is overbroad and legally improper ...................................................................... 28

III.  Plaintiffs Cannot Demonstrate Irreparable Harm............................................32

IV.  Both the Balance of the Equities and Public Interst Weigh Against Granting an Injunction......................................................................................33

CONCLUSION................................................................................................ 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*All. for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ............................................................ 11

*Barney v. City of Eugene,*
   20 F. App'x 683 (9th Cir. 2001) ........................................................ 20

*Bayer v. City of Simi Valley,*
   43 F. App'x 36 (9th Cir. 2002) ..................................................... 26-27

*Bell v. Keating,*
   697 F.3d 445–58 (7th Cir. 2012) ....................................................... 34

*Blackburn v. United States,*
   100 F.3d 1426 (9th Cir. 1996) ............................................... 30-31, 32

*Blair v. Shanahan,*
   38 F.3d 1514 (9th Cir. 1994) ............................................................. 15

*Blum v. Yaretsky,*
   457 U.S. 991 (1982) ........................................................................... 15

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ........................................................................... 29

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ............................................................. 12

*Cantwell v. Connecticut,*
   310 U.S. 296 (1940) ............................................................... 29-30, 30

*Capp v. City of San Diego,*
   940 F.3d 1046 (9th Cir. 2019) ........................................................... 20

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ...................................................................... passim

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ........................................................... 12, 17, 19

*Curtis v. City of New Haven,*
   726 F.2d 65 (2d Cir. 1984) ................................................................ 16

*E. Bay Sanctuary Covenant v. Barr,*
   934 F.3d 1026 (9th Cir. 2019) ........................................................... 29

*Eggar v. City of Livingston,*
   40 F.3d 312 (9th Cir. 1994) ............................................................... 16

*Feiner v. New York*,
  340 U.S. 315 (1951) ...................................................... 29, 33

*Felarca v. Birgeneau*,
  891 F.3d 809 (9th Cir. 2018) ...................................... 24, 26, 28

*Forrester v. City of San Diego*,
  25 F.3d 803 (9th Cir. 1994) ................................................. 27

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) .............................................. 12

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ...................................................... 29

*Graham v. Connor*,
  490 U.S. 386 (1989) ................................................... 9, 10, 28

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ...................................................... 20, 34

*Index Newspapers, Inc. v. City of Portland, No. 3:20-cv-1035-SI*,
  2020 WL 4220820 (D. Or. July 23, 2020) ......................... 7, 17

*Int'l Soc. For Krishna Consciousness, Inc. v. Lee*,
  505 U.S. 672 (1992) ............................................................ 34

*Jackson v. City of Bremerton*,
  268 F.3d 646 (9th Cir. 2001) ............................................. 27

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
  941 F.2d 970 (9th Cir. 1991) ............................................. 29

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ........................................... 11

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...................................................... 13, 14

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
  192 F.3d 1283 (9th Cir. 1999) ........................................... 19

*Menotti v Seattle*,
  409 F.3d 1113 (9th Cir. 2005) ........................................... 21

*Mims v. City of Eugene*,
  145 F. App'x 194 (9th Cir. 2005) ...................................... 20

*Munns v. Kerry*,
   782 F.3d 402 (9th Cir. 2015) ........................................................................ 17

*Murphy v. Kenops*,
   99 F. Supp. 2d 1255–60 (D. Or. 1999) ......................................................... 16

*Nelsen v. King Cty.*,
   895 F.2d 1248 (9th Cir. 1990) ................................................................. 13, 14

*Nelson v. City of Davis.*,
   685 F.3d 867 (9th Cir. 2012) ........................................................................ 27

*Nieves v. Bartlett*,
   139 S. Ct. 1715 (2019) ............................................................................ 21, 22

*Nken v. Holder*,
   556 U.S. 418 (2009) ...................................................................................... 33

*Olagues v. Russoniello*,
   770 F.2d 791 (9th Cir. 1985) ........................................................................ 32

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ................................................................................. 14, 16

*Pac. Kidney & Hypertension, LLC v. Kassakian*,
   156 F. Supp. 3d 1219 (D. Or. 2016) ............................................................. 11

*Rendish v. City of Tacoma*,
   123 F.3d 1216 (9th Cir. 1997) ...................................................................... 32

*Ringgold-Lockhart v. Cty. of Los Angeles*,
   761 F.3d 1057 (9th Cir. 2014) ...................................................................... 34

*Rizzo v. Goode*,
   423 U.S. 362 (1976) ...................................................................................... 16

*Rosenblum v. Does 1-10*,
   2020 WL 4253209 (D. Or. July 24, 2020)........................... 7, 13-14, 15, 16

*Starbuck v. City & Cty. of San Francisco*,
   556 F.2d 450 (9th Cir. 1977) ........................................................................ 17

*Steel Co. v. Citizens for a Better Environment*,
   523 U.S. 83 (1998) ........................................................................................ 13

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ...................................................................................... 12

*United Presbyterian Church v. Reagan*,
   738 F.2d 1375 (D.C. Cir. 1984) .................................................................... 13

*United States v. Christopher*,
   700 F.2d 1253 (9th Cir. 1983) ............................................................ 9

*United States v. City of Arcata*,
   629 F.3d 986 (9th Cir. 2010) ...................................................... 30, 31

*United States v. Griefen*,
   200 F.3d 1256 (9th Cir. 2000) .............................................. 33-34, 34

*United States v. Patane*,
   542 U.S. 630 (2004) ........................................................................ 28

*United Steelworkers of Am. v. Milstead*,
   705 F. Supp. 1426 (D. Ariz. 1988) ................................................. 27

*Updike v. Multnomah Cty.*,
   870 F.3d 939 (9th Cir. 2017) ..................................................... 14, 15

*Washington Mobilization Committee v. Cullinane*,
   566 F.2d (D.C. Cir. 1997) ............................................................... 29

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ........................................................................ 14

*Wilkinson v. Torres*,
   610 F.3d 546 (9th Cir. 2010) .......................................................... 25

*Williams v. Birmingham Bd. Of Educ.*,
   904 F.3d 1248 (11th Cir. 2018) ................................................. 16-17

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................ 11

## Constitution

U.S. Const., amend. I ............................................................... passim

U.S. Const., amend. IV ............................................................ passim

## Statutes

18 U.S.C § 111 .......................................................................... 8, 34

18 U.S.C. § 1361 ............................................................................ 34

28 U.S.C. § 566 ........................................................................ 10, 11

40 U.S.C. § 1315 .......................................................................... 8, 9

Or. Rev. Stat. § 133.005 ................................................................ 31

Or. Rev. Stat. § 133.245 ................................................................ 31

**Regulations**

41 C.F.R. § 102-74.390 ................................................................................................................. 9

28 C.F.R. § 0.111 ........................................................................................................................ 10

## **INTRODUCTION**

During weeks of protests in Portland, violent agitation directed against federal property and federal officers charged with defending that property has occurred on nearly a daily basis. While many of the protesters peacefully assemble, it is now the unfortunate norm that federal officers can expect violence, fireworks, organized efforts to destroy protective barriers, projectiles, and myriad other incursions and assaults during the night. This creates an exotic and unsafe environment.  In this setting, federal officers seek to preserve order. Plaintiffs, who identify themselves as volunteer medics, seek the extraordinary remedy of a temporary restraining order and preliminary injunction against these officers. Plaintiffs base their request for emergency injunctive relief on alleged violations of their First and Fourth Amendment rights. Such an order or injunction is manifestly unwarranted. Their request should fail for several reasons.

First, Plaintiffs lack standing to seek emergency relief. It is well established that a plaintiff lacks standing to obtain prospective injunctive relief for alleged future injuries based on allegations of prior harm. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). Yet that is Plaintiffs' argument here—they seek to have the Court enter an emergency injunction based on alleged past encounters involving federal law enforcement officers, but have not demonstrated that similar incidents will take place in the future, much less that these *particular* plaintiffs will again experience the same alleged conduct by federal law enforcement officers. Because Plaintiffs cannot demonstrate a certainly impending injury, they lack standing to seek injunctive relief. For many of these same reasons, Plaintiffs also cannot show a likelihood of irreparable harm, a prerequisite for granting emergency injunctive relief. And even if Plaintiffs could support a request for injunctive relief with purely retrospective evidence of constitutional violations, they have not shown constitutional violations here.

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 1

Second, the relief that Plaintiffs seek is entirely improper. Plaintiffs seek a sweeping injunction that would add to the complexity of the split-second judgments that federal law enforcement officers have to make during dynamic, chaotic situations. By granting immunity to self-identified "protest medics" from lawful orders to disperse and from other legitimate law enforcement efforts to bring civil disturbance under control, the injunction would effectively shield them from otherwise applicable legal requirements and would improperly bind the hands of law enforcement, including by preventing them from taking appropriate action when individuals are engaging in criminal conduct. The proposed injunction would also require law enforcement officers, while responding to a violent situation threating public safety, to draw real-time fine distinctions among a crowd based on who is displaying particular symbols or words on their clothing (symbols and words that are easy to fabricate), all under the threat of potential contempt.

Third, and finally, the balance of the equities and the public interest counsel against granting Plaintiffs' request. An undefined right to practice protest medicine is not being threatened by the actions of the federal defendants in protecting federal property. And in any event, such a right would not outweigh the public interest in the safety of all individuals present at the protests, including federal law enforcement officers present there to protect federal property. Simply put, the federal government has the legal obligation and right to protect federal property and federal officers, and the public has a compelling interest in the protection of those personnel and that property. Self-described "protest medics" are free to observe and to render aid when they can do so lawfully, but they are not entitled to special, all-access passes behind police perimeters.

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 2

## BACKGROUND

### I.    Recent Destruction of Federal Property and Assaults on Federal Officers in Portland

For over two months, Portland has witnessed daily protests in its downtown area. *See* Declaration of Gabriel Russell ¶ 3, Federal Protective Service (FPS) Regional Director, (attached as Exhibit 1). While the majority of individuals participating in these daily protests have been peaceful, the protests have devolved into nightly criminal activity, including vandalism, destruction of property, looting, arson, and assault. *See id.*

Federal buildings and property have been the targets of many of these attacks, including the Mark O. Hatfield Federal Courthouse, the Pioneer Federal Courthouse, the Gus Solomon Federal Courthouse, the U.S. Immigration and Customs Enforcement (ICE) Building, and the Edith Green Wendall Wyatt Federal Office Building. *See* Russell Decl. ¶ 4. For example, on May 28, 2020, the ICE Portland Field Office was targeted by a Molotov Cocktail. *See* Affidavit of Special Agent David Miller ¶ 5 (July 4, 2020), *United States v. Olsen*, 20-mj-00147 (D. Or) (Exhibit 2). The Mark O. Hatfield Courthouse has experienced significant damage to its façade and building fixtures, including the vandalism and theft of building security cameras and access control devices. *Id.* The most recent repair estimate for the damage at the Hatfield Courthouse is in excess of $50,000. *Id.*

Officers protecting these properties have been subjected to threats, rocks and ball bearings fired with wrist rockets, improvised explosives, aerial fireworks, commercial grade mortars, high intensity lasers targeting officers' eyes, full and empty glass bottles, and balloons filled with paint and other substances such as feces. Russell Decl. ¶ 4. In one incident, a protester wielding a two-pound sledgehammer struck an officer in the head and shoulder when the officer tried to prevent the protester from breaking down a door to the Hatfield Courthouse. *Id.* To date,

118 injuries to federal law enforcement officers during the rioting have been reported. Injuries include broken bones, hearing damage, eye damage, puncture wounds, lacerations, a dislocated shoulder, sprains, strains, and contusions. *Id.*; *see* Acting Secretary Wolf Condemns The Rampant Long-Lasting Violence in Portland (July 16, 2020) (Exhibit 3) (listing over 75 separate incidents of property destruction and assaults against federal officers between May 29, 2020 and July 15, 2020); see also DHS, FPS, and CBP Press Conference July 21, 2020, available at https://www.youtube.com/watch?v=2XTYITCtFlc (last visited July 28, 2020).

In response to the damage to federal property and assaults on federal law enforcement officers, DHS deployed federal officers to Portland to protect federal buildings and property. Russell Decl. ¶ 6. Although the numbers fluctuate in response to the situation and to staffing considerations, as of July 28, several hundred federal law enforcement officers from the FPS, ICE, U.S. Customs and Border Protection (CBP), and the US Marshals Service (USMS) were protecting federal facilities in downtown Portland. *Id.* From May 27 until July 3, officers were stationed in a defensive posture intended to de-escalate tensions by remaining inside federal buildings and only responding to breach attempts or other serious crimes. *Id.* This attempt to de-escalate was met with an increasingly violent series of attacks against federal officials and property, which wave of attacks culminated in a brazen effort to break into and set fire to the Hatfield Courthouse in the early morning hours of July 3, 2020. *Id.* A group of individuals used teamwork and rehearsed tactics to breach the front entry of the Courthouse by smashing the glass entryway doors. *Id.* The individuals threw balloons containing an accelerant liquid into the lobby and fired powerful commercial fireworks towards the accelerant in an apparent attempt to start a fire. *Id.*

The violence against federal officers and federal property over the Fourth of July holiday weekend resulted in the arrests of multiple individuals, including individuals who breached the Hatfield Courthouse and fired a mortar firework inside, destroyed a closed-circuit video camera mounted on the exterior of the Courthouse, assaulted a federal officer with a shield while the officer was attempting to arrest another protester, and assaulted federal officers with high-intensity lasers. *See* Seven Arrested, Facing Federal Charges After Weekend Riots at Hatfield Federal Courthouse (July 7, 2020) (Exhibit 4). In response to the increasingly violent attacks, DHS implemented tactics intended to positively identify and arrest serious offenders for crimes such as assault, while protecting the rights of individuals engaged in protected free speech activity. Russell Decl. ¶ 6.

Plaintiffs' motion focuses on the response by federal law enforcement officers to violence on a few evenings. On the evening of July 11 into the early morning of July 12, 2020, the crowd of protesters near the Hatfield Courthouse grew to approximately 300 people. Russell Decl. ¶ 8. A barrier of police tape was put across the front of the Hatfield Courthouse and protesters were ordered not to trespass but did so. *Id.* As a joint team of FPS, CBP, and USMS officers deployed and made an arrest for trespass, protesters swarmed the officers. *Id.* FPS officers deployed less-lethal projectile rounds to allow the arrest team to safely withdraw. *Id.* The protesters responded by throwing items, including rocks, glass bottles, and mortar-style fireworks, and by pointing lasers at law enforcement personnel. *Id.* One protester encroached on a police barrier, refused to leave, and became combative while detained. *Id.* A crowd of protesters swarmed the officers and tear gas was deployed to protect officers as they withdrew. *Id.* FPS gave protesters additional warnings to stay off federal property, and to cease unlawful activity. Russell Decl. ¶ 9. Tear gas was deployed again to push protesters back. *Id.* The PPB arrived, declared an unlawful assembly,

and closed all roads in the vicinity of the facilities. *Id.* Violent protestors committed multiple attacks throughout the night, including throwing rocks and glass bottles and pointing commercial-grade lasers at officers' eyes. *Id.*

On the night of July 19, 2020, a crowd of over 1,000 protestors gathered. *Id.* ¶ 12. Groups removed fencing from around the Hatfield Courthouse and attempted to use the fencing to trap the Courthouse's occupants inside. *Id.* They then attempted to set fire to the Courthouse. *Id.* Vandals also used air spray paint and a variety of hard objects to damage the federal buildings. *Id.* Federal law enforcement officers exited the Courthouse and ordered the crowd to move back, then used crowd control devices to push violent opportunists back across the street while those individuals continued to assault federal law enforcement officers with lasers and commercial-grade fireworks. *Id.* One officer was shot by a slingshot or an air rifle. *Id.* Later on, violent groups again attempted to barricade the Courthouse doors, and a fire was lit in the Courthouse plaza. *Id.* Federal law enforcement again deployed from the Courthouse and the Edith Green federal building. *Id.* They ordered the crowds back and used crowd control devices when crowds again assaulted the officers and refused to retreat. *Id.*

On the night of July 21, 2020, approximately 2,000 people gathered in front of the Hatfield Courthouse and the Edith Greene federal building, including a well-organized group of at least 500 agitators. *Id.* ¶ 13. Violent opportunists attempted to use vehicles and other objects to block law enforcement. *Id.* They also attempted to set the Courthouse on fire, block the Courthouse exits, and breach the Courthouse. *Id.* They were able to break through two layers of plywood protecting the front entrance of the Courthouse and were breaching the glass doors before being pushed back; one individual also attempted to throw Molotov cocktails into the breached areas. *Id.* Federal law enforcement officers deployed from the Courthouse on several

occasions to disperse the violent crowd from around the building and to put out fires. *Id.* On each

occasion, federal law enforcement officers were assaulted, including with two Molotov cocktails,

rocks, bricks, fireworks, and other hard objects. *Id.*

On July 23, in another case relating to the Portland civil unrest, the court entered an

injunction similar to the one sought by Plaintiffs in this case. *Index Newspapers, Inc. v. City of

Portland*, No. 3:20-cv-1035-SI, 2020 WL 4220820 (D. Or. July 23, 2020). The plaintiffs in that

case entered into a stipulated preliminary injunction with the City of Portland that gave special

access privileges and exemptions from generally applicable laws to self-identified members of

the press and legal observers. The plaintiffs then, with the cooperation of the City, sought to have

the same restrictions imposed on the federal government through a temporary restraining order.

The court granted that motion, requiring federal defendants to give special privileges—such as

an exemption from lawful orders to disperse—to people who self-identify as members of the

press or as legal observers, with such people being identified by anything from a "press pass" to

"distinctive clothing" to hats or vests of certain colors. *Id.* at *10.

On July 24, in yet another case, the Oregon Attorney General sought a temporary

restraining order against federal law enforcement officers' allegedly using unmarked cars to

seize protesters without the officers identifying themselves or stating the reason for the seizure.

*Rosenblum v. Does 1-10*, No. 3:20-cv-1161-MO, 2020 WL 4253209 (D. Or. July 24, 2020). The

court denied the motion for a TRO, holding in relevant part that the plaintiff lacked standing to

pursue injunctive relief because she had presented insufficient evidence of the likelihood of

future harm. *Id.* at *6.

## II.        Legal Authority to Protect Federal Property

FPS, a component of the Department of Homeland Security, is the federal agency charged with protecting federal facilities across the country. *See* Federal Protective Service Operation, at https://www.dhs.gov/fps-operations. Congress authorized DHS to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government." 40 U.S.C. § 1315(a). While engaged in their duties, FPS officers are authorized to conduct a wide range of law enforcement functions:

> (A) enforce Federal laws and regulations for the protection of persons and property;
>
> (B) carry firearms;
>
> (C) make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent or for any felony cognizable under the laws of the United States if the officer or agent has reasonable grounds to believe that the person to be arrested has committed or is committing a felony;[1]
>
> (D) serve warrants and subpoenas issued under the authority of the United States;
>
> (E) conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property; and
>
> (F) carry out such other activities for the promotion of homeland security as the Secretary may prescribe.

40 U.S.C. § 1315(b)(2).

Additionally, the Secretary of Homeland Security may designate DHS employees "as officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property." 40 U.S.C. § 1315(b)(1).

---

[1] *See, e.g.*, 18 U.S.C § 111 (assaulting a federal officer).

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 8

Congress also delegated authority to DHS to issue regulations "necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property." 40 U.S.C. § 1315(c). Current regulations may include "reasonable penalties," including fines and imprisonment for not more than 30 days. 40 U.S.C. § 1315(c)(2). The regulations cover many activities, including prohibiting disorderly conduct on federal property (41 C.F.R. § 102-74.390); failing to obey a lawful order (41 C.F.R. § 102-74.385); and creating a hazard on federal property (41 C.F.R. § 102-74.380(d)). *See United States v. Christopher*, 700 F.2d 1253 (9th Cir. 1983) (affirming convictions on charges of being present on federal property after normal work hours in violation of 41 C.F.R. §§ 101–20.302 and 101–20.315).

In exercising its authority to protect federal property, FPS follows DHS policy on the use of force. *See* DHS Policy on the Use of Force (Sept. 7, 2018) (Exhibit 5). Consistent with guidance from the Supreme Court, *see Graham v. Connor*, 490 U.S. 386 (1989), DHS policy authorizes officers to "use only the force that is objectively reasonable in light of the facts and circumstances confronting him or her at the time force is applied," recognizing that officers are "often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving." DHS Policy at 1–2. The policy states that officers "should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of [the officer] and the public, and that minimize the risk of unintended injury or serious property damage." *Id.* at 3. DHS components must conduct training on "less-lethal use of force" at least every two years and incorporate decision-making and scenario-based situations. *Id.* at 5. Further, officers must demonstrate proficiency with less-lethal force devices, such as impact weapons or

chemical agents, before using such devices. *Id.* DHS policy emphasizes "respect for human life," "de-escalation," and "use of safe tactics." *Id.* at. 3.

DHS has also emphasized to its employees the importance of respecting activities protected by the First Amendment. *See* DHS Memo re: Information Regarding First Amendment Protected Activities (May 17, 2019) (Exhibit 6). "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights." *Id.* at 1.

In addition to DHS's authority to protect federal property, the United States Marshals Service, a component of the Department of Justice, provides security inside federal courthouses in each of the 94 federal judicial districts and in the District of Columbia Superior Court. *See* U.S. Marshals Service, Court Security, at www.usmarshals.gov/duties/courts.htm/. The Marshals Service protects judges and other court officials at over 400 locations where court-related activities are conducted. *Id.* As set forth in 28 U.S.C. § 566(a), "[i]t is the primary role and mission of the United States Marshals Service to provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, the Court of International Trade, and the United States Tax Court, as provided by law." The regulations governing the duties of the Marshals Service further authorize it to provide "assistance in the protection of Federal property and buildings." 28 C.F.R. § 0.111(f); *see also* 28 U.S.C. § 566(i) (requiring the Director of the United States Marshals Service to consult with the Judicial Conference of the United States concerning, *inter alia*, "the security of buildings housing the judiciary" and stating that the "United States Marshals Service retains final authority regarding security requirements for the judicial branch of the Federal Government.").

The Marshals Service's actions to protect the federal judiciary are guided by an agency-wide use of force policy. *See* United States Marshals Service, Policy Directive 14.15, Use of

Force (Sept. 24, 2018) (Exhibit 7). Pursuant to that policy, the use of force must be objectively reasonable and Deputy Marshals may use less-than-lethal force only in situations where reasonable force, based upon the totality of the circumstances at the time of the incident, is necessary to, among other things, protect themselves or others from physical harm or make an arrest. *See id.* Deputy Marshals are not authorized to use less-than-lethal devices if voice commands or physical control achieve the law enforcement objective. *See id.* Further, they must stop using less-than-lethal devices once they are no longer needed to achieve its law enforcement purpose. *See id.* And in all events, less-than-lethal weapons may not be used to punish, harass, taunt, or abuse a subject. *See id.*

## STANDARD FOR EMERGENCY RELIEF

The standard for a temporary restraining order is generally the same as for a preliminary injunction. *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 (D. Or. 2016). A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). A plaintiff must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[2] "Likelihood of success on the merits is the most important factor" and if a plaintiff fails to meet this "threshold inquiry," the

---

[2] Alternatively, the Ninth Circuit has held that "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citation omitted). Even assuming for the sake of this Opposition that that standard is not inconsistent with *Winter* and applies in this case, Plaintiffs fail to satisfy it.

court "need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). Because standing is a prerequisite to the Court's exercise of jurisdiction, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014), the plaintiff's claims on the merits have no likelihood of success if the plaintiffs cannot establish standing. *Id.* at 158 ("The party invoking federal jurisdiction bears the burden of establishing' standing and must do so "the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.") (internal quotations and citations omitted).

Plaintiffs must meet an even higher standard in this case because they seek a mandatory injunction that would alter the status quo and impose affirmative requirements on law enforcement officers as they carry out their duties. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (mandatory injunctions are "particularly disfavored" and the "district court should deny such relief unless the facts and law clearly favor the moving party.") (internal quotations omitted). As explained below, Plaintiffs cannot meet this demanding standard.

## **ARGUMENT**

### I.    **Plaintiffs Lack Standing to Obtain an Injunction Against Federal Defendants**

Even if Plaintiffs had shown that they suffered some isolated First or Fourth Amendment violation during their participation in past riots, their lawsuit fails at the outset to satisfy the minimum requirements of standing to pursue injunctive relief against future injuries Plaintiffs might suffer—namely, that the "threatened injury must be *certainly impending*" and not merely "*possible*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Because Plaintiffs have provided only bare-bones factual descriptions of a handful of isolated past incidents and speculation about federal officials'

motivations, they have failed—indeed, failed even to try—to show that future injury against any Plaintiff is "certainly impending."

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983). One of the "landmarks" that differentiates a constitutional case or controversy from more abstract disputes "is the doctrine of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). And the first requirement of standing is that "the plaintiff must have suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Id.* at 560.

Where, as here, a party seeks prospective equitable relief, the complaint must contain "allegations of future injury [that are] particular and concrete." *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 109 (1998). While allegations of past injury might support a remedy at law, prospective equitable relief requires a claim of imminent future harm. *Lyons,* 461 U.S. at 105; *see also Nelsen v. King Cty.*, 895 F.2d 1248, 1251 (9th Cir. 1990) ("[P]ast exposure to harm is largely irrelevant when analyzing claims of standing for injunctive relief that are predicated upon threats of future harm."); *United Presbyterian Church v. Reagan,* 738 F.2d 1375, 1381 (D.C. Cir. 1984) (past harm suffered by plaintiff does not support declaratory and injunctive relief).

It is therefore well established that a plaintiff lacks standing to obtain prospective injunctive relief for alleged future injuries based on allegations of prior harm. *Lyons*, 461 U.S. at 101–02; *Nelsen*, 895 F.2d at 1251; *Rosenblum*, 2020 WL 4253209 at *6 ("[I]njunctive relief requires more than a showing that a plaintiff has been harmed; it requires a showing that she will

likely be harmed again."). As the Supreme Court held in *Whitmore v. Arkansas,* 495 U.S. 149

(1990), allegations of possible future injury do not satisfy the requirements of Article III. A

threatened injury must be "certainly impending" to constitute injury in fact. 495 U.S. at 158

(quoting *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979)). As a result, in order to

invoke Article III jurisdiction, a plaintiff in search of prospective equitable relief must show a

significant likelihood and immediacy of sustaining some direct injury. *Updike v. Multnomah

Cty.*, 870 F.3d 939, 947 (9th Cir. 2017) ("[S]tanding for injunctive relief requires that a plaintiff

show a 'real and immediate threat of repeated injury.'" (quoting *O'Shea v. Littleton*, 414 U.S.

488, 496 (1974))). And standing cannot be presumed or deferred just because this case is

currently being considered on a TRO and preliminary injunction posture; standing is "an

indispensable part of the plaintiff's case" that "must be supported in the same way as any other

matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of

evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

     For a plaintiff to have standing, an alleged injury must be "concrete" and "actual or

imminent, not 'conjectural' or 'hypothetical.'" *Lyons*, 461 U.S. at 101–02. Even where a plaintiff

establishes that his rights were violated in past incidents, he nonetheless lacks standing to obtain

prospective injunctive relief absent a "real and immediate threat" that he will suffer the same

injury in the future. *Id.* at 105. "[P]ast wrongs do not in themselves amount to that real and

immediate threat of injury necessary to make out a case or controversy." *Id.* at 103 (citing

*O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) and *Rizzo v. Goode,* 423 U.S. 362, 372 (1976)).

*See also Nelsen*, 895 F.2d at 1251. This "imminence requirement ensures that courts do not

entertain suits based on speculative or hypothetical harms." *Lujan*, 504 U.S. at 564. Thus, a

plaintiff "who has been subject to injurious conduct of one kind [does not] possess by virtue of

that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982).

Moreover, the plaintiff seeking injunctive relief must show not just that the predicted *injury* will reoccur, but also that the plaintiff himself will suffer it. *See, e.g.*, *Updike*, 870 F.3d at 948 (holding that the plaintiff lacked standing for injunctive relief because his evidence was "insufficient to establish that any such wrongful behavior is likely to recur against him"); *Blair v. Shanahan*, 38 F.3d 1514, 1519 (9th Cir. 1994) (holding that a plaintiff seeking declaratory or injunctive relief must "establish a personal stake" in the relief sought); *Rosenblum*, 2020 WL 4253209 at *6 (plaintiff seeking injunctive relief must show "real or immediate threat that [he] will be wronged again" (alteration in original) (quoting *Lyons*, 461 U.S. at 106)). In other words, plaintiffs cannot show an entitlement to injunctive relief unless they show that they themselves are likely to suffer injury from the allegedly unlawful activities. That other individuals might suffer future harm does nothing for a plaintiff's own standing.

The facts and reasoning of *Lyons* are instructive. At issue in *Lyons* was a civil rights action against the City of Los Angeles and several police officers who allegedly stopped the plaintiff for a routine traffic violation and applied a chokehold without provocation. In addition to seeking damages, the plaintiff sought an injunction against future use of the chokehold unless deadly force was threatened. The Supreme Court held that plaintiff lacked standing to seek prospective relief because he could not show a real or immediate threat of future harm.

> That Lyons may have been illegally choked by the police . . . , while presumably affording Lyons standing to claim damages . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.

*Lyons*, 461 U.S. at 104; *see also O'Shea*, 414 U.S. at 495-96 ("Past exposure to illegal conduct

does not in itself show a present case or controversy regarding injunctive relief . . . if

unaccompanied by any continuing, present adverse effects."); *Rizzo*, 423 U.S. at 372 (holding

that plaintiffs' allegations that police had engaged in widespread unconstitutional conduct aimed

at minority citizens was based on speculative fears as to what an unknown minority of individual

police officers might do in the future).

Courts in this Circuit have applied *Lyons* and *O'Shea* in similar contexts to hold that

plaintiffs lack standing to pursue prospective injunctive relief where they were subject to past

law enforcement practices but could only speculate as to whether those practices would recur.

*See, e.g.*, *Eggar v. City of Livingston*, 40 F.3d 312, 317 (9th Cir. 1994) (plaintiff who had

previously been repeatedly detained, charged, and convicted of offenses without court-appointed

counsel despite her indigence lacked injunctive standing because whether she "will commit

future crimes in the City, be indigent, plead guilty, and be sentenced to jail is speculative");

*Rosenblum*, 2020 WL 4253209 at *6–7; *Murphy v. Kenops*, 99 F. Supp. 2d 1255, 1259–60 (D.

Or. 1999) (plaintiffs lacked standing because it was highly speculative "that the Forest Service

will exercise its discretion to issue future closure orders, that the closure orders will violate the

First Amendment, that plaintiffs will violate those closure orders, and that plaintiffs will be

arrested because of those closure orders"). *See also Curtis v. City of New Haven*, 726 F.2d 65, 68

(2d Cir. 1984) (vacating an injunction that had been entered against police use of mace, because

the plaintiffs had not shown a "likelihood that these plaintiffs will again be illegally assaulted

with mace"); *Williams v. Birmingham Bd. Of Educ.*, 904 F.3d 1248, 1267 (11th Cir. 2018)

(plaintiff alleging that a school resource officer employed by the police unconstitutionally used

an incapacitating chemical spray on her lacked standing to pursue injunctive relief, because she

did not show that a likelihood that the resource officer would again unconstitutionally spray her).

Although the court in *Index Newspapers* determined that the facts of that case satisfied the

requirements of standing for injunctive relief, 2020 WL 4220820 at *5, Federal Defendants

respectfully disagree with that conclusion, which occurred in the context of journalists at the

protests. Regardless, that decision is not binding on this court. *Starbuck v. City & Cty. of San*

*Francisco*, 556 F.2d 450, 457 n.13 (9th Cir. 1977) ("The doctrine of stare decisis does not

compel one district court judge to follow the decision of another").

       Nor can plaintiffs create standing for injunctive relief by alleging that their own fear of

future government action has "chilled" their willingness to engage in First Amendment activities.

When a plaintiff contends that injunctive relief is supported by such an alleged "chilling effect,"

the analysis is unchanged from the *Lyons* inquiry—the supposed chilling effect will not provide

standing for injunctive relief if it is "based on a plaintiff's fear of future injury that itself was too

speculative to confer standing." *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015); *see also*

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture

standing merely by inflicting harm on themselves based on their fears of hypothetical future

harm that is not certainly impending"). In other words, where a plaintiff's request for injunctive

relief lacks any non-speculative basis for finding a likelihood of future harm, the plaintiff cannot

circumvent Article III merely by saying that he or she is *afraid* of future harm.

       The scant factual record supplied by Plaintiffs shows it to be wholly deficient in

attempting to prove an imminent likelihood of future harm. The crux of their Motion is that

federal law enforcement should be required to give any self-identified "protest medics" special

privileges, such as exemptions from lawful orders to disperse and from the application of crowd-

control tactics, because Plaintiffs believe that federal law enforcement officers have violated

Plaintiffs' First and Fourth Amendment rights in the past. As discussed *infra*, Plaintiffs have not shown that they suffered constitutional violations in the past. But even assuming for the sake of argument that Plaintiffs' declarations had accurately described events and made out past constitutional violations, the declarations would still have been deficient to show injunctive standing because they are solely retrospective and do not raise even a bare inference that any named plaintiff faces an imminent threat of injury from federal officers.

The declarations provided with the Motion are threadbare and focus on a small handful of past incidents. They generally involve assertions that the declarant was shoved, exposed to tear gas, or hit with a baton or with nonlethal crowd-control rounds. Durkee Decl. ¶ 22; Martinez Decl. ¶ 32; Durkee Decl. ¶¶ 20, 22, 25; Guest Decl. ¶¶ 15, 25; Guest Decl. ¶ 17; Wise ¶ 29. Sometimes the declarant provides a few details that explain the events, although never in a way that raises even an inference that federal law enforcement officers were targeting or retaliating against medics for being medics. *E.g.*, Durkee Decl. ¶ 29 (stating that declarant was standing behind "a group of protestors who formed a line with physical shields" facing "federal law enforcement officers" when a law enforcement officer "shot a tear gas canister at [declarant's] head"); Guest Decl. ¶ 17 (stating that federal law enforcement fired unknown crowd control rounds at declarant when she attempted to move a tear gas canister that an officer had deployed); Guest Decl. ¶ 20 (stating that federal law enforcement officers struck the ground next to her with a baton after she ignored their instructions to keep moving).[3] In short, Plaintiffs have provided allegations regarding their disagreement with past actions by individual federal law enforcement

---

[3] Because declarant Peyton Dully Hubbard is not a plaintiff, her declaration regarding her own past experiences at the riots is not probative regarding whether any Plaintiff faces any certainly impending future harm. Regardless, her declaration is of a kind with the others provided by Plaintiffs, giving only threadbare descriptions of past isolated incidents, and thus would not support standing in any fashion.

officers, but they have alleged nothing showing that any named plaintiff faces "future harm" that is "*certainly impending*" and not merely "*possible* future injury." *Clapper*, 568 U.S. at 409.

## II.    Plaintiffs Are Not Likely to Succeed on the Merits Because They Will Not Suffer a First or Fourth Amendment Violation, and the Injunction They Seek is Legally Improper

### A.    Plaintiffs have not demonstrated that Federal Defendants violated their constitutional rights or will continue to do so.

Plaintiffs' Motion and supporting documentation are purely retrospective, describing isolated past incidents that they contend are violations of the First and Fourth Amendments. But even on that score, Plaintiffs' claims fail, because Plaintiffs have not established even past violations of the First or Fourth Amendment.

### 1.    Plaintiffs fail to show that the lack of special privileges for "protest medics" is First Amendment retaliation

Plaintiffs devote substantial attention to undisputed propositions of law that protesting is a protected First Amendment activity that may be exercised in public places, subject to reasonable time, place, and manner restrictions. But the key question in a First Amendment retaliation claim is whether the plaintiff has established that "by his actions the defendant deterred or chilled the plaintiff's political speech and such deterrence was a substantial or motivating factor in the defendant's conduct." *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).

Preliminarily, though, in the situations about which Plaintiffs complain, they have not established that a First Amendment inquiry is even appropriate. *See* Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 4 ("Pls. Mot.), at 16. ("To succeed on their First Amendment retaliation claims, Plaintiffs must show that (1) they engaged in constitutionally-protected speech."). They state that their activities as medics constitutes expression, which is what they are seeking to be protected. Pls. Mot. at 6 ("Plaintiffs, themselves passionate about the

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 19

cause of eliminating brutality against Black lives at the hands of police, decided to exercise their

free expression rights through their assistance to others."). But they have also not disputed that

any order to disperse given by federal law enforcement officers relevant to their claims was

lawful, nor have they claimed that the alleged retaliation occurred at a time other than when a

lawful order to disperse had been given. Accordingly, their obligation at that time was to vacate

the area. Their choice not to do so does not entitle them to the protections of the First

Amendment. *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here

demonstrations turn violent, they lose their protected quality as expression under the First

Amendment"). There is no First Amendment inquiry to be made.

      Even if a First Amendment claim were viable, Plaintiffs would not have carried their

burden to establish that the use of force was "anything other than the unintended consequence of

an otherwise constitutional use of force under the circumstances." *Barney v. City of Eugene*, 20

F. App'x 683, 685 (9th Cir. 2001) (rejecting First Amendment retaliation claim where "protesters

were warned repeatedly to clear the street or tear gas would be deployed, and there is no dispute

that a small group of the crowd became violent"); *see also Mims v. City of Eugene*, 145 F. App'x

194, 196 (9th Cir. 2005) (holding that use of a crowd control team "in full riot gear was not a

disproportionate response and does not indicate preexisting hostility toward the protestors'

views"). Given the chaotic circumstances presented by the violent protests, Plaintiffs have not

established that Defendants would not have used force "but for" a retaliatory motive. *Capp v.

City of San Diego*, 940 F.3d 1046, 1059 (9th Cir. 2019)*.* As the Ninth Circuit has recognized*,* the

unlawful actions of a few may impair the ability of others to exercise their rights:

> In balancing desired freedom of expression and the need for civic order, to
> accommodate both of these essential values, a measure of discretion
> necessarily must be permitted to a city, on the scene with direct
> knowledge, to fashion remedies to restore order once lost. It may be that a

> violent subset of protesters who disrupt civic order will by their actions
> impair the scope and manner of how law-abiding protesters are able to
> present their views.

*Menotti v Seattle,* 409 F.3d 1113, 1155 (9th Cir. 2005) (declining "to hold unconstitutional the

City's implementation of procedures necessary to restore safety and security" when confronted

by protesters with "violent and disruptive aims" that "substantially disrupt civic order"). Because

Plaintiffs cannot dispute that they were present at large public demonstrations that included

groups of people behaving violently and criminally, they cannot establish that Defendants

violated the First Amendment by deploying crowd-control measures to respond to those people

acting criminally and lawlessly, even if those measures also affected protesters allegedly not

engaging in unlawful behavior around the rioters. Moreover, a plaintiff may generally not base

any retaliation claim on a lawful Fourth Amendment seizure, *see Nieves v. Bartlett*, 139 S. Ct.

1715, 1727 (2019), so Plaintiffs would have to also prevail on their Fourth Amendment claims to

pursue their First Amendment claims.

Perhaps seeking to avoid that impediment, Plaintiffs' Motion at times appears to assert

that they were not just affected by the lawful deployment of crowd-control measures, but that

they were targeted within that law enforcement response specifically because federal officers

wanted to discourage Plaintiffs from being protest medics. But even assuming that could be a

cognizable claim under the law, Plaintiffs have not supplied a factual basis to conclude that

federal law enforcement officers were motivated by a desire to stop Plaintiffs from being protest

medics. The complaints in Plaintiffs' declarations recount instances not of protest medics being

treated with any special disfavor, but instead instances in which Plaintiffs were expected to

comply with the same law enforcement instructions as anyone else, or instances in which

Plaintiffs were subjected to the same crowd-control tactics that, by Plaintiffs' own admissions,

were widely used in the tumultuous riots surrounding the federal courthouse. And even where the declarations are devoid of sufficient information regarding the events described, Plaintiffs have not alleged facts that raise an inference of some special disfavor for protest medics.

Plaintiffs provide details about only approximately five incidents. Plaintiff Wise describes being struck in the leg with "pepper balls" by a city or federal officer while "standing in the crowd" that was being exposed to tear gas on July 14, 2020. Wise Decl. ¶ 28. But he admittedly cannot even say for sure that it was a federal officer who struck him. Wise does not make any factual assertion that he was targeted as a protest medic; instead, his complaint seems to be that the officer should not have treated Wise the same way that the officer treated the crowd of which Wise was a member, an obviously untenable position that also highlights how this is not a case of retaliation. In a more recent incident, on July 21 or the morning of July 22, he was struck by a tear gas canister in the head while situated behind a line of protesters who were kneeling and forming a shield wall. Wise ¶ 29. He implies that he was targeted because he "verbally identified [him]self as a medic." *Id.* But apparent from the fact that such a verbal warning would almost certainly be impossible to hear (and at a minimum Mr. Wise does not establish that officers heard him), he fails to establish anything other than that he was physically located where federal officers needed to launch tear gas (behind the shield wall) to disperse protesters who were physically resisting. The fact that his clearly exposed head was struck by a projectile that needed to be fired into his general vicinity does not show that federal law enforcement intended to strike him.

Plaintiffs Durkee and Guest each allege two incidents from the night of July 11 to the morning of July 12, 2020. First, they state that Guest was "attempt[ing] to transport injured protestors" when officers "fir[ed] tear gas canisters and pepper balls" at her; they each admit,

however, that they were moving *towards* federal officers who were advancing on protesters. Durkee ¶ 22; Guest ¶ 17. It is again unclear whether Guest was in a location for which officers had given an order to disperse, whether there were other people around her, what they or others may have been doing that prompted officers to deploy crowd-control measures, and what other facts were known to the officers, including whether officers could tell that Guest was marked as a medic. There is no basis to assert that Durkee and Guest were treated differently than anyone who runs at law enforcement while they are attempting to disperse a violent crowd. Durkee and Guest also allege that federal officers pushed Durkee with a baton, tackled him, and shoved both of them after telling them to retreat from the area where they had been evaluating a "houseless" man; they both point to a video of the encounter. Durkee 23-26; Guest 18-21. The video shows that both individuals in it refused to move after multiple commands until federal officers were immediately upon them; they then slowly walked backwards while facing the officers, and each was holding spray cans in their hands. That federal officers used force against these two individuals who refused to move and appeared potentially combative—walking in something indistinguishable from a defensive crouch from which one could launch attacks—falls far short of demonstrating that officers were targeting those individuals for their speech or expression.

Guest also describes a third incident on July 19, 2020 in little detail in which she was again advancing toward an allegedly injured person (this time in a car) and federal officers shot her with rubber bullets and used tear gas. Guest ¶ 29. Again, being shot while advancing toward federal officers (and this time, towards a vehicle and without alleging federal officers knew the occupant needed medical attention, elevating the risk that the vehicle could be used as a weapon) as they are trying to disperse violent rioters falls well short of demonstrating that any officer targeted Guest on the grounds that she was identifying herself or acting as a medic.

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 23

Indeed, much of Plaintiffs' theory that police were targeting "protest medics" in any incident relies on the unproven assertion that officers dealing with unruly crowds at night through the haze of tear gas can readily determine who among the dozens or scores of people in a given crowd has some sort of "medic" marking. And even accepting this premise, Plaintiffs have alleged no facts to support the claim that federal law enforcement officers want to apply extra pressure to those protest medics to stop them from being protest medics. Plaintiffs therefore have not raised the barest inference that federal law enforcement officers are somehow singling out Plaintiffs for special disfavor, let alone that they are doing so in an effort to discourage Plaintiffs from being protest medics.

### 2.    Plaintiffs have not shown that Federal Defendants used excessive force

Plaintiffs cannot prevail on their claim of excessive force, because they have not shown that officers acted unreasonably in light of the circumstances.[4] Plaintiffs have not shown and cannot hope to show that the particular incidents they alleged violated the Fourth Amendment, much less that they are entitled to an injunction against speculative future such incidents.

To demonstrate excessive force, Plaintiffs must show that "police use of force" was "objectively unreasonable under the circumstances." *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018).[5] That showing requires "balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). The reasonableness of police

---

[4] Plaintiffs also complain that "law enforcement officers" unlawfully seized a tent, a banner, and related items from a medical station. Plaintiffs allege that Portland Police carried out this alleged seizure and then disposed of some of the items. Pls. Mot. at 29. Because Plaintiffs do not allege any federal involvement by Federal Defendants, this claim does not implicate Federal Defendants and thus requires no response in this Opposition.

[5] *Felarca* was a § 1983 action for damages and thus did not address the further requirements to show entitlement to injunctive relief.

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 24

use of force must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and the analysis "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396–97).

Plaintiffs cannot show an entitlement to injunctive relief by relying on past Fourth Amendment violations, but even examining Plaintiffs' allegations of past conduct on their own, the current Motion has not shown a likelihood that Plintiffs would succeed on proving past violations. The highly fact-specific, context-dependent judgments of reasonableness are not appropriate for resolution solely on the basis of a self-serving and threadbare declaration from a given plaintiff. Here, Plaintiffs' descriptions of incidents of "excessive force" are often a few lines long and lacking in any factual detail—even though these incidents allegedly occurred during protests that even Plaintiffs admitted involved violence by protesters. Wise Decl. ¶ 19. If Plaintiff Wise, for example, wants to seek relief for an excessive force claim relating to being struck with pepper balls on July 14 while standing in a crowd that police were attempting to disperse, he needs more of a factual basis than a six-line description devoid of any additional context. Wise Decl. ¶ 28. Indeed, Plaintiffs' motion appears to contend that a plaintiff can make out an excessive force claim simply by stating, "I have also suffered the effects of tear gas exposure." Guest Decl. ¶ 13 (cited by Pls. Mot. at 25). Plaintiffs essentially invite this Court to hold that a self-declared "protest medic's" exposure to standard methods of crowd control during mass lawlessness is *per se* excessive force—a proposition that has no basis in law.

In addition to their factual deficiencies, Plaintiffs' excessive force claims are unlikely to succeed on the merits because courts have generally found the use of many of the same crowd-control methods at issue here to be constitutionally permissible. For example, when police were dismantling an illegal tent city set up by protesters on the University of California at Berkeley campus, the Ninth Circuit rejected an excessive-force claim (there, for damages under Section 1983) brought by protesters who had been struck with batons and knocked over by hand while trying to block officers from dismantling the tents. *Felarca*, 891 F.3d at 818. The court held that the government was not required to permit "organized lawlessness." *Id.* at 818 (quoting *Forrester*, 25 F.3d at 807). The officers were reasonable in using force because the government was not required to permit "organized lawlessness," and the protesters "substantially outnumbered" officers, "refused to obey the officers' commands to disperse," "shouted at the officers," and "engaged the officers in verbal and physical altercations." *Id.* (quoting *Jackson*, 268 F.3d at 652). The same is true here: After the peaceful daytime protests have transformed into the lawless nighttime rioting (as they do nearly daily), officers have been faced with protecting federal property from huge mobs throwing projectiles and explosives, defacing federal property, and physically assaulting officers. Russell Decl. ¶ 7–13.

Defendants can lawfully use crowd-dispersal tactics in those circumstances because it is a reasonable level of force to protect the government's interests. On each night in which Plaintiffs alleged federal officers used excessive force, violent opportunists attacked the courthouse and assaulted officers, and federal officers had to order those violent crowds to disperse and use force to disperse them. Particularly when facing violent and potentially armed individuals, the kind of crowd control devices like those used in Portland has been found to be reasonable. *See Bayer v. City of Simi Valley*, 43 F. App'x 36, 38 (9th Cir. 2002) (holding use of tear gas was reasonable

against armed unstable individual who refused to surrender); *Forrester*, 25 F.3d at 805-07

(holding pain compliance techniques on passive protesters not unreasonable to remove them);

*Jackson*, 268 F.3d at 652 (holding threat and use of chemical irritant to disperse unruly crowd,

where they were interfering with arrest, was not unreasonable); *United Steelworkers of Am. v.*

*Milstead*, 705 F. Supp. 1426, 1430, 1437 (D. Ariz. 1988) (holding use of strong tear gas "for

outdoor use only" on crowd gathered inside that had been throwing objects was not excessive

force, even though innocent people also inside). This is nothing like the case Plaintiffs primarily

rely on, *Nelson v. City of Davis*, where police shot a student with a pepperball in the eye, when

the student and his friends were "attempting to leave [a] party and awaiting instruction from the

officers." 685 F.3d 867, 872-74, 879-80 (9th Cir. 2012). Moreover, despite Plaintiffs' allegations

about the danger of such force, their injuries have been relatively minor. Durkee Decl. ¶¶ 18

("had to flush our eyes, coughed uncontrollably, and had difficulty breathing"), 25 ("shoulder

hurt for several days"); Guest ¶¶ 17 ("abrasions and marks on my feet and ankles"), 30 ("bruise

to my thigh"). The most significant injury appears to be Plaintiff Wise's concussion from being

hit in the head, which was minor, Wise Decl. ¶ 29, and a common injury in physical

confrontations. No Plaintiff alleges permanent harm caused by federal officers. Additionally,

Plaintiffs have been substantially more protected than the average pedestrian or college student,

and have increased their protection since the incidents. Durkee ¶ 15 ("lacrosse chest guards,

helmets, sturdy boots, and military grade gas masks"); Guest ¶ 13 ("military-grade gas masks

[so] now able to walk into thick clouds of tear gas"); Wise ¶ 34 ("I now wear body armor, a

bulletproof vest, ballistic goggles, shin guards, gloves, and knee pads."). Accordingly, the "risk

of harm" is substantially attenuated, while the "need for force" to disperse entrenched, violent

opportunists is great. *Nelson*, 685 F.3d at 878-79.

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 27

As discussed throughout this Opposition, Plaintiffs have failed to allege that they face a threatened injury that is "certainly impending," and they therefore lack standing to seek injunctive relief. Their Fourth Amendment claim fares no better than their First Amendment claims, because while they vaguely assert that Defendants "continue to use excessive force against Plaintiffs," their factual deficiencies are the same—they describe a few past incidents that Plaintiffs dislike, but nothing that shows that any named plaintiff will certainly be subject to a particular level of force in the future, let alone an amount of force that is "objectively unreasonable under the circumstances" in light of "the nature and quality of the intrusion" and the "countervailing governmental interests at stake." *Felarca*, 891 F.3d at 816 (quoting *Graham*, 490 U.S. at 396). If Plaintiffs believe they have been the subject of past instances of excessive force, they should pursue the traditional and adequate remedy for such claims—a damages action that will allow for the development of a factual record sufficient to judge claims of excessive force.

### B.    The injunction Plaintiffs seek is overbroad and legally improper

There is no basis for the Court to grant Plaintiffs' request for an overbroad injunction that would micromanage the manner in which federal law enforcement officers respond to dynamic and chaotic situations involving violent protesters seeking to damage federal property and harm federal officers. "It is not for this Court to impose its preferred police practices on either federal law enforcement officials or their state counterparts." *United States v. Patane*, 542 U.S. 630, 642 (2004). Yet that is precisely what Plaintiffs' requested injunction would do here. The federal officers protecting federal property in Portland are doing so under difficult circumstances and must make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. Those judgments should not be encumbered by the

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 28

potential threat of contempt of court from a vague, overbroad, and—at bottom—legally improper injunction.

It is a basic principle of Article III that "a plaintiff's remedy must be limited to the inadequacy that produced his injury in fact." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (quotation omitted). "An injunction must be narrowly tailored to remedy the specific harm shown." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (internal quotations omitted); *see Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir.1991). It "should be no more burdensome to the defendant than necessary to provide complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Plaintiffs' proposed injunction is legally improper in several respects. The injunction would exempt "Protest Medics" from the requirements of following a lawful order to disperse when the protest medic is "providing medical care to an individual," Pls. Mot. at 2, but Plaintiffs provide no authority that protest medics are somehow immune from such a lawful order. The First Amendment allows the police to impose reasonable restrictions upon demonstrations, including the right to "contain or disperse demonstrations that have become violent or obstructive." *Cullinane*, 566 F.2d at 119 (stating that it is "axiomatic" that "the police may, in conformance with the First Amendment, impose reasonable restraints upon demonstrations to assure that they be peaceful and not obstructive"); *see Feiner v. New York*, 340 U.S. 315, 320 (1951) ("This Court respects, as it must, the interest of the community in maintaining peace and order on its streets."); *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940) ("When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or

punish is obvious."). Self-identified "protest medics" who choose to monitor the violent

activities of nearby protesters are not exempt from a lawful command to disperse.

The proposed injunction is replete with such special privileges for protest medics that

have no basis in law and would make federal law enforcement's duties even more challenging.

For example, if a protest medic is "providing medical care" (an undefined term) the police

cannot use physical force "directly or indirectly targeted" (another undefined term) at the protest

medic. Pls. Mot. at 2. There is an exception if the protest medic poses a "threat to the lives or

safety of the public or the Police," *id.*, but presumably not if the police otherwise have lawful

cause to use physical force, such as to effect an arrest. If the police want that protest medic to

abide by a lawful order to disperse, it appears that the police either may not to do so at all (*id.*

¶ 4), or may not to do so unless they are seizing the person receiving treatment (*id.* 3 ¶ 6). There

is no basis in law for these special procedures, and they would just further complicate the already

difficult job that federal officers face in restoring order to these large-scale riots. Furthermore, it

is not difficult to imagine that the rioters who confront federal officers every night would have a

strong incentive to self-identify as "protest medics," as it would suddenly exempt them from so

much legitimate law enforcement activity.

Another unlawful component of Plaintiffs' requested injunction is their proposal that

Oregon state law govern how federal law enforcement operations execute their duties. Subjecting

federal law enforcement to state regulation would violate the Supremacy Clause's doctrine of

intergovernmental immunity. That doctrine prohibits state and local governments from

"seek[ing] to regulate the government directly" by "constraining the conduct of federal agents

and employees." *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010); *see also*

*Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996) ("[S]tates may not directly

regulate the Federal Government's operations or property."). The state cannot impose a law that is "expressly intended" to "regulate the federal government," and it cannot apply a statute that would "'constitute[e] a direct and intrusive regulation by the State of the Federal Government's operation of its property.'" *City of Arcata*, 629 F.3d at 991 (quoting *Blackburn*, 100 F.3d at 1435). Likewise, a state government cannot "discriminate[] against the federal government" by "'treat[ing] someone else better than it treats' the government." *Id.* (quoting *North Dakota v. United States*, 495 U.S. 423, 438 (1990)).

Plaintiffs ask this Court to restrict federal law enforcement officers from "arresting, threatening to arrest, or using physical force" against protest medics "unless authorized under Or. Rev. Stat. § 133.235 or Or. Rev. Stat. § 133.245." Those statutes govern or purport to govern the actions of law enforcement officers within Oregon—§ 133.235 governs the circumstances under which "peace officers" can make arrests and the methods they can use, and § 133.245 purports to do the same for federal officers. Plaintiffs presumably seek to apply only § 133.245 against federal officers, as § 133.235 by its terms applies only to "peace offices," which Oregon law does not define to include federal law enforcement officials. Or. Rev. Stat. § 133.005(3). Plaintiffs therefore are asking this court to legitimize and enforce a state statute that purports to govern federal officers specifically.

Applying Oregon's regulation of law enforcement to federal officers would be a paradigmatic violation of intergovernmental immunity. By its own terms, the Oregon law is "expressly intended" to regulate the federal government and its officers, which is prohibited. *City of Arcata*, 629 F.3d at 991. And, by purporting to set standards for how the federal government conducts arrests, the state government is undeniably imposing "a direct and intrusive regulation" on the federal government. *Id.* Furthermore, because the federal officers in Portland are

defending federal property, *see* Russel Decl. ¶¶ 4–5, this would be an intrusion not just into the conduct of federal officers but also into the operation of federal property. *See Blackburn*, 100 F.3d at 1435. That would be true even if the Plaintiffs' sought to instead apply § 133.235 against federal officers—it would be the same direct regulation of federal officers and federal property with the same intrusive effects. And the application of § 133.245 would also be impermissible discrimination against the federal government; for example, § 133.235 allows a state police officer to arrest anyone on probable cause, *see* § 133.235(2) (citing § 133.310(1)), whereas § 133.245 purports to limit the authority of a federal officer to do so unless the officer was either present at the crime or is arresting for a felony or a Class A misdemeanor, *see* § 133.245(1)(a)– (b). This Court must reject Plaintiffs' attempt to unconstitutionally give state law a veto power over the enforcement of federal law.

### III.    PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM

Plaintiffs argue that, because they have raised First and Fourth Amendment claims, they have necessarily demonstrated the likelihood of irreparable injury. But the Ninth Circuit has held that "no presumption of irreparable harm arises in a First Amendment retaliation claim." *Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997). And regardless of the nature of the alleged injury, any irreparable harm must be likely to occur. Separate from any Article III standing concerns, where "there is no showing of any real or immediate threat that the plaintiff will be wronged again," there is no irreparable injury supporting equitable relief. *Lyons*, 461 U.S. at 111; *see Olagues v. Russoniello*, 770 F.2d 791, 797 (9th Cir. 1985). As shown above, and for the same reasons that Plaintiffs lack standing to seek an injunction in the first instance, Plaintiffs' future injuries are speculative and, therefore, also insufficient to demonstrate the likelihood of

irreparable injury. To recover for their allegations of past harm, Plaintiffs' remedy is a damages

action, not an injunction.

### IV.    BOTH THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST GRANTING AN INJUNCTION

Plaintiffs have not shown that the public interest or the balance of the equities[6] justifies

imposing another layer of restrictions on Federal Defendants' lawful efforts to protect federal

property. Plaintiffs argue that there is a strong public interest in First Amendment principles

generally, which is true. They also contend that the public has a First Amendment interest in

Plaintiffs' providing "comfort and care" for other protesters during unlawful assemblies. Pls.

Mot. at 37. Even if that is true, Plaintiffs have not established any violation of these First

Amendment rights and, in any event, they fail to explain how the desire to provide "comfort and

care" to particular individuals outweighs the important public interest in maintaining peaceful

assembly and guarding against mass violence and destruction in the first place.

Indeed, Federal agents have deployed to protect various federal properties, including the

Hatfield Federal Courthouse and the Edith Green Federal Building, in response to violent rioting.

Rioters have vandalized and threatened to severely damage those buildings, and they have

assaulted the responding federal officers. The government has a comprehensive interest in

maintaining public order on public property. *Feiner v. New York*, 340 U.S. 315, 320 (1951)

("This Court respects, as it must, the interest of the community in maintaining peace and order

on its streets."). There is an even more pointed public interest when disorder threatens the

integrity of that public property. *See United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir.

2000) ("The clear purpose of the order . . . was for reasons of health and safety, and for the

---

[6] The balance of the equities and the public interest are analyzed together here because, when the government is a party, these last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

protection of property . . . . These are compelling reasons . . . and certainly represent significant

government interests."). Congress has recognized such interests, including by making the

destruction of federal property and the assault of federal officers felonies punishable by lengthy

sentences of up to ten and twenty years of imprisonment respectively. 18 U.S.C. §§ 111, 1361.

Additionally, there is a fundamental First Amendment right of access to the courts, *see, e.g.*,

*Ringgold-Lockhart v. Cty. of Los Angeles*, 761 F.3d 1057, 1061 (9th Cir. 2014), which is

jeopardized by the breach and destruction of a federal court building; it is in the public interest to

prevent the violation of *these* rights, too. Moreover, the federal government, just as any other

property owner, has an interest in "preserv[ing] the property under its control for the use to

which it is lawfully dedicated"; for government buildings, those uses are of course public uses

that are in the public interest. *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672,

679-680 (1992).

On balance, it is clearly in the public interest to ensure federal officers can disperse

violent opportunists near courthouses and federal buildings when those events have turned and

may continue to turn violent. *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972)

("[W]here demonstrations turn violent, they lose their protected quality as expression under the

First Amendment"); *Griefen*, 200 F.3d at 1260 (upholding the relocation of protesters who "had

already shown by their destructive conduct that they presented a clear and present danger to the

safe completion of the construction project, both to other persons as well as to themselves"); *Bell

v. Keating*, 697 F.3d 445, 457–58 (7th Cir. 2012) ("[O]therwise protected speech may be

curtailed when an assembly stokes—or is threatened by—imminent physical or property

damage.").

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 34

Plaintiffs do not attempt to link the public interest and balance of the equities to their Fourth Amendment claim of excessive force, and that claim shows why the balance of equities and the public interest oppose the injunction. As discussed, Plaintiffs' excessive-force claims at this preliminary posture would require essentially a declaration that long-accepted crowd-control methods such as tear gas are per se excessive, at least if they affect someone who states in his subjective opinion that he was no danger or obstacle to federal law enforcement. *Supra* II.A.2. The public interest and the balance of the equities favor allowing officers to continue their legitimate practice of deploying crowd-control methods to protect federal property and federal officers from destruction and violence by an unruly mob.

Accordingly, both the public interest and the balance of the equities weigh in favor of denying the injunction.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a Temporary Restraining Order and Preliminary Injunction should be denied.


Dated:  July 28, 2020                    ETHAN P. DAVIS
                                         Acting Assistant Attorney General

                                         BILLY J. WILLIAMS
                                         United States Attorney

                                         DAVID M. MORRELL
                                         Deputy Assistant Attorney General

                                         ALEXANDER K. HAAS
                                         Director, Federal Programs Branch

                                         BRIGHAM J. BOWEN
                                         Assistant Director, Federal Programs Branch

*/S/ Andrew I. Warden*
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel

JEFFREY A. HALL
KERI BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:   (202) 616-5084
Fax:    (202) 616-8470

*Attorneys for Defendants*