**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **CHRISTOPHER WISE, MICHAEL MARTINEZ, CHRISTOPHER DURKEE, and SAVANNAH GUEST** | Case No. 3:20-cv-01193-IM |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **CITY OF PORTLAND, OFFICER STEPHEN B. PETTEY, JOHN DOES 1-60, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES MARSHALS SERVICE, JOHN DOES 61-100**, | |
| Defendants. | |

**IMMERGUT, District Judge.**

Before this Court is Plaintiffs' Motion for a Temporary Restraining Order ("TRO")

pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiffs are four individuals who

serve as "protest medics" at demonstrations against racial violence in downtown Portland. They

seek an order with respect to the City of Portland, Officer Stephen B. Pettey, and John Does 1-60

("Municipal Defendants") that shall expire fourteen days after entry, unless extended by a

stipulation of the parties or by further order of the court. The requested order would enjoin the Municipal Defendants from:

> (1) arresting, threatening to arrest, or using physical force directed against any person they know or reasonably should know is a protest medic, unless authorized under Or. Rev. Stat. § 133.235 or Or. Rev. Stat. § 133.245;

> (2) using physical force directly or indirectly targeted at a protest medic when the medic is providing medical care to an individual and poses no threat to the lives or safety of the public or police;

> (3) requiring properly identified protest medics to disperse or move with demonstrators following the issuance of an order to disperse or move when the medic is providing medical care to an individual, and prohibiting Municipal Defendants from using the protest medic's decision not to disperse or move as any basis to establish that the medic has committed a crime;

> (4) seizing any medical equipment or other materials necessary for the protest medics to administer medical care, unless Municipal Defendants are lawfully seizing the protest medic; and

> (5) ordering a protest medic to stop treating an individual, or ordering a protest medic to disperse or move when they are treating an individual, unless Municipal Defendants are lawfully seizing that person. ECF 35 at ¶¶ 2–6.

On September 1, 2020, this Court held oral argument. After considering the pleadings, declarations, exhibits and arguments of counsel, this Court finds Plaintiffs have failed to show sufficient facts and adequate legal support to warrant providing protest medics unique exemptions from lawful dispersal orders, or specialized treatment different from that of their

fellow protesters. Further, the particular TRO sought in this case is unworkable when considering the totality of the chaotic circumstances that have been described by all parties in this case. In finding that Plaintiffs have not met their burden to obtain the extraordinary remedy of a mandatory injunction, this Court does not seek to discredit or diminish the efforts of the protest medics, or question their right to participate in the protests. Nor is this Court ruling on the merits of Plaintiffs' underlying claims, which will be further developed through discovery.

For the reasons that follow, Plaintiffs' Motion for a Temporary Restraining Order, ECF 35, is DENIED.

## BACKGROUND

George Floyd's tragic killing on May 25, 2020 sparked national and international protests in support of Black lives and against systemic racism in American policing. In Portland, these protests have continued for almost one hundred days. While thousands of protesters have remained peaceful, a smaller number of protesters have engaged in vandalism, destroyed property, and committed acts of violence. Russell Decl., ECF 17-1 at ¶ 3; *see also Don't Shoot Portland v. City of Portland*, No. 3:20-cv-00917-HZ, 2020 WL 3078329 (D. Or. June 9, 2020), Passadore Decl., ECF 118 at ¶¶ 25–60 (describing destructive and violent acts by protesters on June 25, 2020 and June 30, 2020). Over the past few months, various crowd dispersal tactics have been used at the protests, including rubber bullets, impact munitions, and other forms of force. *Id.* at ¶¶ 8, 9. Although the City of Portland initially used tear gas as a dispersal technique, that dispersal method was limited by a temporary restraining order issued on June 9, 2020 in *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-00917-HZ, 2020 WL 3078329 (D. Or. June 9, 2020). Those restrictions remain in effect today.[1]

---

[1] On July 14, 2020, based on a joint request by the parties, Chief United States District Judge Marco A. Hernandez extended the temporary restraining order restrictions in their current

Plaintiffs are "protest medics" who attend public demonstrations in Portland to provide support, comfort, and medical aid to protesters. Plaintiffs hail from a diverse array of backgrounds and medical training.[2] Protest medics, as defined in the TRO, have no required uniform or dress, but identify themselves as medics through marks on their clothing—such as painting the word "medic" on their backs, or affixing a red-cross symbol with duct-tape to their arms and chest. *See* ECF 35 at ¶ 1. They often also carry medical supplies on their person and in backpacks.

The protest medics provide a range of services, including rendering basic medical aid to injured protesters, carrying injured persons to safety, providing water and food, and providing moral support. Durkee Decl., ECF 5 at ¶¶ 10 (dancing to keep spirits high), ¶ 13 (dressing lacerations), ¶ 21 (applying pressure to injured protester Donavan LaBella's wound until the arrival of an ambulance); Wise Decl., ECF 6 at ¶ 15 (wrapping injured protester Donavan LaBella's wound with gauze before helping to transport him to an ambulance); Paul Decl., ECF 8 at ¶ 9 (cleaning eye wound); Hubbard Decl., ECF 10 at ¶ 7 (washing out the eyes of protester who was pepper sprayed); Guest Decl., ECF 11 at ¶ 12 (providing eye wash to protesters after exposure to tear gas); Shifflett Decl., ECF 37 at ¶ 10 (attempting to carry an injured protester out of harm's way). Protest medics also hand out supplies such as eye wash and eye wipes in anticipation of tear gas, and masks, gloves, and hand sanitizer to protect against COVID-19. Martinez Decl., ECF 9 at ¶ 23. The most common police-inflicted injuries the protest medics have seen in the Portland protests is exposure to tear gas. Guest Decl., ECF 11 at ¶ 12.

---

form until further order of the court. *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-00917-HZ, ECF 133.

[2] Based on the declarations provided, none of the plaintiffs appear to currently be licensed medical professionals in the state of Oregon.

Plaintiffs allege Municipal Defendants violated the First and Fourteenth Amendments by targeting them in retaliation for serving as protest medics, using excessive force against Plaintiffs, and unlawfully seizing the property of protest medics. ECF 1 at ¶¶ 4, 186–87. Additionally, Plaintiffs contend that supporting protesters as protest medics constitutes expressive conduct protected by the First Amendment, and Municipal Defendants infringe on their right of free speech by ordering Plaintiffs to leave an area pursuant to lawful dispersal orders while they provide medical aid. *Id.* at ¶ 184. Plaintiffs have not challenged the lawfulness of the dispersal orders. Plaintiffs therefore raise the narrow issue of whether protest medics, as defined by the TRO, should effectively receive special dispensation under the First Amendment to remain in areas where police have issued lawful dispersal orders.

Plaintiffs previously filed for a TRO against both Federal and Municipal Defendants on July 24, 2020. ECF 4. Before this Court held a hearing on the motion, Federal Defendants announced an intention to reduce their presence in Portland. Shortly thereafter, Plaintiffs withdrew their TRO motion. ECF 24. On August 21, 2020, Plaintiffs filed this second motion for a TRO solely against Municipal Defendants. ECF 35.[3]

**A. Plaintiffs**

Plaintiff Christopher Wise completed training at Southwestern Oregon Community College to be an emergency medical technician ("EMT"). Wise Decl., ECF 6 at ¶ 2. Although not certified as an EMT, Plaintiff Wise has certifications for Basic Life Support ("BLS") and CPR for Healthcare Workers. *Id.* Since June 2, 2020, Plaintiff Wise has regularly attended

---

[3] At oral argument, Plaintiffs and Municipal Defendants agreed the Court can consider the supporting declarations for the initial TRO in evaluating Plaintiffs' second TRO as well as those filed in *Don't Shoot Portland v. City of Portland,* No. 3:20-cv-00917-HZ, 2020 WL 3078329 (D. Or. June 9, 2020).

demonstrations as a protest medic. *Id.* at ¶ 7. While serving as a medic, Plaintiff Wise displays bright orange or pink duct-taped crosses on his outermost layer of clothing on his chest and each of his shoulders. *Id.* at ¶ 9. He also has the word "medic" spray painted in red lettering across his back. *Id.*

Plaintiff Michael Martinez has been a graduate student at Oregon Health & Sciences University ("OHSU") since the fall of 2019, in a doctoral program for Medical and Molecular Genetics. Martinez Decl., ECF 9 at ¶ 2. He has attended the Portland protests several times as a protest medic with a group organized by OHSU faculty and graduate students. *Id.* at ¶¶ 19, 21, 22. The OHSU group sets up a medic station with a variety of medical supplies including gauze, bandages, antibiotic ointments, tape, ear plugs, over-the-counter pain medications, and eye wash solutions. *Id.* at ¶ 23. The station also offers snacks, water, and COVID-19 related supplies such as masks, gloves, and hand sanitizer. *Id.* Because Plaintiff Martinez has only basic first aid training, he generally assists medics with higher levels of training by providing supplies. *Id.* at ¶ 26. He has also provided food and water to protestors as part of his role as a protest medic. *Id.* at ¶ 22.

Plaintiff Christopher Durkee previously worked in Los Angeles County as an EMT and emergency dispatcher for five years. Durkee Decl., ECF 5 at ¶ 2. He has also worked at a psychiatric hospital in some capacity. *Id.* at ¶ 2. Plaintiff Durkee serves as a protest medic with a partner, Plaintiff Savannah Guest. *Id.* at ¶ 12; Guest Decl., ECF 11 at ¶ 9. Plaintiff Guest previously worked as a volunteer emergency medical responder for emergency medical services in Powhatan, Virginia for 1.5 years. Guest Decl., ECF 11 at ¶ 2. She is not trained as an EMT, but she is CPR, First Aid, and Automated External Defibrillator ("AED") certified. *Id.* While attending the protests, both Plaintiffs Durkee and Guest wear dark-colored clothes with high-

gloss, red duct tape in the shape of crosses on the front and back of their clothing. Durkee Decl., ECF 5 at ¶ 9; Guest Decl., ECF 11 at ¶ 7. They also wear shoulder patches with crosses and display the word "medic" on their backpacks. Durkee Decl., ECF 5 at ¶ 9; Guest Decl., ECF 11 at ¶ 7.

**B.  Protests**

The Portland protests initially centered around the downtown area near the Multnomah County Justice Center, the Portland Police Bureau's North and Central Precincts, and the Mark O. Hatfield United States Courthouse. Dobson Supp. Decl., ECF 43 at ¶ 9. Demonstrations have also occurred near the Portland Police Association Union Hall in Northeast Portland and the Immigration and Customs Enforcement Building in Southwest Portland. *Id.* Most recently, demonstrations have also been held at Multnomah County's Penumbra Kelly Building and the Portland Police Bureau's East Precinct. *Id.* Several of these buildings are in or near residential neighborhoods. *Id.*

Although many demonstrators have peacefully assembled, declarations submitted by the parties demonstrate that the protests have regularly escalated into dangerous scenarios for the community, law enforcement, as well as protesters, particularly during the late hours of the night and into the early mornings.[4] *See* Dobson Supp. Decl., ECF 43 at ¶ 9. For example, Federal Defendants allege that in the early morning hours of July 3, 2020, a group of individuals smashed the glass in the doors of the Mark O. Hatfield Courthouse, threw balloons containing an

---

[4] Both law enforcement officers and protesters have been injured during altercations at the protests. Most recently, although not part of the declarations submitted, the protests turned deadly when someone was shot and killed in downtown Portland on August 29, 2020. Eder Campuzano, *1 man shot, killed near downtown Portland protests Saturday*, THE OREGONIAN (Aug. 30, 2020), https://www.oregonlive.com/portland/2020/08/1-person-shot-killed-near-downtown-portland-protests-saturday.html.

accelerant liquid into the lobby, then fired commercial fireworks towards the accelerant in an apparent attempt to start a fire. Russell Decl., ECF 17-1 at ¶ 6.

Federal Defendants also describe further violence which occurred on July 11, 2020. That night there were approximately 300 protesters around the Courthouse. *Id.* at ¶ 8. A barrier of police tape was placed across the front of the Hatfield Courthouse and protesters were ordered not to trespass onto federal property. *Id.* When an individual refused to comply with that command, federal officers deployed and made an arrest for trespass. *Id.* While the officers were making the arrest, a crowd of individuals swarmed them. *Id.* Officers deployed less-lethal projectile rounds into the crowd, and the crowd responded by throwing rocks, glass bottles, and fireworks at the officers. *Id.* Tear gas was then deployed as officers withdrew to the courthouse. *Id.*

On the night of July 19, 2020, a crowd of over 1,000 protesters demonstrated in the downtown area near the Hatfield Courthouse. *Id.* at ¶ 12. Federal Defendants allege the protesters removed fencing from around the courthouse and again attempted to set fire to the building. *Id.* Additionally, protesters are alleged to have shot commercial grade fireworks at law enforcement. *Id.* Officers used dispersal tactics to move the crowd off federal property. *Id.*

More recently, on the night of August 4, 2020, a protest of approximately 200 individuals marched from Peninsula Park to the Portland Police Association located in Northeast Portland. Dobson Supp. Decl., ECF 43 at ¶ 19. Protesters allegedly lit a large dumpster on fire near the Portland Police Association office while chanting that they wanted to burn down the building. *Id.* Municipal Defendants further allege protesters attempted to break into the building several times and lit a Molotov cocktail. *Id.* Furthermore, one protester allegedly pulled out a firearm and shot it several times after engaging in a fist fight with another protester. *Id.*

PAGE 8 – OPINION AND ORDER

Protesters again marched from Peninsula Park to the Portland Police Association on August 8, 2020. *Id.* at ¶ 21. Members of the crowd of roughly 500 protesters moved dumpsters onto the street and lit them on fire. *Id.* Municipal Defendants allege demonstrators attempted to break into the Portland Police Association office that night by breaking windows and disabling the security cameras. *Id.*

On the night of August 20, and the early morning August 21, 2020, roughly 200 to 250 protesters gathered around the ICE building, located near a residential neighborhood. Municipal Defendants allege members of the crowd threw rocks, hammers, and fireworks at law enforcement officers. *Id.* at ¶ 22. Protesters also allegedly sprayed graffiti, kicked doors, and broke windows. *Id.*

Yet another night, on August 23, 2020, there was a demonstration near the Portland Police Bureau's North Precinct with over 200 protesters. *Id.* at ¶ 23. Municipal Defendants allege members of the crowd threw rocks, bottles, and other projectiles at law enforcement officers. Municipal Defendants also allege some members of the crowd "threw a commercial mortar on to the North Precinct roof, and lit the [northwest] corner awning of the Precinct building on fire." *Id.*

During the demonstrations, officers protecting the municipal and federal properties allege they have been "subject to threats, rocks and ball bearings fired with wrist rockets, improvised explosives, aerial fireworks, and commercial grade mortars, high intensity lasers targeting officer's eyes, thrown rocks, full and empty glass bottles, and balloons filled with paint and other substances such as feces." Russell Decl., ECF 17-1 at ¶ 4. One protester is alleged to have struck an officer in the head and shoulder with a two-pound sledgehammer when the officer tried to prevent the protester from breaking into the Hatfield Courthouse. *Id.*

Over the course of the past few months, the Portland Police Bureau ("PPB") has frequently declared protests in Portland to be unlawful assemblies. *See, e.g.*, Dobson Supp. Decl., ECF 43 at ¶¶ 19–23; *Don't Shoot Portland v. City of Portland,* No. 3:20-cv-00917-HZ, 2020 WL 3078329 (D. Or. June 9, 2020), Dobson Decl., ECF 105. Since July 25, 2020, the Portland Police Bureau ("PPB") has declared a riot under state law eight times. *Id.* at ¶ 11. Once an unlawful assembly or riot has been declared, the PPB has authority under Oregon law to disperse the group, and arrest those who fail to comply with police orders. *See* Or. Rev. Stat. § 131.675. Once dispersal orders have been given, it is important for the safe management of crowd control operations that protesters comply. Dobson Supp. Decl., ECF 43 at ¶ 14. When people fail to disperse, they are potentially interfering with a police tactical operation. *Id.*

Plaintiffs provide declarations that describe the police response to the protests. Plaintiffs allege they and other medics suffered injuries from crowd control tactics such as chemical irritants and less-lethal munitions deployed by Defendants.[5] *See, e.g.*, Martinez Decl., ECF 9 at ¶ 32; Durkee Decl., ECF 5 at ¶ 20; Guest Decl., ECF 11 at ¶ 15; Wise Decl., ECF 6 at ¶¶ 22–26, 28, 30. They argue these injuries evince an effort on the part of law enforcement to target the medics. The harms Plaintiffs allege they experienced have generally happened in the aftermath of a dispersal order while officers are trying to clear the area.

For example, Plaintiff Wise alleges on June 2, 2020, he was shot in the shin with a rubber bullet while attempting to pull another fallen protester out of a recently deployed cloud of tear gas. Wise Decl., ECF 6 at ¶ 22. Plaintiff Wise also alleges a Portland police officer forcefully shoved him down on the night of July 4, 2020, injuring his shoulder and hand. *Id.* at ¶ 26.

---

[5] It is unclear whether some of the alleged harms described in Plaintiffs' declarations are attributed to Federal or Municipal Defendants.

Plaintiff Guest alleges on July 4, 2020, she was shot with a projectile, checked in the shoulder with a baton, and forcibly pushed by law enforcement officers. Guest Decl., ECF 11 at ¶ 15. Plaintiff Durkee alleges that an officer checked him from behind with a baton on that same night. Durkee Decl., ECF 5 at ¶ 20. Plaintiff Guest also alleges she was shot three times with rubber bullets on July 19, 2020 while trying to approach a protester suffering from tear gas exposure. Guest Decl., ECF 11 at ¶ 29.

Plaintiff Durkee alleges on July 11, 2020, and into the early morning of July 12, 2020, he and Plaintiff Guest were attempting to move injured people out of the street and away from incoming federal officers, who responded by firing tear gas canisters and pepper balls at them. Durkee Decl., ECF 5 at ¶ 22. Plaintiff Guest alleges she was also pushed by those federal officers and struck with their batons that same night after they refused to allow her to provide aid to someone lying on the ground during a dispersal order. Guest Decl., ECF 11 at ¶¶ 19–20.

Plaintiffs Martinez and Wise also allege they were unlawfully singled out and arrested by Municipal Defendants. Plaintiff Martinez alleges that on June 13, 2020, he was arrested while working at the OHSU medic station after starting to film the officers while they attempted to clear the area. This occurred after a dispersal order was announced. Martinez Decl., ECF 9 at ¶¶ 33–39. Plaintiff Wise alleges that while serving as a protest medic on August 20, 2020, through the early morning of August 21, 2020, he was unlawfully arrested while walking among a group of protesters who were complying with a police dispersal order. Wise Supp. Decl., ECF 38 at ¶ 4.

## STANDARD

In deciding whether to grant a motion for a temporary restraining order, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is

PAGE 11 – OPINION AND ORDER

likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Like a preliminary injunction, a temporary restraining order is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22.

The Ninth Circuit applies a "sliding scale" approach in considering the factors outlined in *Winter*. A stronger showing of one element of the preliminary injunction test may offset a weaker showing of another. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Thus, "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (quoting *All. for the Wild Rockies*, 632 F.3d at 1135).

Finally, the already high standard for granting a TRO or preliminary injunction is further heightened when the type of injunction sought is a "mandatory injunction." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden is "doubly demanding" for a mandatory injunction). To obtain a mandatory injunction, a plaintiff must "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Id.* (emphasis in original). As explained by the Ninth Circuit:

> A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." A mandatory injunction orders a responsible party to take action. A mandatory injunction goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored. In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.
>
> The *status quo ante litem* referenced in *Chalk* means the last, uncontested status which preceded the pending controversy.

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir.

2009) (quotation marks and citation omitted) (alterations in original).

## DISCUSSION

### A.  TRO Factors

#### 1. Likelihood of Success on the Merits

##### a. First Amendment Claim

Plaintiffs' First Amendment claim alleges Municipal Defendants unlawfully retaliated

against them for serving as protest medics. ECF 1 at ¶¶ 182–188, 201–213. The First

Amendment prohibits governmental officials from retaliating against individuals for engaging in

constitutionally protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). In order to

prevail on a First Amendment retaliation claim, Plaintiffs must show that: (1) they engaged in a

constitutionally protected activity; (2) the Municipal Defendants' actions would "chill a person

of ordinary firmness" from continuing to engage in the activity; and (3) Plaintiffs' engagement in

protected speech was a "substantial or motivating factor" in the Municipal Defendants' conduct.

*O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016).

Plaintiffs allege that rendering medical aid to protesters is a constitutionally protected

form of expressive conduct. ECF 1 at ¶ 184. To be sure, First Amendment protection of speech

"does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

Constitutional protection extends also to expressive conduct. *Rumsfeld v. Forum for Acad. &*

*Inst'l Rights, Inc.*, 547 U.S. 47, 66 (2006). But to merit First Amendment protection, the conduct

must be "inherently expressive." *Id.* Whether expressive conduct constitutes a protected form of

speech depends on whether the conduct "is intended to convey a 'particularized message' and the

likelihood is great that the message would be so understood." *Corales v. Bennett*, 567 F.3d 554,

562 (9th Cir. 2009) (quoting *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999)). Expressive

conduct need not convey a specific message. *Hurley v. Irish–Am., Gay, Lesbian & Bisexual Group of Boston, etc.,* 515 U.S. 557, 569 (1995). The critical question is whether a reasonable observer would interpret the conduct as *some* sort of message. *Id.*

Plaintiffs contend that they exercise their right of free speech by "providing care and support to the protesters demonstrating for the cause of equal treatment and absolute equality under the law." ECF 35 at 12. Certainly, participating in a protest is expressive conduct "clearly protected by the First Amendment," *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996), but Plaintiffs assert the novel position that "rendering medical aid to support and advance a protest is itself a form of constitutionally protected expression." ECF 35 at 25. Additionally, Plaintiffs ask this Court to allow them to essentially disregard dispersal orders so they may provide aid to injured protesters. Although Plaintiffs' goal of providing aid to protesters is undoubtedly admirable, this Court has found no legal authority for affording protest medics, as defined by Plaintiffs, unique recognition under the First Amendment beyond that afforded any individual who attends a protest.[6] Protest medics may continue to protest, and provide medical aid during the protests. They simply have no unique status under the First Amendment that allows them to disregard lawful orders.

---

[6] Plaintiffs primarily rely on two cases—*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235 (11th Cir. 2018) and *Abay v. City of Denver*, 445 F. Supp. 3d 1286 (D. Colo. 2020)—for their assertion that serving as a protest medic is expressive conduct. Neither of these cases are precedential to this Court. Furthermore, these cases have not made clear that acting as a protest medic, as described in this case, constitutes expressive conduct. In *Abay*, the district court grouped the analysis of the alleged excessive force used against protesters, protest medics, and journalists. 445 F. Supp. 3d at 1292. Nowhere did the court recognize that participating in a protest as a medic is a distinct type of expressive conduct. In *Food Not Bombs*, the Eleventh Circuit concluded that an organization's act of providing free food to the public constituted expressive conduct after noting that the group posted signs and distributed literature at the events which distinguished its food sharing from every day activities. 901 F.3d at 1242. Accordingly, the facts in that case are not sufficiently analogous to the issues before this Court.

Regardless, Plaintiffs have not demonstrated that the Municipal Defendants' actions were motivated by their status as protest medics sufficient to satisfy the third prong of a First Amendment retaliation claim. Plaintiffs argue that Municipal Defendants "indiscriminately, and at close range, unleashed chemical irritants, deployed munitions, and engaged in physical violence specifically against them," despite visible markings identifying them as medics. ECF 4 at 30–31. But Plaintiffs admittedly lack a distinct uniform, instead identifying themselves primarily with crosses taped or painted onto ordinary clothing. This lack of uniformity cuts against the proposition that protest medics are readily identifiable, especially when considering the chaotic situations where officers must distinguish between protest medics and other protesters through split-second judgments.

Plaintiffs also concede that they often position themselves right next to protesters in areas which pose the most risk of harm, rather than standing apart from the crowd. *See* Durkee Decl., ECF 5 at ¶¶ 14–15 (stating that Plaintiff Durkee and Plaintiff Guest work in the "front line" during stationary moments and the "back line" during dispersals because those areas present a clear danger of injury); Wise Decl., ECF 6 at ¶ 29 (describing that declarant was standing behind "a group of protestors who formed a line with physical shields" facing "federal law enforcement officers"); Rivera Decl., ECF 36 at ¶ 15 (relating declarant's participation in forming a wall between protesters and police with other non-medic, military veteran protesters after the PPB made an unlawful assembly announcement).

Furthermore, in many of the described instances of harm, the protest medics were not in the act of providing medical aid such that their unique role would be obvious to the outside observer. *See, e.g.*, Wise Decl., ECF 6 at ¶ 25 (describing a PPB officer spraying "bear mace" at declarant in close proximity while declarant was attempting to pull a protester away from another

PPB officer), ¶ 29 (stating that declarant was standing behind "a group of protestors who formed a line with physical shields" facing "federal law enforcement officers" when a law enforcement officer "shot a tear gas canister at [declarant's] head"); Guest Decl., ECF 11 at ¶¶ 19–20 (describing being pushed and jabbed with a baton while federal agents were dispersing an area). Accordingly, on balance, Plaintiffs have not shown they were retaliated against because they exercised a First Amendment Right.

Many, if not all, of the instances of alleged targeting appear to occur when protest medics refuse to follow police dispersal orders. *See, e.g.*, Guest Decl., ECF 11 ¶¶ 18–20 (being pushed while federal agents were dispersing an area after deciding to "stand our ground to try to assist the injured person, despite the incoming federal officers"); Durkee Decl., ECF 5 at ¶ 25 (stating a federal law enforcement officer struck him with a baton and another tackled him from the side while agents were trying to disperse the area). It is well established that protected speech can be regulated. Regulation of speech is justified "if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 376–377 (1968). As previously noted, under Oregon law, Portland police have authority to disperse unlawful or riotous assemblies and arrest those who do not immediately comply. Or. Rev. Stat. § 131.675. Portland police are entitled to use some level of reasonable force under the circumstances to effectuate the dispersal. *See Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001).

In sum, Plaintiffs have not demonstrated a likelihood of success on the merits of their First Amendment claim, let alone shown that "the law and facts *clearly favor* [their] position," as required to obtain a mandatory injunction. *Garcia*, 786 F.3d at 740 (emphasis in original).

### b. Fourth Amendment Claim

Plaintiffs' central Fourth Amendment claim alleges Municipal Defendants used excessive force in targeting the protest medics.[7] ECF 35 at 12–13 ("the Portland Police are continuing to use excessive force to retaliate against Plaintiffs and numerous other protest medics for providing medical aid to protesters who the police themselves injure"); *id.* at 39–43. All claims of excessive force are analyzed under the Fourth Amendment's "reasonableness" standard, using the framework the Supreme Court set forth in *Graham v. Connor*, 490 U.S. 386, 396 (1989). The objective reasonableness standard balances: (1) the nature and quality of the intrusion on the individual's Fourth Amendment interests against (2) the countervailing governmental interests at stake. *Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Further, to obtain an injunction, Plaintiffs must show law enforcement's use of force was targeted against

---

[7] Plaintiffs also claim the PPB unlawfully seized medical equipment and materials from a medic station at which Plaintiff Martinez was volunteering on June 13, 2020. ECF 35 at 44–45. Even assuming Plaintiffs have stated a Fourth Amendment unlawful seizure claim, this appears to be at most one of two isolated incidents in which protest medic property was seized over the course of several months. *See* Shifflett Decl., ECF 37 at ¶ 11 (alleging on July 4, 2020, a police officer "dumped [declarant's] medical-supply bag into the street."). This Court finds that Plaintiffs have not met their burden to demonstrate any future risk of irreparable injury related to the unlawful seizure of property. Plaintiffs' claims for equitable relief on this basis fail.

them because they were protest medics, and therefore they are likely to suffer irreparable harm.
*See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

Plaintiffs allege they experienced multiple injuries at the hands of Municipal Defendants
from crowd control tactics such as chemical irritants and less-lethal munitions. Martinez Decl.,
ECF 9 at ¶ 32; Durkee Decl., ECF 5 at ¶ 20; Guest Decl., ECF 11 at ¶ 15; Wise Decl., ECF 6 ¶¶
22–26, 28, 30. A Fourth Amendment excessive force analysis is a highly particularized inquiry
to be determined by assessing the "totality of the circumstances," *Tennessee v. Garner*, 471 U.S.
1, 8–9 (1985), with consideration of the surrounding context of each interaction, *Nelson v. City
of Davis*, 685 F.3d 867, 886 (9th Cir. 2012).

While some of these alleged instances do raise serious questions about the merits of the
excessive force claims, Plaintiffs have not demonstrated that "the law and facts *clearly favor*
[their] position," as required to obtain a mandatory injunction at this time. *Garcia*, 786 F.3d at
740 (emphasis in original). Many of the alleged instances of excessive force occurred while
police were attempting to clear an area through a dispersal order. *See, e.g.*, Wise Decl., ECF 6 at
¶ 22 (describing being shot in the shin with a rubber bullet while attempting to pull another fallen
protester out of a recently deployed cloud of tear gas). In other allegations, the context of the
surrounding circumstances is entirely unclear. *See* Martinez Decl., ECF 9 at ¶ 32 (explaining that
"[w]hile serving as a protest medic, [declarant has] been shoved, shot at, and tear gassed"
without providing any further context). Plaintiffs claim they were targeted, but as previously
mentioned, their appearance would not make them obviously distinguishable from others,
particularly in the dark amongst a large crowd. Further, Plaintiffs often position themselves
directly between law enforcement and other protesters during dispersals. *See* Durkee Decl., ECF
5 at ¶¶ 14–15.

PAGE 18 – OPINION AND ORDER

Finally, in some circumstances, there are directly competing narratives about what transpired on the ground. *See* Dobson Supp. Decl., ECF 43–1 (explaining declarant Rivera's arrest occurred because he repeatedly shined a high-powered flashlight directly at police officers' eyes in an alleged attempt to obscure their vision); Rivera Supp. Decl., ECF 46 at ¶¶ 3–5 (refuting allegations declarant ever possessed a high-powered flashlight or shined it at officers). A determination of excessive force in this context is better suited through litigation of the underlying Complaint, upon fuller development of the record. This Court cannot make the credibility determinations necessary to find for the Plaintiffs on the merits of their Fourth Amendment claims at this stage.

### 2. Irreparable Harm

Plaintiffs must also "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. To satisfy this factor, Plaintiffs must show a "real or immediate threat that [Plaintiffs] will be wronged again." *Lyons*, 461 U.S. at 111. In general, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879 (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980) (internal quotation marks omitted)).

As previously discussed, Plaintiffs have not raised sufficient evidence to suggest that they are being systematically targeted by law enforcement for their medical assistance at protests. The protest medics are a loosely organized group, united through an "informal network." Wise Decl., ECF 6 at ¶ 12. They do not wear a particular uniform; instead, they each make their own. Because of their varied backgrounds and training, they do not offer uniform types of aid. While some utilize trauma kits, Durkee Decl., ECF 5 at ¶ 13, others hand out food, water, and basic

medical supplies, Martinez Decl., ECF 9 at ¶¶ 22–23. In other words, the protest medics are not obviously distinguishable from other protesters.

Moreover, as described previously, in many of the incidents of alleged targeting described, the protest medics were not in the act of providing medical aid. *See, e.g.*, Wise Supp. Decl., ECF 38 at ¶ 4 (recounting two PPB officers arresting him while "walking among a group of protesters"). The Municipal Defendants deny any targeting of protest medics in their use of force. *See* Dobson Supp. Decl., ECF 43 at ¶ 12 ("PPB and its [Rapid Response Team] squads do not target medics for application of Riot Control Agents . . . or other forms of physical force."). Further, with regard to the alleged unlawful arrests, Municipal Defendants raise at least the plausible contention that rather than targeting protest medics without reason, there was probable cause to arrest them. *See, e.g.*, Dobson Supp. Decl., ECF 43–1 (explaining declarant Rivera was arrested after allegedly refusing to stop shining an industrial grade flashlight into police officers' eyes from less than ten feet away). These incidents raise further doubts that the protest medics were targeted for their activity as medics.

Additionally, the dynamic and evolving circumstances governing Municipal Defendants' interactions with protesters caution against the likelihood of future similar injury to these Plaintiffs, particularly with regard to tear gas and less lethal munitions. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (noting a defendant's cessation of a challenged practice is an important factor bearing on the question of whether a court should exercise its power to enjoin the defendant from renewing the practice). For instance, the PPB has several new restrictions on the use of tear gas, including: (1) an Executive Order issued by Mayor Wheeler on June 6, 2020, directing the PPB to only use CS gas (a form of tear gas) when there is "a serious and immediate threat to life safety, and there is no other viable alternative for

dispersal," ECF 18 at 8; Dobson Supp. Decl., ECF 43 at ¶ 24; (2) a TRO issued by Chief Judge

Hernandez prohibiting the PPB's use of tear gas to "to disperse crowds where there is no or little

risk of injury," ECF 18 at 9; Dobson Supp. Decl., ECF 43 at ¶ 24; and (3) a new law signed by

Governor Kate Brown on June 30, 2020, restricting Oregon law enforcement agencies'

deployment of tear gas to circumstances constituting a riot under Or. Rev. Stat. § 166.015, and

only after announcements are made and sufficient time is allowed for persons to leave the area,

ECF 18 at 9; Dobson Supp. Decl., ECF 43 at ¶ 24.

Moreover, on June 26, 2020, Chief Judge Hernandez entered a stipulated TRO restricting

PPB's use of certain crowd control munitions and aerosol restraints. ECF 18 at 10. For example,

Rubber Ball Distraction Devices of the type Plaintiff Wise alleges he was targeted with on June

21, 2020, by a PPB officer, Wise Decl., ECF 6 at ¶ 24, can now only be used in situations where

the lives or safety of the public or police are at risk, and cannot be used to disperse crowds where

there is no or little risk of injury. ECF 18 at 26. The TRO is currently operative and has been

extended by the court until further notice. *Id.* at 10.

Finally, Plaintiffs' nearly one-month delay in seeking equitable relief following the

withdrawal of the First Motion for a TRO further undercuts their argument that such an

extraordinary or drastic remedy is needed at this time. *See Lydo Enters., Inc. v. City of Las

Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a

factor to be considered in weighing the propriety of relief."). Plaintiffs have not shown that

"irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.

### 3. The Public Interest and the Balance of the Equities

A plaintiff seeking a preliminary injunction or temporary restraining order must also

establish not only that he is likely to succeed on the merits and is likely to suffer irreparable harm

in the absence of preliminary relief, but also that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter*, 555 U.S. at 20. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (internal citations omitted).

This Court acknowledges the significance of this moment in our nation's history, and the crucial role of peaceful assembly in preserving American democracy. *See Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (noting the important public interest in upholding First Amendment principles). However, there is also a strong public interest in maintaining order and public safety.

In their request for relief, the protest medics essentially ask for special status. They seek an exemption from generally applicable dispersal orders. However, doing so may impose irreparable harm and undue hardship on law enforcement, creating an unworkable distinction between the ordinary protestor, who is subject to dispersal orders, and the protest medics, who are not.

Based on the facts presented to this Court, the line between protester and protest medic is not sufficiently clear such that granting them the relief they request would not sow confusion or create additional risks. The protest medics wear no particular uniform, offer no particular type of aid, and possess no particular level of medical training. When they attend the protests, many deliberately stand in the spaces between law enforcement and the protesters, or even enmesh themselves with other protesters. *See, e.g.*, Rivera Decl., ECF 36 at ¶ 15 (describing declarant's participation in forming a wall between protesters and police with other non-medic, military veteran protesters after the PPB made an unlawful assembly announcement). The protest medics' actions and appearance would not obviously distinguish them from a diverse crowd of protesters.

Upon consideration of the record before this Court, at this time, Plaintiffs have failed to demonstrate that the public interest and the balance of equities support their position. Certainly, the safety of all protesters is clearly in the public interest. However, that safety is not the responsibility of these volunteers alone.[8] These factors weigh against Plaintiffs' request for injunctive relief.

## CONCLUSION

In so ruling, this Court does not seek to diminish or devalue the efforts of the protest medics in keeping others safe, nor does this Court question the protest medics right to continue engaging in the protests and offering medical support to protestors. Like ordinary protesters, however, the protest medics must abide by lawful police orders. Plaintiffs' Motion for a Temporary Restraining Order, ECF 35, is DENIED.

**IT IS SO ORDERED**.

DATED this 2nd day of September 2020.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

---

[8] Portland Fire & Rescue Medics have also been present at the protests to assist with injured protesters and law enforcement. *See Don't Shoot Portland v. City of Portland,* No. 3:20-cv-00917-HZ, 2020 WL 3078329 (D. Or. June 9, 2020), Simmons Decl., ECF 94 at ¶ 6 (stating as of July 3, 2020, Portland Fire & Rescue Medics had assisted 42 protesters and 32 officers).