JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
JEFFREY A. HALL
MICHAEL P. CLENDENEN
Trial Attorneys
U.S. Department of Justice
Civil Division
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 353-8679
Fax:    (202) 616-8470

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| CHRISTOPHER WISE, *et al.*,<br><br>       Plaintiffs,<br><br>   v.<br><br>CITY OF PORTLAND, *et al.*,<br><br>       Defendants. | Case No. 3:20-cv-01193-IM<br><br>**FEDERAL DEFENDANTS'<br>MOTION TO DISMISS AGENCY<br>AND OFFICIAL CAPACITY<br>CLAIMS** |

FEDERAL DEFENDANTS' MOTION TO DISMISS

**FEDERAL DEFENDANTS' MOTION TO DISMISS AGENCY AND OFFICIAL
CAPACITY CLAIMS UNDER RULES 12(B)(1) AND 12(B)(6)**

Federal Defendants respectfully move under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss all claims against federal agency defendants and federal officers sued in their official capacities.  In support of this Motion, Federal Defendants refer the Court to the attached Memorandum.  Pursuant to Local Rule 7-1, Federal Defendants certify that their counsel have conferred in good faith with counsel for Plaintiffs but were unable to resolve the issues raised by this motion.

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Jeffrey A. Hall*
JEFFREY A. HALL (DC 1019264)
MICHAEL P. CLENDENEN
Trial Attorneys
United States Department of Justice
Civil Division
1100 L Street NW, Rm. 11214
Washington, DC 20005
Tel: (202) 353-8679
Email: jeffrey.a.hall@usdoj.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

CHRISTOPHER WISE, *et al.*,

       Plaintiffs,

    v.

CITY OF PORTLAND, *et al.*,

       Defendants.

Case No. 3:20-cv-01193-IM

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FEDERAL DEFENDANTS' MOTION TO DISMISS AGENCY AND OFFICIAL CAPACITY CLAIMS UNDER RULES 12(B)(1) AND 12(B)(6)**

FEDERAL DEFENDANTS' MOTION TO DISMISS

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

LEGAL STANDARD........................................................................................................ 4

ARGUMENT ..................................................................................................................... 5

   I.   Plaintiffs Lack Standing to Obtain Equitable Relief Against Federal Defendants .............. 5

     A.  Plaintiffs Must Demonstrate a Certainly Impending Injury............................................. 5

     B.  Plaintiffs Have Failed to Demonstrate Standing For Injunctive Relief .......................... 8

     C.  Because Plaintiffs Lack Standing For Injunctive Relief, They Also Cannot Obtain a Declaratory Judgment ...................................................................................................... 12

   II.  Plaintiffs' Pleading Failures in Their Constitutional Claims Require Dismissal of Those Claims............................................................................................................................. 13

     A.  Plaintiffs Have Failed to Plead a Violation of Their First Amendment Rights ............. 16

     B.  Plaintiffs Have Failed to Plead a Violation of Their Fourth Amendment Rights .......... 21

   III. Plaintiffs Have Failed to Plead Any Violation of the APA................................................ 24

CONCLUSION.................................................................................................................. 28

## **TABLE OF AUTHORITIES**

**Cases**

*Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d 320 (D.D.C. 2018)...............................................27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................................................. 2, 4, 15

*Austin v. Univ. of Oregon*, 925 F.3d 1133 (9th Cir. 2019) ............................................................ 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................................... 4

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................................................ 28

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).... 14

*Blackburn v. United States*, 100 F.3d 1426 (9th Cir. 1996)......................................................... 26

*Blair v. Shanahan*, 38 F.3d 1514 (9th Cir. 1994) ......................................................................... 6

*Capp v. City of San Diego*, 940 F.3d 1046 (9th Cir. 2019) ......................................................... 21

*City of Los Angeles v. Lyons,* 461 U.S. 95 (1983) ................................................................ passim

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ....................................................... 6, 8, 10, 11

*Colten v. Kentucky*, 407 U.S. 104 (1972) .................................................................................... 18

*Dugan v. Rank*, 372 U.S. 609 (1963).......................................................................................... 14

*Eggar v. City of Livingston*, 40 F.3d 312 (9th Cir. 1994) ............................................................. 8

*Fed. Deposit Ins. Corp. v. Mey*er, 510 U.S. 471 (1994) ............................................................... 14

*Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018) ................................................. 21, 22, 23, 24

*Gilbert v. DaGrossa*, 756 F.2d 1455 (9th Cir. 1985)..................................................................... 5

*Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220 (9th Cir. 1998) (en banc) ............................. 12

*Graham v. Connor*, 490 U.S. 386 (1989) .............................................................................. 21, 22

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..................................................................... 18

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) ...................................................................... 27

*Hicks v. City of Portland*, No. CV 04-825-AS, 2006 WL 3311552 (D. Or. Nov. 8, 2006).......... 18

*Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. 2001) .................................................. 22, 23

*Kentucky v. Graham*, 473 U.S. 159 (1985) ................................................................. 14

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949) ...................................... 14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................................... 5, 10, 15

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ....................................................... 27

*Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 14 F.3d 457 (9th Cir. 1994) ............................ 17, 19

*Menotti v Seattle*, 409 F.3d 1113 (9th Cir. 2005) ......................................................... 18

*Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993) ......................................................... 26

*Miller v. Lifestyle Creations, Inc.*, 993 F.2d 883 (9th Cir. 1993) .................................. 4

*Munns v. Kerry*, 782 F.3d 402 (9th Cir. 2015) ............................................................. 8

*Murphy v. Kenops*, 99 F. Supp. 2d 1255 (D. Or. 1999) .................................................... 8

*Nationwide Mut. Ins. Co. v. Liberatore*, 408 F.3d 1158 (9th Cir. 2005) ...................................... 12

*Nelsen v. King Cty.*, 895 F.2d 1248 (9th Cir. 1990) ..................................................... 6

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ............................................................ 6, 7

*Rizzo v. Goode*, 423 U.S. 362 (1976) ................................................................... 7

*Rosenblum v. Does 1-10*, No. 3:20-CV-01161-MO, 2020 WL 4253209 (D. Or. July 24, 2020) ... 6

*Shell Gulf of Mexico Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632 (9th Cir. 2014) ... 12, 13

*Sloman v. Tadlock*, 21 F.3d 1462 (9th Cir.1994) ....................................................... 17

*Solida v. McKelvey*, 820 F.3d 1090 (9th Cir. 2016) ...................................................... 14

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ........................................... 6

*United States ex rel. Solis v. Millennium Pharm., Inc.*, 885 F.3d 623 (9th Cir. 2018) .................. 4

*United States v. Washington*, 759 F.2d 1353 (9th Cir. 1985) ...................................... 12

FEDERAL DEFENDANTS' MOTION TO DISMISS

*Updike v. Multnomah Cty.*, 870 F.3d 939 (9th Cir. 2017) ................................................ 6

*Wheeler v. Hurdman*, 825 F.2d 257 (10th Cir. 1987) ...................................................... 4

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000)................................................................. 4

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................................ 6

*Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010) ...................................................... 22

**Statutes**

Or. Rev. Stat. § 133.245................................................................................... 25

**Other Authorities**

Executive Order 13933, 85 Fed. Reg. 40,081 (June 26, 2020).............................................. 24, 25

**Treatises**

10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2751 (4th ed.

    2020) .................................................................................................. 13

## INTRODUCTION

This case concerns protests in downtown Portland from May through July of this year. Those protests frequently centered around federal property, including the Hatfield Federal Courthouse. The protests often turned violent at night. Members of the large crowds attempted to damage federal property and attacked federal law enforcement officers protecting it. Portland Police responded with force each night. Law enforcement officers from two federal agencies, the Department of Homeland Security (DHS) and the U.S. Marshals Service (USMS), also deployed to protect federal property.

Plaintiffs are volunteer "protest medics" who attempt to render medical services to injured protesters. They allege that federal law enforcement officers (and Portland Police officers) have violated their First and Fourth Amendment rights by using crowd control devices against them as they attempt to approach injured protesters while officers are still dispersing those protesters. Plaintiffs also allege that the Federal Defendants' actions generally violate the Administrative Procedure Act because they are misaligned with an Executive Order. But Plaintiffs have no standing to seek prospective equitable relief, which is the only relief they may seek against federal agencies and federal officers in their official capacity, because they have not alleged that they are subject to future injuries that are concrete and imminent. The allegations are also insufficient to plead any violations of the Constitution or the APA.

The federal agency defendants and federal officers sued in their official capacities accordingly submit this motion to dismiss all claims against them.[1]

---

[1] Plaintiffs' Complaint includes federal "Doe" officers as defendants in their individual and official capacities. Plaintiffs have not named or served these defendants.

FEDERAL DEFENDANTS' MOTION TO DISMISS – 1

# BACKGROUND[2]

Beginning on May 29, 2020, protesters gathered in the streets of Portland to protest racism and police violence. Compl. (Dkt. No. 1) ¶¶ 27, 30. Those protests continued every night, for more than 50 days, up through the date that Plaintiffs filed their Complaint. *Id.* ¶ 30. The protests clustered around certain federal buildings, including the Mark O. Hatfield Federal Courthouse, and Portland city government buildings. *Id.* ¶ 31. Each night, hundreds or thousands of protesters gathered in those locations. *Id.* ¶ 32.

Also, each night, police clashed with protesters. *Id.* While initially these clashes involved Portland Police, around July 4, 2020, DHS and USMS also deployed law enforcement units to Portland to protect federal property, including the Hatfield Federal Courthouse. *Id.* ¶¶ 32, 41, 46. Federal law enforcement officers, like Portland Police, have frequently used crowd control devices, including pepperballs, rubber bullets, and tear gas. *See e.g.*, *id.* ¶¶ 33-36, 44, 91. Portland Police have justified their use of force by claiming that protesters have thrown objects, including soda cans and small rocks, at its officers. *Id.* ¶ 53. The Complaint incorporates by reference, and does not dispute the accuracy of, a statement by Acting DHS Secretary Chad Wolf. *Id.* ¶ 54. It describes many nights of "lawless destruction and violence" by "anarchists," including many nights in which those anarchists assaulted federal law enforcement with thrown projectiles, slingshots, lasers, and "large mortar style fireworks" as well as vandalized federal property with graffiti and attempted to start fires.[3] The Complaint

---

[2] This motion treats the Complaint's factual allegations as true for purposes of only the motion to dismiss for failure to state a claim, as this Court must in ruling on it. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] https://www.dhs.gov/news/2020/07/16/acting-secretary-wolf-condemns-rampant-long-lasting-violence-portland

acknowledges that, on one evening, "several" protesters "shot fireworks" in the vicinity of a crowd of one thousand, "including at nearby buildings." *Id.* ¶ 82.

Plaintiffs are four individuals (Martinez, Guest, Durkee, and Wise). They serve as volunteer "protest medics" who provide medical care to protesters injured during the protests as a way to support the protests and the larger protest movement. *Id.* ¶¶ 6-9, 148, 174. They have sued DHS, USMS, and unnamed federal officers ("Federal Doe Defendants"), as well several defendants from the City of Portland. *Id.* ¶¶ 10-20. Plaintiffs claim that Federal Doe Defendants violated their First and Fourth Amendment rights. *Id.* ¶¶ 201-225. They also claim that Federal Defendants generally have violated the Administrative Procedure Act. *Id.* ¶¶ 226-234. Plaintiffs seek an injunction, a declaratory judgment, damages, and attorneys' fees and costs.

Plaintiffs filed their Complaint on July 22, 2020, Dkt. No. 1, and two days later filed a motion for a temporary restraining order against both Federal Defendants and the City of Portland defendants, Dkt. No. 4. After Federal Defendants filed their response on July 28, 2020, Dkt. No. 18, Plaintiffs filed an unopposed notice the following day, noting that there had been significant developments since the filing of Plaintiffs' motion:

> The circumstances giving rise to Plaintiffs' request for emergency relief may have changed since Plaintiffs filed their Motion. This morning, the Governor for the State of Oregon announced that the State had reached some form of an agreement with the Department of Homeland Security regarding a phased drawdown of federal officers from downtown Portland. Counsel for the United States is still investigating the fact or content of any agreement but, in the meantime, has informed us that Plaintiffs' requested relief could be affected by any ongoing developments. Plaintiffs are also unclear about what will happen with these federal officers in downtown Portland, and agree that their requested relief could be affected.

Dkt. No. 22. The Court deferred briefing for several days, and Plaintiffs withdrew their emergency motion against all defendants on August 2, 2020. Dkt. Nos. 23, 24.

FEDERAL DEFENDANTS' MOTION TO DISMISS – 3

Plaintiffs later renewed their motion for a temporary restraining order against the City of Portland defendants on August 21, 2020, Dkt. No. 35, which the Court denied after a hearing on September 2, 2020.  Dkt. Nos. 48-49.

## LEGAL STANDARD

Defendants bring this motion under Federal Rule of Civil Procedure 12(b)(1), arguing that Plaintiffs lack standing, and under Rule 12(b)(6), arguing that Plaintiffs have failed to state a claim upon which relief can be granted.

In response to a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *United States ex rel. Solis v. Millennium Pharm., Inc.*, 885 F.3d 623, 625 (9th Cir. 2018).  In order for the Court to have subject-matter jurisdiction over a challenge to agency action, the plaintiff must have standing to sue.  *See, e.g.*, *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  A court may examine materials outside the pleadings as it deems appropriate in order to resolve the question of its jurisdiction.  *See Miller v. Lifestyle Creations, Inc.*, 993 F.2d 883 (9th Cir. 1993) (mem.) (citing *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).

Under Rule 12(b)(6), courts must dismiss complaints that do not allege sufficient facts to demonstrate a plausible entitlement to relief.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This plausibility showing "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and it "asks for more than a sheer possibility that the defendant has acted unlawfully."  *Id.  See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1137 (9th Cir. 2019).

## ARGUMENT

**I.    Plaintiffs Lack Standing to Obtain Equitable Relief Against Federal Defendants**

Plaintiffs may seek only equitable relief, rather than damages, against DHS, USMS, and any federal officers sued in their official capacities.[4]  Yet they have failed to demonstrate the standing necessary for this Court to have jurisdiction to consider such relief.

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983).  One of the "landmarks" that differentiates a constitutional case or controversy from more abstract disputes "is the doctrine of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The first requirement of standing is that "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Id.* at 560 (citations omitted).  Second, "there must be a causal connection between the injury and the conduct complained of" such that the injury is fairly traceable to the defendant and not the result of the independent action of some third party not before the court.  *Id.*  Third, it must be "likely," and not merely "speculative," that the injury will be redressed by a favorable decision from the court.  *Id.* at 561.

### A.    Plaintiffs Must Demonstrate a Certainly Impending Injury

Where, as here, a party seeks prospective equitable relief, the injury in fact must be in the future; there must be "allegations of future injury [that are] particular and concrete."  *Steel Co. v.*

---

[4] Plaintiffs appear to be pursuing their damages claims for constitutional violations against Federal Doe Defendants in their individual and official capacities.  Like federal agencies, federal officers may not be sued in their official capacities for damages absent a waiver of sovereign immunity.  *See, e.g.*, *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985).  There is no waiver here.  Similarly, Plaintiffs' APA claim cannot result in money damages.  5 U.S.C. § 702.

*Citizens for a Better Env't,* 523 U.S. 83, 109 (1998).  That "threatened injury must be *certainly impending*" and not merely "*possible*."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  Accordingly, the injury may not be based on a "speculative chain of possibilities."  *Clapper*, 568 U.S. at 410.

While a plaintiff's allegations that he was injured in the past might support a remedy at law, a plaintiff seeking prospective equitable relief must establish imminent future harm to himself.  *Lyons,* 461 U.S. at 105; *see also Nelsen v. King Cty.*, 895 F.2d 1248, 1251 (9th Cir. 1990).  Thus, even when he has suffered a specific past injury, a plaintiff must show a significant likelihood that it will be sustained again in the immediate future.  *Updike v. Multnomah Cty.*, 870 F.3d 939, 947 (9th Cir. 2017) (denying injunctive relief to a plaintiff challenging the lack of American Sign Language interpreters in pretrial detainment and at arraignment, even though he had been booked at the same correctional facility five times before, because "standing for injunctive relief requires that a plaintiff show a 'real and immediate threat of repeated injury'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).  Moreover, a plaintiff seeking injunctive relief must show not just that the predicted *injury* will reoccur, but also that the plaintiff himself will suffer it.  *See, e.g.*, *Updike*, 870 F.3d at 948 (holding that the plaintiff lacked standing for injunctive relief because his evidence was "insufficient to establish that any such wrongful behavior is likely to recur against him"); *Blair v. Shanahan*, 38 F.3d 1514, 1519 (9th Cir. 1994) (holding that a plaintiff seeking declaratory or injunctive relief must "establish a personal stake" in the relief sought); *Rosenblum v. Does 1-10*, No. 3:20-CV-01161-MO, 2020 WL 4253209, at *6 (D. Or. July 24, 2020).

The facts and reasoning of *Lyons* are instructive.  *Lyons* was a civil rights action against the City of Los Angeles and several police officers who had allegedly stopped the plaintiff for a

routine traffic violation and applied a chokehold without provocation.  In addition to seeking

damages, the plaintiff sought an injunction against future use of the chokehold unless deadly

force was threatened.  The Supreme Court held that plaintiff lacked standing to seek prospective

relief because he could not show a real or immediate threat of future harm.

> That Lyons may have been illegally choked by the police . . . , while
> presumably affording Lyons standing to claim damages . . . does nothing
> to establish a real and immediate threat that he would again be stopped for
> a traffic violation, or for any other offense, by an officer or officers who
> would illegally choke him into unconsciousness without any provocation
> or resistance on his part.

*Lyons*, 461 U.S. at 104.  *See also O'Shea*, 414 U.S. at 495-96 ("Past exposure to illegal conduct

does not in itself show a present case or controversy regarding injunctive relief . . . if

unaccompanied by any continuing, present adverse effects."); *Rizzo v. Goode*, 423 U.S. 362, 372

(1976).  *Lyons* concluded that to demonstrate a real and immediate threat of injury, the plaintiff

would have to show either a consistent practice, always followed by all officers, that violated his

rights, or an official policy.  *See Lyons*, 461 U.S. at 106 (requiring that he show "(1) that all

police officers in Los Angeles always choke any citizen with whom they happen to have an

encounter, . . . or, (2) that the City ordered or authorized police officers to act in such manner").

Even an official policy that simply allowed for the challenged conduct is insufficient.  *Id.*

Similarly, a widespread practice that is not common to all law enforcement officers with whom a

plaintiff may come in contact is also insufficient.  *Rizzo*, 423 U.S. at 372 (holding that plaintiffs'

allegations that police had engaged in widespread unconstitutional conduct aimed at minority

citizens was based on speculative fears as to what an unknown minority of individual police

officers might do in the future).

Courts in this Circuit have applied *Lyons* and *O'Shea* in similar contexts to hold that

plaintiffs lack standing to pursue prospective injunctive relief where they could only speculate as

FEDERAL DEFENDANTS' MOTION TO DISMISS – 7

to whether particular law enforcement practices would occur, even if they had previously been subjected to them.  *See, e.g.*, *Eggar v. City of Livingston*, 40 F.3d 312, 317 (9th Cir. 1994) (plaintiff who had been repeatedly convicted without court-appointed counsel lacked standing because whether she "will commit future crimes in the City, be indigent, plead guilty, and be sentenced to jail is speculative"); *Murphy v. Kenops*, 99 F. Supp. 2d 1255, 1259–60 (D. Or. 1999) (plaintiffs lacked standing because it was highly speculative "that the Forest Service will exercise its discretion to issue future closure orders, that the closure orders will violate the First Amendment, that plaintiffs will violate those closure orders, and that plaintiffs will be arrested because of those closure orders").

Nor can plaintiffs create standing for injunctive relief by alleging that their own fear of future government action has "chilled" their willingness to engage in First Amendment activities. When a plaintiff contends that injunctive relief is supported by such an alleged "chilling effect," the analysis is unchanged from the *Lyons* inquiry—the supposed chilling effect will not provide standing for injunctive relief if it is "based on a plaintiff's fear of future injury that itself was too speculative to confer standing."  *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015); *see also* *Clapper*, 568 U.S. at 416 (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").  In other words, where a plaintiff's request for injunctive relief lacks any non-speculative basis for finding a likelihood of future harm, the plaintiff cannot circumvent Article III merely by saying that he or she is *afraid* of future harm.  *See Clapper*, 568 U.S. at 416.

### B.    Plaintiffs Have Failed to Demonstrate Standing For Injunctive Relief

Plaintiffs' allegations are insufficient to demonstrate a future injury that confers standing. They describe only a few specific incidents in the past and do not describe any concrete, certainly impending injuries in the future.

FEDERAL DEFENDANTS' MOTION TO DISMISS – 8

Although the Complaint has some very general allegations about past conduct, Compl.

¶¶ 62-63 ("Since the Federal Defendants arrived in Portland, they have done the same thing" as

Portland Police, *i.e.*, "indiscriminately attacked, and at times have specifically targeted protest

medics."), and some incidents that could have involved either Portland Police or federal law

enforcement officers, *id.* ¶ 153 ("One of the Municipal Doe Defendants or Federal Doe

Defendants shot Plaintiff Guest with a projectile and another officer checked her in the shoulder

with his baton."), the Complaint focuses on details concerning only four past incidents involving

federal law enforcement.  These four incidents—occurring on just two nights, over three months

ago—form the basis of Plaintiffs' constitutional claims.  The four incidents allegedly involve

federal officers using force against three of the Plaintiffs.  On the night of July 11 into the

morning of July 12, Plaintiffs Guest and Durkee were allegedly shot with pepperballs by federal

law enforcement officers as they advanced toward those officers, and Plaintiff Guest was later

shot with rubber bullets after she kicked a tear gas canister.  *Id.* ¶¶ 159-60.  Both contend that

they were also later shoved and hit with batons as federal law enforcement officers pushed them

back.  *Id.* ¶ 169.  On July 14, Plaintiff Wise was allegedly shot in the legs with pepperballs by

federal law enforcement officers while standing in a crowd that Portland Police were attempting

to disperse.  *Id.* ¶¶ 90-91.  While, as explained *infra*, these allegations do not establish even past

constitutional violations, they certainly do not establish a certainly impending injury in

connection with *future* protests that Plaintiffs may attend, and at which Plaintiffs suggest they

may, in theory, be subjected to dispersal actions by Federal Defendants.  Indeed, even the

Complaint notes that Plaintiffs have attended other evenings of protests in Portland but fail to

describe any specific incidents involving federal law enforcement harming them.  *See id.* ¶¶ 150,

171-72.  These limited past incidents fail to demonstrate past conduct that suggests with any

certainty that *if* Plaintiffs interact with federal law enforcement officers in the future they will be predictably harmed, as is required to establish standing. *See Lyons*, 461 U.S. at 106.

In turn, Plaintiffs' speculations about potential future events are likewise insufficient to demonstrate a certainly impending injury. Indeed, although Plaintiffs state that they "wish" to continue participating in the protests, they do not even state that they have concrete plans to do so. Compl. ¶¶ 174 ("Plaintiffs wish to continue attending protests . . . ."), 178 ("Plaintiffs wish to continue supporting the protests by serving as protest medics. They wish to continue treating protester injuries and doing their part to create a safer protest environment."). That itself undermines standing. *See Lujan*, 504 U.S. at 563-64 (holding that a plaintiff that "hope[s]" she will visit a location "without any description of concrete plans" does not demonstrate the "actual or imminent" injury that standing requires). Plaintiffs also provide no concrete description of the harms they fear. Their general statement that they "fear for their safety from the Federal Defendants' violence" is tied to general statements that "Federal Defendants have been coordinating with the Portland Police to violently disperse demonstrators, neutrals, and medics" and that "Federal Defendants use the same types (or worse) of force—chemical irritants, rubber bullets, batons—as the Portland Police." Compl. ¶ 173. Plaintiffs also simply state that they "will be at risk of injury." *Id.* ¶ 177. But these statements do nothing to demonstrate that those practices will necessarily be used against Plaintiffs in their every interaction with Federal Defendants, as required. *See Lyons*, 461 U.S. at 106. Nor do Plaintiffs allege that all such instances of violence are unlawful, meaning that Plaintiffs also have a problem tracing their fear to the challenged conduct. *Clapper*, 568 U.S. at 417-18. When Plaintiffs do allege that they fear a violation of their rights, it is in entirely conclusory terms. *See* Compl. ¶¶ 211("Each of them is in fear that the Federal Defendants will take actions and perform operations to violate their First

FEDERAL DEFENDANTS' MOTION TO DISMISS – 10

Amendment rights . . . ."), 212 (same regarding their "Fourth Amendment rights").  None of this demonstrates a concrete injury that is "certainly impending," *Clapper*, 568 U.S. at 409.

Plaintiffs also cannot demonstrate standing through the few public statements that they include in the Complaint concerning the federal presence in Portland.  Plaintiffs cite two tweets from Acting DHS Secretary Wolf, noting 1) that the Federal Defendants "will never surrender to violent extremists" and 2) that "valiant men and women have defended our institutions of justice against violent anarchists" and that they "will prevail."  Compl. ¶ 176.  Neither have anything specifically to do with Plaintiffs; rather, they concern federal law enforcement defending federal property from violent criminals.  Plaintiffs also misquote a statement from the President by stating that he said that "if the protests start[] again, we'll quell it again very easily," Compl. ¶ 177.  The news story that Plaintiffs incorporate by reference (and hyperlink) makes clear that the President did not say "protests" but rather said if "it starts again," in reference to the fact that "Portland was totally out of control" and many arrests had been made.[5]  The "it" accordingly refers to violent criminal activity, and that statement cannot be taken to suggest a policy of quelling any peaceful protests, let alone those expressing a particular viewpoint, or by particular means.  This statement also has nothing specifically to do with Plaintiffs.

Finally, Plaintiffs cannot circumvent their lack of standing by alleging, without any factual basis, that Federal Defendants have adopted "policies and directions."  Compl. ¶¶ 231 ("Federal Defendants have adopted a policy and have given direction to federal officers to engage in generalized anti-protest law enforcement, including dispersal of crowds with uses of force such as deployment of chemical irritants and munitions to quell protest activity."), 232.  As

---

[5] https://www.cbsnews.com/news/portland-protests-tear-gas-oregon-officials-call-for-federal-authorities-to-leave/

discussed below, Plaintiffs have failed to properly plead the existence of any specific "policy." But even if they had properly pleaded the existence of such a policy, it does not direct or require Federal Defendants to engage in any specific unlawful conduct. Therefore, to the extent it even exists, it is also insufficient to confer standing. *See Lyons*, 461 U.S. at 106.

### C.    Because Plaintiffs Lack Standing For Injunctive Relief, They Also Cannot Obtain a Declaratory Judgment

Plaintiffs also cannot pursue a declaratory judgment. A request for a declaratory judgment does not present a standalone claim; a declaratory judgment is merely a remedy. *See Shell Gulf of Mexico Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632, 635 (9th Cir. 2014) (the declaratory judgment statute "does not create new substantive rights, but merely expands the remedies available in federal courts"). The Declaratory Judgment Act does not by itself confer federal subject-matter jurisdiction. *Nationwide Mut. Ins. Co. v. Liberatore*, 408 F.3d 1158, 1161 (9th Cir. 2005). For a plaintiff to claim an entitlement to declaratory relief, the plaintiff must "must first present an actual case or controversy within the meaning of Article III." *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1222 (9th Cir. 1998) (en banc).

Here, as demonstrated above, Plaintiffs have not shown that a case or controversy exists with respect to their claims for prospective relief. Furthermore, declaratory relief is improper here because it "will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *United States v. Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985). As the Ninth Circuit has recognized, the utility of a declaratory judgment is fairly narrowly cabined; it is designed principally to allow a potential defendant "to file preemptive litigation to determine whether they have any legal obligations to their potential adversaries." *Shell Gulf of Mexico*, 771 F.3d at 635. This action has not been filed by a party that faces the "Damoclean threat of

impending litigation which a harassing adversary might brandish." *Id.  See also* 10B Charles

Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2751 (4th ed. 2020) (noting

that declaratory judgement "is intended to minimize the danger of avoidable loss and the

unnecessary accrual of damages and to afford one threatened with liability an early adjudication

without waiting until an adversary should see fit to begin an action after the damage has

accrued").  Instead, Plaintiffs claim that they have been harmed by Federal Defendants in the

past and want an injunction against future harm of the same conduct.[6]  That does not require an

anticipatory settling of the legal relations between the parties, nor would such a declaration at the

conclusion of this case reduce any uncertainty between the parties, especially because the

underlying legal claims will necessarily be resolved at the same time as Plaintiffs' other claims

for relief.  In short, Plaintiffs' request for declaratory relief is entirely duplicative of the relief

they already seek, and they cannot show how declaratory relief will offer any appropriate benefit.

## II.    Plaintiffs' Pleading Failures in Their Constitutional Claims Require Dismissal of Those Claims

Plaintiffs allege First and Fourth Amendment claims against "Federal Doe Defendants"

in Counts Three and Four.  The nature of these claims is, however, unclear.  "Federal Doe

Defendants" are defined as "individual and supervisory law-enforcement officers employed by

USMS and DHS who directly assaulted Plaintiffs" and "supervisory officials whose liability

could include their own culpable action or inaction in the training, supervision, or control of their

---

[6] In Count Six of the Complaint, seeking a declaratory judgment, Plaintiffs note that they fear "'kettling' tactics" and want the declaratory judgment to state that arresting Plaintiffs or threatening them with arrest while they render aid violates the First and Fourth Amendments. Compl. ¶¶ 236-38.  These aspects appear relevant solely to the Portland Police defendants because there are no specific allegations that Federal Defendants used "kettling" tactics, arrested Plaintiffs, or threatened them with arrest.  There are no allegations demonstrating that such harm would occur in the future.  There is no basis to grant declaratory relief regarding such conduct (or any conduct) against Federal Defendants.

FEDERAL DEFENDANTS' MOTION TO DISMISS – 13

subordinates." *Id.* ¶¶ 18-20 & n.2. "Federal Defendants," by contrast, are defined to include

DHS and USMS. *Id.* ¶ 20 n.2. The Complaint itself defines Federal Doe Defendants as being

"sued in their *individual capacity*." *Id.* (emphasis added). The third and fourth counts are,

however, described as being "Against the Federal Doe Defendants in their Official and

Individual Capacities." In each, the Complaint states that the "action arises under *Bivens v. Six*

*Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)," but it also states

that the Court has "inherent authority to grant injunctive relief to direct compliance of the federal

government and individual federal officials with" the Constitution. Compl. ¶¶ 202-03, 215-16.

The premise of the individual capacity damages cause of action recognized in *Bivens* was

that other forms of relief, such as an injunction, were not available—it was "damages or

nothing." *Bivens*, 403 U.S. at 410 (Harlan, J, concurring). An official capacity claim seeking

injunctive relief, by contrast, is "only another way of pleading an action against an entity of

which an officer is an agent."[7] *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). *See Larson*

*v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 687-88 (1949) ("A suit against a federal

agency or officer which seeks relief against the sovereign is, in effect, a suit against the

sovereign."); *Dugan v. Rank*, 372 U.S. 609, 621 (1963). Federal agencies and officers cannot be

sued in their official capacity through a *Bivens* action, and injunctive relief for official action

cannot be granted through a *Bivens* action. *See Fed. Deposit Ins. Corp. v. Mey*er, 510 U.S. 471,

475 (1994); *Solida v. McKelvey*, 820 F.3d 1090, 1093-94 (9th Cir. 2016).

---

[7] Plaintiffs do not appear to have actually served any Federal Doe Defendants. Federal Rule of
Civil Procedure 4(i)(2) requires service on individual officers or employees served in their
official capacities. To the extent that service on the agencies, who are the real parties in interest,
is sufficient to establish jurisdiction over those claims against Federal Doe Defendants in their
official capacities, this motion is provided on their behalf to protect the interests of the agencies
and the United States. But to the extent such service is insufficient, this motion is not intended to
waive personal jurisdiction defenses.

FEDERAL DEFENDANTS' MOTION TO DISMISS – 14

Even if Plaintiffs' defective pleading could be construed in a manner that would confer jurisdiction over their claims for injunctive relief against Federal Doe Defendants in their official capacities, the fact that the constitutional claims are against *only* those defendants and *not* the federal agencies (DHS and USMS) further highlights their standing problems.  Because the Complaint provides no details about those officers, it is entirely uncertain whether binding them through an injunction would afford Plaintiffs any relief.  With regard to the Federal Doe Defendants who "directly assaulted Plaintiffs," Compl. ¶ 18, Plaintiffs have not and cannot establish that those same officers even continue to be deployed in Portland or would encounter Plaintiffs again (much less that they would engage in dispersal tactics vis-à-vis Plaintiffs in the same manner as alleged for the few incidences in the past).  Thus, an injunction against those individual officers (in their official capacities), who may well be deployed elsewhere now, would do nothing to redress Plaintiffs' allegations of harm from coming into contact with federal officers from DHS and USMS generally, including a large number of officers not party to this suit and not bound by any injunction against the individuals who directly used force against Plaintiffs before.  *See Lujan*, 504 U.S. at 568-69 (noting redressability problems with failing to bind federal entities not party to the suit but necessary for relief).

With regard to the supervisory officials sued in their official capacities, specific allegations are nonexistent.  Plaintiffs do not allege that any such defendants actually exist or did anything, only that those Does are the ones "whose liability could include" supervisory failures. Compl. ¶ 13.  Some of those failures, such as "acquiescence in the constitutional deprivations alleged here," *id.*, are plainly insufficient to state a claim.  *See Iqbal*, 556 U.S. at 677 (holding that "purpose rather than knowledge is required" to state a claim against supervisory personnel and that "acquiescence" in subordinates' conduct is insufficient).  For others, Plaintiffs simply

state in conclusory fashion the requirements of the law for similar claims.  Compl. ¶ 19

("deliberate indifference" or "culpable action or inaction").  Unlike the allegations against the

Portland Police Department occupying several paragraphs in Count Two (which is specifically

against the police department in addition to individuals), Compl. ¶¶ 196-99, Plaintiffs do not

allege anything factual about failures of training, supervision, or control concerning federal

officers.  Thus, Plaintiffs have wholly failed to plead anything against such officers.  Plaintiffs

have also failed to show that the actions of those supervisory officials, rather than the

independent acts of their subordinates, were the cause of Plaintiffs' alleged injuries in the past,

much less that they will continue to cause such injuries.  Similarly, Plaintiffs have failed to

establish that granting an injunction against any supervisory official in their official capacity

would redress their grievances because it is unclear whether they remain the relevant supervisors

over officers on the ground in Portland or could substantially change how federal officers

respond in moments of chaotic violence.  Accordingly, Plaintiffs also lack standing to sue the

supervisory Doe officers in their official capacities.

Even if Plaintiffs could somehow use past injuries by Federal Doe Defendants to assist

them in obtaining standing to sue those defendants in their official capacities, they have

nevertheless failed to properly allege any past violation of their First or Fourth Amendment

rights.

### A.     Plaintiffs Have Failed to Plead a Violation of Their First Amendment Rights

Plaintiffs allege that, in using force against Plaintiffs Durkee, Guest, and Wise in the four

incidents they describe, Federal Defendants "intentionally violated Plaintiffs' First Amendment

rights."  Compl. ¶ 207.  Plaintiffs appear to be asserting a theory of First Amendment retaliation

because they cite *Mendocino Environmental Center v. Mendocino County*, 14 F.3d 457, 464 (9th

Cir. 1994) and state that Plaintiffs "provide medical services to protesters as an act of expression and a form of speech" and sent a "particularized message" to other protesters that Federal Defendants likely understood.  Compl. ¶¶ 204-05.

The question in a First Amendment retaliation case is whether the defendant "deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct."  *Mendocino Envtl. Ctr.*, 14 F.3d at 464 (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir.1994) (alterations in original)).  To properly allege such a cause of action, a plaintiff must allege that the speech at issue is "protected activity" under the First Amendment.  *Id.*  Here, Plaintiffs have not established that a First Amendment inquiry is even appropriate.  Plaintiffs allege that they "provide medical services to protesters as an act of expression and a form of speech."  Compl. ¶ 205.  As this Court noted in its order denying Plaintiffs' renewed motion for a temporary restraining order against the City of Portland, there is no legal support for the idea that providing medical services is a form of protected First Amendment activity separate from general participation in a protest.  Dkt. No. 49 at 14 & n.6.

Even assuming that Plaintiffs' provision of medical services as part of their participation in the protests could be considered protected expression, that does not mean it was protected at the relevant time.  Plaintiffs note several times that they were ordered to disperse along with other demonstrators, including by Portland Police working alongside federal law enforcement officers.  *See* Compl. ¶¶ 129, 153, 154, 173 ("Federal Defendants have been coordinating with the Portland Police to violently disperse demonstrators, neutrals, and medics . . . .").  Indeed, it appears from the allegations that each of the four incidents occurred after an order to disperse was given; in two Plaintiffs specifically mention that the Portland Police gave an order to disperse or were dispersing protesters before federal officers used force.  *See id.* ¶¶ 90 ("Portland

FEDERAL DEFENDANTS' MOTION TO DISMISS – 17

Police began 'kettling' the protest attendees"), 162, 163 ("Portland Police brought their LRAD to

the corner of Third Avenue and Main Street and announced that protesters needed to clear the

area."), 174 ("Defendants have prevented Plaintiffs and other medics from providing aid when

police have dispersed protesters . . . ."). The whole point of their presence at the protests is to

provide medical care to protesters after defendants have used force to disperse those protesters.

*See, e.g.*, *id.* ¶ 174. But Plaintiffs' only challenge to such dispersal orders, if any, is under the

APA, which, as discussed below, must fail (and which would not be an infirmity in situations

where Portland Police gave the dispersal orders). Plaintiffs have no general or special right to

ignore a lawful order to disperse. *See* Dkt. No. 49 at 14. Plaintiffs' choice not to vacate the area

once a lawful order to disperse is given does not entitle them to the continued protections of the

First Amendment. *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here

demonstrations turn violent, they lose their protected quality as expression under the First

Amendment"); *Colten v. Kentucky*, 407 U.S. 104, 106–09 (1972) (noting that there is "no

constitutional right to observe the issuance of a traffic ticket or to engage the issuing officer in

conversation" after being ordered to disperse); *Menotti v Seattle*, 409 F.3d 1113, 1155-56 (9th

Cir. 2005) (noting that "a measure of discretion necessarily must be permitted" to the

government officers "on the scene with direct knowledge, to fashion remedies to restore order

once lost" and declining "to hold unconstitutional the City's implementation of procedures

necessary to restore safety and security" when confronted by protesters with "violent and

disruptive aims" that "substantially disrupt civic order"); *Hicks v. City of Portland*, No. CV 04-

825-AS, 2006 WL 3311552, at *12 (D. Or. Nov. 8, 2006) ("Plaintiff had no protected First

Amendment [right] to enter the street in violation of a lawful order to disperse.").

FEDERAL DEFENDANTS' MOTION TO DISMISS – 18

Even if Plaintiffs' expressive conduct was protected, Plaintiffs have not sufficiently alleged that deterring such expression was a "substantial or motivating factor" in Federal Doe Defendants' conduct, *Mendocino Envtl. Ctr.*, 14 F.3d at 464. Indeed, Plaintiffs' own pleadings contradict one another. On the one hand, Plaintiffs repeatedly allege that Federal Defendants have used force "indiscriminately." Compl. ¶¶ 152, 154, 174. On the other hand, they allege that they were subjected to the very same force as a result of being targeted "specifically" and "directly" because of their "particularized message." Compl. ¶¶ 205, 207, 208. But Plaintiffs do not allege any facts from which to reasonably infer that they were targeted for their particularized message (if that were actually protected by the First Amendment) or their general participation in the protest.

The specific allegations concerning the four incidents do not demonstrate any retaliatory motive. In contrast to some of the incidents alleged against Portland Police, *see, e.g.*, Compl. ¶ 100, ("Plaintiff Martinez was not engaged in any conduct that presented a danger or threat to public safety, and he also did not see any other protesters engaged in conduct in any way threatening to any police officer."), Plaintiffs do not allege that the protests were peaceful or that there was no threat to safety during the four incidents involving federal officers. Instead, the scenes were chaotic and violent. In each, Plaintiffs refused to disperse and even appeared as potential threats, and the allegations establish that they were treated no differently than other protesters behaving similarly. On the night of July 11 into the morning of July 12, after federal officers had already allegedly fired impact munitions at other protesters, Plaintiffs Guest and Durkee were allegedly shot with pepperballs as they advanced *toward* federal law enforcement officers. *Id.* ¶ 159. They were not treated differently than other protesters or than anyone who advances toward law enforcement in the middle of a riot. Apparently, the pepperballs did not

dissuade Plaintiff Guest from continuing, and, as she knelt near an injured person, a federal officer allegedly deployed tear gas near her; she kicked the canister and was allegedly shot with rubber bullets.  *Id.* ¶ 160.  These allegations do not establish that the Federal Doe Defendant intended to chill her message rather than simply to effectuate a dispersal.

Plaintiffs also allege that Plaintiffs Durkee and Guest were shoved and hit with batons as federal law enforcement officers pushed them back that same night.[8]  *Id.* ¶ 169.  This occurred after Portland Police had issued an order to disperse.  *Id.* ¶ 163.  The video the Complaint incorporates by reference (and a hyperlink), *id.* ¶ 169, shows that Plaintiffs Durkee and Guest refused to move, despite multiple commands from federal officers, until federal officers were immediately upon them.  Plaintiffs admit as much.  *Id.* ¶ 167.   Then, the video shows Plaintiffs Durkee and Guest slowly walked backwards while facing the officers (which Plaintiffs acknowledge, *id.* ¶ 168), and each was holding a spray can.  That federal officers used force against these two individuals who refused to move and appeared potentially combative falls far short of demonstrating that officers were targeting those individuals for their speech or expression.

Plaintiffs also allege that on July 14, 2020, Plaintiff Wise stood across the street from the Hatfield Federal Courthouse as Portland Police were dispersing protesters and was allegedly shot in the legs with pepperballs by federal law enforcement officers.  *Id.* ¶¶ 90-91.  Plaintiffs provide no other context, so there is no basis to infer that he was in any way targeted specifically, much less for his "message," rather than for refusing to disperse with the other protesters.

---

[8] The Complaint alleges that this incident occurred on July 5, 2020 but also suggests that it is the same night as July 11-12, 2020.  *Id.* ¶¶ 161-62.  Both Plaintiffs submitted declarations stating that the events occurred on the morning of July 12, 2020.  Durkee Decl., Dkt. No. 5, ¶¶ 23-26; Guest Decl., Dkt. No. 11, ¶¶ 18-21.  July 5 is apparently a typo.

Indeed, Plaintiffs' real theory appears to be that, since they wear clothing with colored duct tape in the shape of a cross and various similar insignia or writing, they are "clearly identifiable" (a proposition this Court found dubious, Dkt. No. 49 at 15), and the only reason Plaintiffs would direct force against them is their message. That is simply not a reasonable inference. The allegations show that the Plaintiffs were subjected to crowd control tactics that, by Plaintiffs' own admissions, were widely used in the tumultuous riots surrounding the Federal Courthouse. Given the chaotic circumstances presented by the violent protests, Plaintiffs have not established that the official capacity Federal Doe Defendants would not have used force "but for" a retaliatory motive, *Capp v. City of San Diego*, 940 F.3d 1046, 1059 (9th Cir. 2019).

Accordingly, Plaintiffs' allegations are insufficient to plead that the official capacity defendants violated the First Amendment.

### B. Plaintiffs Have Failed to Plead a Violation of Their Fourth Amendment Rights

Plaintiffs also allege that Federal Doe Defendants "violated Plaintiffs' rights under the Fourth Amendment, by using excessive force." Compl. ¶ 218. Excessive force requires showing that the "use of force" was "objectively unreasonable under the circumstances." *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018). It requires "balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). The reasonableness of police use of force must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and the analysis "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount

of force that is necessary in a particular situation." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396-97).

Plaintiffs have not pleaded sufficient facts to establish that the uses of force in the four incidents they describe were objectively unreasonable. Indeed, in determining the government's interest in the use of force—one side of the balancing test—the "most important" factor is the "immediate threat to the safety of the officers or others" posed by those against whom force is used; a situation in which officers are "greatly outnumbered and verbally and physically provoked" is "far more threatening" than a few obstinate protesters. *Felarca*, 891 F.3d at 817. But Plaintiffs provide no information at all about the potential threats facing Federal Doe Defendants sued in their official capacity. Indeed, the omission is even more curious because they *affirmatively* allege that they "did not commit any crimes, pose any threat to any officers or any other person, or resist arrest" in their excessive force claim against Portland Police. Compl. ¶ 191. What little information that exists suggests that there were substantial threats to safety. Beyond the uncontroverted statements of Portland Police and DHS that there were substantial threats to officers, Plaintiffs themselves acknowledge that on one evening, "several" protesters "shot fireworks" in the vicinity of a crowd of one thousand, "including at nearby buildings." *Id.* ¶ 82. Plaintiffs note that hundreds and even thousands of people routinely attended the protests. *Id.* ¶¶ 1, 32, 82. Officers have a "'safety interest in controlling' a mass of people," *Felarca*, 891 F.3d at 817 (quoting *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001)), and that interest is only heightened when a group refuses to disperse after warnings (such as that a chemical irritant will be used), even more so when individuals attempt to interfere with officers' attempts to maintain order, *Jackson*, 268 F.3d at 653. In such situations, with crowds far smaller than here, the types of force allegedly employed here have been found reasonable. Use of a

chemical irritant is justified when a large group refuses to disperse and individuals attempt to interfere with officers' attempts to maintain order. *See id.* Similarly, use of physical force, including jabs with a baton and shoving, are reasonable when individuals actively resist dispersing, even when they are generally nonviolent. *Felarca*, 891 F.3d at 818.

To the extent that any context can be gleaned from the allegations, the individual instances of force were also proportionate to Plaintiffs' conduct. When Plaintiffs Guest and Durkee were allegedly shot with pepperballs, they were advancing *toward* federal law enforcement officers after officers had already attempted to disperse the crowd. Compl. ¶ 159. Such use of force was no greater in magnitude than jabs with a baton or use of pepper spray, which would be justified by active resistance or attempting to interfere with federal officers; certainly it was objectively reasonable for officers to conclude that protesters approaching them might well pose a threat and that such protesters objectively were interfering with the attempt to disperse the crowd. Plaintiffs also provide no context for federal officers' alleged use of rubber bullets on protesters immediately before that—if such use was in response to violence committed by protesters, it would only heighten the threat, and any reasonable officer would have concerns with Plaintiffs approaching those violent protesters. Similarly, using tear gas to get Plaintiff Guest to move when she refused to do so, after the crowd had already been dispersed, *id.* ¶ 160, was objectively reasonable. Kicking the tear gas canister was a significant act of provocation that justified more significant force—the rubber bullets a federal officer allegedly used were no more significant in magnitude than overhand strikes with a baton, which would have been reasonable under Ninth Circuit precedent. *Felarca*, 891 F.3d at 818 (finding overhand strikes reasonable when a protester engaged in provocation by "throwing leaves and shaking [her] fist"). And when Plaintiffs Durkee and Guest again refused to disperse after multiple commands and

FEDERAL DEFENDANTS' MOTION TO DISMISS – 23

appeared to be resisting as much as possible (by facing federal officers as they walked backward and holding spray cans and their free hands up toward officers), *id.* ¶¶ 167-69, federal officers were again justified in using their batons and shoving Plaintiffs, *Felarca*, 891 F.3d at 817-18. Finally, while Plaintiff Wise provides almost no context for when he was allegedly shot in the legs with pepperballs by federal law enforcement officers, he was nevertheless standing and facing the protesters, planning to advance toward them to assist where needed, and thus actively resisting an order to disperse by Portland Police. *Id.* ¶¶ 90-91.  Officers were justified in using some force to disperse him.  The pepperballs federal officers allegedly used caused only "temporary pain" and only because of preexisting injuries from Portland Police, implying (based on "the minor nature of [his] injuries") that "the force applied was minimal."  *Felarca*, 891 F.3d at 817.

Accordingly, the allegations are insufficient to plead any violation of the Fourth Amendment for excessive force.

## III.    Plaintiffs Have Failed to Plead Any Violation of the APA

Plaintiffs allege that the Federal Defendants violated the Administrative Procedure Act (APA) in relation to Executive Order 13933 and Oregon state law.  Compl. ¶ 232.  This count should also be dismissed for failure to state a claim.

Plaintiffs start by citing Executive Order 13933, 85 Fed. Reg. 40,081 (June 26, 2020). *See* Compl. ¶¶ 39 & n.4, 229, 231.  The "purpose" section of that Order states:  "Individuals and organizations have the right to peacefully advocate for either the removal or the construction of any monument.  But no individual or group has the right to damage, deface, or remove any monument by use of force."  85 Fed. Reg. at 40,081.  The "policy" recognized in the Order is for the United States "to prosecute to the fullest extent permitted under Federal law, and as

appropriate," persons who destroy or vandalize monuments, memorials, statues, or religious

property, and to "withhold Federal support" to State and local governments if they fail to protect

such properties." *Id.* at 40,082.  Plaintiffs also cite Oregon Revised Statute § 133.245, which

authorizes federal law enforcement officers to "arrest a person" in Oregon for violations of state

law.  Compl. ¶ 230.

 Plaintiffs do not challenge the Executive Order, but rather claim that Federal Defendants

have somehow violated it and the Oregon statute:

> Notwithstanding the limitations of the Executive Order and ORS 133.245, the
> Federal Defendants have adopted a policy and have given direction to federal
> officers to engage in generalized anti-protest law enforcement, including dispersal
> of crowds with uses of force such as deployment of chemical irritants and
> munitions to quell protest activity.  Federal officials' public statements indicate
> that the anti-protest law enforcement authorized and directed pursuant to these
> policies and directives are without regard to the location or other nexus with
> federal monuments, memorials, statues, and property.

Compl. ¶ 231.  Plaintiffs claim that it follows that "Federal Defendants have acted arbitrarily and

capriciously, abused their discretion, and not in accordance with the Executive Order and ORS

133.245."  *Id.* ¶ 232.

 This claim fails on multiple levels, but perhaps most fundamentally because it entirely

misconceives the nature of the Executive Order and the Oregon statute.  Neither purport to *limit*

Federal Defendants.  The Executive Order at most establishes priorities for use of resources—

specifically, that it is a priority to protect federal property and prosecute those who vandalize it,

(and such direction is addressed only to the Department of Justice, *not* DHS).  85 Fed. Reg.

40,083.  But the Order itself provides no language limiting federal law enforcement to do *only*

that—and such an interpretation is absurd, given federal law enforcement's many other functions

and authorities.  The Order pointedly states as much:  "Nothing in this order shall be construed to

impair or otherwise affect the authority granted by law to an executive department or agency, or

the head thereof." 85 Fed. Reg. at 40,083. Also, the Order is clear that it does not "create any

right or benefit, substantive or procedural, enforceable at law or in equity by any party against

the United States, its departments, agencies, or entities, its officers, employees, or agents, or any

other person." 85 Fed. Reg. at 40,084. "An Executive Order devoted solely to the internal

management of the executive branch—and one which does not create any private rights—is not

. . . subject to judicial review." *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993).

Accordingly, even if the Order could be transgressed in some manner, that would not give rise to

an APA claim to enforce the Order against Federal Defendants. The Oregon statute Plaintiffs

cite similarly *grants* federal officers *additional* authority. If Oregon state law purported to *limit*

federal operations, that would violate the Supremacy Clause. *See Blackburn v. United States*,

100 F.3d 1426, 1435 (9th Cir. 1996) ("[S]tates may not directly regulate the Federal

Government's operations or property.")

 Beyond that fundamental misunderstanding, the Complaint also does not sufficiently

allege facts indicating even the existence of an official "policy" that can be ascribed to any of the

Federal Defendants. Indeed, the Complaint fails to describe the "policy" beyond "generalized

anti-protest law enforcement" that is not specifically tied to federal property. Compl. ¶ 231. The

only basis for its existence is a set of several "public statements" from Federal Defendants,

which do not discuss the terms of such policy, but only what it is *not*—specifically, that it is

"without regard to the location or other nexus with federal" property. *Id.* Plaintiffs do not

identify these statements, but the only ones in the Complaint, discussed above, refute their

characterization. First, Acting DHS Secretary Chad Wolf's public statement, cited in the same

paragraph of the Complaint as a tweet from him standing in front of the vandalized Hatfield

Federal Courthouse, *see id.* ¶ 54, recites a lengthy list of damage to federal property and notes

that it is DHS's "solemn duty to protect federal facilities and those within them."[9]  Second, Acting Secretary Wolf's tweet states that DHS has "defended our institutions of justice"—*i.e.*, the *Federal* Courthouse—"against violent anarchists."  Compl. ¶ 176.  Third, in the statement from the President that Plaintiffs misquoted, *see id.* ¶ 177, he said nothing about federal officers enforcing the law away from federal property.

Plaintiffs have accordingly offered no "more than a nebulous assertion of the existence of a 'policy.'"  *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987).  Absent a plausible allegation, Plaintiffs should not be allowed to go fishing for one.  *Cf. Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d 320, 328 (D.D.C. 2018) ("Plaintiff cannot use the APA to justify a fishing expedition for evidence that defendants were motivated, not by their stated reason for denying her passport renewal application (that plaintiff is not a U.S. citizen), but by a discriminatory policy that plaintiff believes exists.").

Furthermore, Plaintiffs' challenge to a "generalized" policy is not cognizable under the APA.  A plaintiff cannot seek "wholesale improvement" of a federal agency's operations "by court decree."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  Broad law enforcement operations are not an "'agency action' within the meaning of [5 U.S.C.] § 702, much less a 'final agency action' within the meaning of § 704."  *Id.* at 890 (noting a "'drug interdiction program' of the Drug Enforcement Administration" as an example of agency "operations" that are not agency actions).  A "generalized" policy of where to deploy officers and what they generally should be doing does not terminate the decisionmaking process and finalize how federal officers will act toward Plaintiffs, as would be required for a final agency action, *see Bennett v. Spear*,

---

[9] https://www.dhs.gov/news/2020/07/16/acting-secretary-wolf-condemns-rampant-long-lasting-violence-portland

520 U.S. 154, 177-78 (1997), and there is no indication that the "generalized" policy, to the extent it exists, does not simply leave most discretion to federal officers on the scene.

Finally, even if such a "policy" could be challenged under the APA, such claim must fail. Throughout the Complaint, Plaintiffs recall instances in which federal law enforcement officers operated from or in the immediate vicinity of the Hatfield Federal Courthouse. *See, e.g.*, Compl. ¶¶ 46, 50, 52, 82, 91, 161.  Despite claiming that Federal Defendants are operating "without regard to the location [of] or other nexus with federal . . . property," *id.* ¶ 231, there is no specific allegation that federal officers operated in areas of Portland far from the Federal Courthouse or other federal property, much less as part of a formal "policy."  Indeed, in all four specific incidents involving Federal Defendants, the Complaint specifies that they occurred in the vicinity of the Hatfield Federal Courthouse (including Lownsdale Square, which is directly across the street) as Federal Defendants were attempting to push protesters away from the Courthouse.  *Id.* ¶¶ 90, 161.  There is thus no factual basis to their claim.

Accordingly, Plaintiffs' APA claim must be dismissed.

## **CONCLUSION**

For the foregoing reasons, all claims against the federal agencies and federal officers in their official capacities should be dismissed.

Dated: October 20, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Jeffrey A. Hall*
JEFFREY A. HALL (DC 1019264)
MICHAEL P. CLENDENEN
Trial Attorneys
United States Department of Justice
Civil Division
1100 L Street NW, Rm. 11214
Washington, DC 20005
Tel: (202) 353-8679
Email: jeffrey.a.hall@usdoj.gov

*Attorneys for Defendants*