JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
JEFFREY A. HALL
MICHAEL P. CLENDENEN
Trial Attorneys
U.S. Department of Justice
Civil Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
Tel.:   (202) 353-8679
Fax:    (202) 616-8470

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| CHRISTOPHER WISE, *et al.*, | Case No. 3:20-cv-01193-IM |
| Plaintiffs, | **FEDERAL DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS AGENCY AND OFFICIAL CAPACITY CLAIMS** |
| v. | |
| CITY OF PORTLAND, *et al.*, | |
| Defendants. | |

FEDERAL DEFENDANTS' REPLY

## INTRODUCTION

Through this action, Plaintiffs seek injunctive relief against hypothetical future law enforcement activity based on events from violent protests in Portland last summer.  The federal agency defendants and individual federal officers sued in their official capacities (for purposes of this motion, "Federal Defendants") moved to dismiss the claims against them for lack of standing and failure to state a claim.  Dkt. No. 58 ("Mot.").  In their response, Dkt. No. 61 ("Opp."), Plaintiffs do not squarely address many of Federal Defendants' arguments, and in fact entirely ignore some of them.  On standing, Plaintiffs focus on their scattered past injuries, which are insufficient to provide standing, and they do not demonstrate any official policy or officially sanctioned pattern of behavior that would afford them standing.  Plaintiffs ignore entirely the problems with their claims against individual officers.  On their constitutional claims, they offer nothing that would help them avoid this Court's previous rejection of their First Amendment claims, and they offer no rebuttal to the charge that their Fourth Amendment claims are too vague.  They also do not explain why their inability to clearly articulate their claims does not destroy any chance of demonstrating a clear, certainly impending recurrence of a clear past injury.  Finally, Plaintiffs almost entirely ignore the central problem with their Administrative Procedure Act (APA) claim—that the only source of law they say was contravened, the Executive Order, provides no limitations on the agencies' discretion—and instead attempt to add a new claim under the Tenth Amendment without any basis to do so. Accordingly, all claims against the federal agencies and official capacity defendants should be dismissed.

## ARGUMENT

**I.    Plaintiffs' Complaint Fails to Demonstrate That They Face a Certainly Impending Injury**

As explained at length in Federal Defendants' motion to dismiss, past injuries—even repeated ones—do not confer standing to obtain injunctive relief.  Dkt. No. 59 ("Mot.) at 5-8.

Rather, Plaintiffs must show a future injury that is concrete and particularized is certainly impending. *Id.* In their motion, Federal Defendants noted that Plaintiffs failed to plausibly allege any specific future plans or any specific, concrete, and particular situations in which injury is certainly impending related to any potential future protests. *Id.* at 10. In opposition, Plaintiffs merely stress the past injuries they have suffered and assert that Federal Defendants have a policy sanctioning the allegedly unlawful behavior of federal officers. None of this cures their failure to explain how they will be specifically harmed in the future. Additionally, those arguments fall short on their own.

A. **Plaintiffs' Attempt to Demonstrate Future Injury Through Past Injury Must Fail**

Even Plaintiffs concede that they must demonstrate that they are "realistically threatened by a repetition of [the violation]." Dkt. No. 61 ("Opp.") at 5-6; *Armstrong v. Davis*, 275 F.3d 849, 860–61 (9th Cir. 2001) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)). But they cannot do so with only instances of past harm. *Armstrong*, 275 F.3d at 861 (noting that *Lyons* held "that plaintiff cannot establish the requisite type of harm simply by pointing to some past injury"). Indeed, the courts have required either a formal, written policy or an rigid, officially sanctioned practice to demonstrate future harm precisely because past harm is inherently insufficient. *See Lyons*, 461 U.S. at 106; *Armstrong*, 275 F.3d at 861.

Accordingly, Plaintiffs' efforts to illustrate the repeated nature of the past harm that they have allegedly suffered achieves nothing. As discussed in Federal Defendants' motion, Mot. at 9, the Complaint alleges only four specific incidents involving federal officers over the course of two nights (among weeks of active, riotous protests). Plaintiffs attempt to expand this number, without any specific response to Federal Defendants' arguments on this point, by reciting other allegations in the Complaint surrounding the four incidents. But those allegations do not distinguish Federal Defendants' actions from those of the Portland Police Bureau and are fatally vague. *See Thomas v. Mundell*, 572 F.3d 756, 763 (9th Cir. 2009) (noting that vague or conclusory allegations need not be

accepted, including to establish standing).  Indeed, for many of the specific allegations noted in Plaintiffs' Opposition, the Complaint clearly attributes them *solely* to the Portland Police Bureau, rather than the Federal Defendants.  Opp. at 4 (citing, *inter alia*, Compl. ¶¶ 72, 75, 80, 84, all of which concern only the Portland Police Bureau but noting this fact only with regard to the last two).  Plaintiffs' obfuscation of which defendant performed which action both creates problems for the merits of their claim, *see, e.g.*, *Fortaleza v. PNC Fin. Servs. Grp., Inc.*, 642 F. Supp. 2d 1012, 1020 (N.D. Cal. 2009), and undermines their weak effort to establish standing.

In any event, the additional allegations amount to little.  There is only one other specific allegation, concerning Plaintiff Guest.  Plaintiffs allege that either "Municipal Doe Defendants or Federal Doe Defendants" shot and pushed her, Compl. ¶ 153, though in their Opposition they misrepresent this allegation as being about only federal officers, Opp. at 5.  The Complaint provides no basis to conclude that the incident involved federal officers, rather than Portland Police.

The only other allegations concern Plaintiff Wise, and are general, rather than specific.  The Complaint generally alleges that "Portland Police and Federal Defendants have severely injured him multiple times," "threatened him with physical harm essentially every night he has attended the protests," and "have thrown or shot flashbang grenades and teargas canisters directly at" him.  Opp. at 4-5 (citing Compl. ¶¶ 69, 93).  The generic allegation that Federal Defendants have "injured" Plaintiff Wise—not necessarily *physically*—is not a "concrete and particularized" injury of the kind to confer standing at any time, much less for future injury.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  It is also unclear if more than one of the "multiple" injuries were inflicted by Federal Defendants or if the allegation counts only the one incident involving federal officers.  That defendants "threatened" physical harm is also not "concrete and particularized"—indeed, it could be simply referring to warnings that force may be used.  Those warnings are issued in conjunction with orders to disperse, which Portland Police routinely gave, *see* Compl. ¶¶ 129-30, and, in any event, it means little if Plaintiff Wise was in fact injured in only one specific incident.  Finally, it is also

FEDERAL DEFENDANTS' REPLY – 3

unclear if Federal Defendants, rather than Portland Police, launched flashbangs or tear gas at Plaintiff Wise, *see* Compl. ¶¶ 71, 75 (alleging that Portland Police used both munitions near him), so there is no factual basis to assume that Federal Defendants also did so.

Regardless, the number of incidents is dwarfed by the number of nights of protest. "[A]t the time of filing the Complaint, there had been at least 50 straight days of demonstrations." Opp. at 6 (quoting Compl. ¶ 178). Plaintiff Wise (who alleged only one specific incident involving federal officers) attended protests six nights a week unless he was too injured (including by Portland Police), Opp. at 7 (Compl. ¶ 65). The Complaint does not make clear how many nights of protests that Plaintiffs Durkee and Guest attended, but it is at least several more than the singular night of the incidents involving federal law enforcement. *See, e.g.*, Compl. ¶ 171. The final Plaintiff, Martinez, does not allege any incidents involving federal law enforcement, despite attending several protests each week. Compl. ¶ 142. That Plaintiffs have had four or some similar handful of incidents with federal law enforcement over months of protests that they have attended falls far short of demonstrating that they are "realistically threatened" with the repetition of any injury, *Armstrong*, 275 F.3d at 861, or that any harm is "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

None of the cases that Plaintiffs cite regarding standing come close to suggesting that their allegations of past injury are sufficient. Indeed, the Ninth Circuit has specifically held that even *five* past instances of the same injury to the same person are insufficient to demonstrate a sufficient threat of repeated future injury. *Updike v. Multnomah Cty.*, 870 F.3d 939, 947 (9th Cir. 2017) (denying injunctive relief to a plaintiff challenging the lack of American Sign Language interpreters in pretrial detainment and at arraignment, even though he had been booked at the same correctional facility five times before, because "standing for injunctive relief requires that a plaintiff show a 'real and immediate threat of repeated injury'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974))). *See also Blair v. Shanahan*, 38 F.3d 1514, 1517-19 (9th Cir. 1994) (holding plaintiff lacked standing to

challenge panhandling statute even though he had been arrested five times before under it); *Eggar v. City of Livingston*, 40 F.3d 312, 316-17 (9th Cir. 1994) (holding that plaintiffs did not have standing to challenge city's conduct even though they and other indigents had repeatedly been jailed without counsel and one plaintiff remained under a six-month sentence).

The only case that Plaintiffs cite regarding standing that relied in part on past injury, *Thomas v. City of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992),[1] pre-dates *Clapper* and is distinguishable on that basis alone.  Moreover, *Thomas* involved *seventy-five* plaintiffs who alleged that they were victims of police misconduct within a small section of the city and that class members were allegedly victimized repeatedly.  *Id.* at 507.  That extensive and pervasive alleged misconduct is nothing like what is alleged here.  Additionally (and as Plaintiffs recognize), the court in *Thomas* relied on several other factors for standing as well, including the fact that class members alleged retaliation for the lawsuit itself and that the police conduct was "officially sanctioned."  *Id.*  It accordingly provides no basis to transform Plaintiffs' scattered, alleged past injuries into a risk of future harm sufficient to confer standing.

Plaintiffs outlandishly suggest that *Lyons* and similar cases are inapposite because they concerned state or local law enforcement, rather than federal law enforcement.  Opp. at 13-14.  This is directly contrary to binding Supreme Court authority.  The standard for demonstrating certainly impending injury does not change when the federal government is the defendant.  *See, e.g.*, *Clapper*, 568 U.S. at 409 (2013).

---

[1] Plaintiffs quote *Thomas* for the proposition that the "possibility of recurring injury ceases to be speculative when actual repeated incidents are documented."  Opp. at 6 (quoting 978 F.2d at 507).  As noted, even in that case, it was not merely the presence of repeated injury that conferred standing.  But Plaintiffs did not note that that specific phrase in *Thomas* is a direct quotation from a case that was overruled, *Nicacio v. INS*, 797 F.2d 700, 702 (9th Cir.1985), because it considered harms to class members who were not plaintiffs, *see Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044-45 (9th Cir. 1999) (recognizing that *Nicacio* was overruled).  *Thomas* notes that "class members" were repeatedly victimized but says nothing about the named plaintiffs.  978 F.2d at 507.  Accordingly, *Thomas* may no longer be good law, particularly on standing.

**B.      Plaintiffs' Other Arguments About Alleged Harm Are Also Misguided**

Plaintiffs offer two additional arguments in an attempt to magnify the nature of the past harm that they allegedly suffered: that the harm was "unprovoked" and that it chilled Plaintiffs' expression, resulting in continuing, present effects.   Neither is supported by the Complaint.

Plaintiffs are correct that some opinions have noted, as relevant to standing, that the law enforcement violations alleged occurred without any provocation or even potentially illegal conduct on the part of plaintiffs.  *Thomas*, 978 F.2d at 506, 508; *LaDuke v. Nelson*, 762 F.2d 1318, 1326 (9th Cir. 1985).  That factor is relevant because courts routinely find that future injury is merely speculative if it depends on the plaintiff committing some infraction and coming into contact with law enforcement, with law enforcement then inflicting some challenged harm.  *See, e.g.*, *Lyons*, 461 U.S. at 105-08; *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974)  ("We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners."); *Eggar*, 40 F.3d at 316-17.  Plaintiffs suggest that this assists them with standing because they were not breaking any laws.  Opp. at 14.  But they have the situation entirely backwards.

As Federal Defendants explained in their motion, Mot. at 17-18, Plaintiffs allege that they attempt to provide medical care after officers disperse crowds, and they necessarily must disobey officers' orders to do so.  Indeed, even in their opposition, Plaintiffs admit that in at least some of the incidents, they were disobeying such orders, Opp. at 17, and do not dispute that that was the case with the four main incidents.  Their situation is entirely different than the "completely innocent" individuals who simply resided in immigrant farm housing, *LaDuke*, 762 F.2d at 1326, or minorities arrested without cause and then beaten, *Thomas*, 978 F.2d at 506.  Plaintiffs are instead like the plaintiff in *Lyons* and similar cases, alleging mistreatment after coming into contact with law enforcement or the criminal justice system because of some infraction.  And the chain of events

required to result in future harm—that Plaintiffs would attend protests that would turn violent, that federal law enforcement would attempt to disperse the crowds, that Plaintiffs would disobey any order to disperse and instead move toward law enforcement in an attempt to render aid to other protesters who had been injured, and that federal law enforcement would use force against Plaintiffs—is no less speculative than the chain of events found too speculative to confer standing in numerous other cases. *See, e.g.*, *Lyons*, 461 U.S. at 105-08; *Updike*, 870 F.3d at 948; *Eggar*, 40 F.3d at 316-17.

Plaintiffs also argue that they are suffering "continuing, present adverse effects" because Federal Defendants have chilled the exercise of their free speech. Opp. at 11. This is entirely baseless. There is not even the most conclusory allegation in the Complaint that Plaintiffs are unwilling to attend any future protests. The two allegations that Plaintiffs note in their opposition are that Plaintiff Wise has generally attended protests unless he is too injured (perhaps from the numerous injuries he ascribes to Portland Police, rather than Federal Defendants, and which in any case have nothing to do with a future chilling effect) and that Plaintiffs Guest and Durkee delayed returning to protests until July 18 (after they purchased protective gear)—showing that they did in fact resume attending protests. Opp. at 11 (citing Compl. ¶¶ 65, 171). Moreover, alleging a chilling effect does not actually add anything to Plaintiffs' injuries. As explained in Federal Defendants' motion, a chilling effect will only provide standing if the feared injury producing that effect is itself a sufficient injury in fact—meaning that the feared injury is non-speculative, concrete and particularized, and certainly impending. *See* Mot. at 8. Thus, if Plaintiffs cannot demonstrate a future injury from the nights that they have attended protests—and they cannot—it does nothing for them to claim that they also missed other nights because they were "chilled."

C.     **Plaintiffs Have Not Demonstrated Standing Through a Policy or Pattern of Behavior**

Plaintiffs also argue that Federal Defendants have adopted a policy or otherwise officially sanctioned a pattern of behavior that led to Plaintiffs' injuries.  Yet the allegations on which Plaintiffs rely do not demonstrate that such a policy or officially sanctioned practice exists.  Indeed, Plaintiffs largely concede as much.

To demonstrate standing to challenge future injury by federal agents, plaintiffs must generally show that either that the alleged future injury stems directly from a formal written policy or that there is an rigid, officially sanctioned practice of officers causing that injury.  *See Lyons*, 461 U.S. at 106 (requiring that Lyons show "(1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, . . . or, (2) that the City ordered or authorized police officers to act in such manner"); *Armstrong*, 275 F.3d at 861 (noting that plaintiffs generally demonstrate either that "the harm alleged is directly traceable to a written policy, or is part of a "pattern of officially sanctioned . . .  behavior, violative of the plaintiffs' [federal] rights." (quoting *LaDuke*, 762 F.2d at 1323)).  Plaintiffs must show "specific . . . policies and practices that would subject [them] to a realistic possibility that [federal officers] would subject [them] to the injurious acts again in the future."  *Updike*, 870 F.3d at 948.

Plaintiffs have not demonstrated that there is anything like a written policy in this case that could establish standing.  The written policies that have been found sufficient are not just any that touches on the subject but a policy concerning the very harm at issue and from which the alleged harm is "directly traceable."  *Armstrong*, 275 F.3d at 861.  For instance, in *Lyons*, the plaintiff alleged that the city had a policy of allowing chokeholds in some situations short of a deadly threat but not specifically when there was no provocation or resisting arrest—as was the case when Lyons was allegedly subjected to a chokehold.  *Lyons*, 461 U.S. at 106.  The Supreme Court concluded that the policy made the complained-of conduct no less speculative.  *Id.*  Here, the only written policy

noted by Plaintiffs was Executive Order 13933.  Although Plaintiffs quote language from it, the policy does not address law enforcement practices.  As explained in Federal Defendants' motion, Mot. at 24-25, the Executive Order concerns only priorities in prosecution and federal funding.  Nothing in it concerns the uses of force that Plaintiffs challenge, much less specifically authorizes the challenged conduct.  Indeed, in their Opposition, in the section concerning their APA challenge, Plaintiffs specifically rely on the idea that the Executive Order concerns *only* the protection of federal property and *not* the conduct they challenge.  Opp. at 27-28.  They cannot also maintain that the conduct they challenge flows directly from that Order.

There is also no basis for the assertion that the incidents are part of a pattern of officially sanctioned conduct sufficient to confer standing.  A finding of standing on such grounds is rare.  As noted above, in one of the cases upon which Plaintiffs rely, *Thomas*, there were 75 plaintiffs who alleged injury in a small neighborhood and ongoing retaliation, but there was also voluminous evidence that "a white-supremacist gang of deputies" operated in the area and the plaintiffs alleged that the misconduct was condoned and tacitly authorized by department policy makers.  978 F.2d. at 506-08.  In the other, there was a finding that "defendants engaged in a standard pattern of officially sanctioned officer behavior" of searching migrant farm housing over many years, *LaDuke* 762 F.2d at 1324, and various INS directives were amended to allow the specific complained-of behavior, *see LaDuke v. Nelson*, 560 F. Supp. 158, 162 (E.D. Wash. 1982).  Both *Thomas* and *LaDuke* also predate, and are exceedingly difficult to square with, *Clapper*.  At the same time, *Lyons* makes clear how rare these examples are because it explains that where there is no official policy, there must be an invariable practice of always engaging in the challenged conduct.  *Lyons*, 461 U.S. at 106.  Indeed, even the plaintiff's allegation in that case that the police "routinely" applied chokeholds when not threatened by the use of deadly force fell short of showing the necessary pattern of using chokeholds without any provocation at all.  *Id.* at 105.  Even repeated violations that do not flow

from a policy do not establish the kind of practice necessary for standing.  *See Updike*, 870 F.3d at 948.

Plaintiffs' handful of incidents are obviously insufficient to establish the kind of pattern necessary, but Plaintiffs also cannot demonstrate official sanction.  As Federal Defendants already explained in their motion, Mot. at 11, the few statements Plaintiffs cite in their complaint—two tweets from Acting DHS Secretary Wolf and a statement by President Trump quoted in a news story[2]—specifically concern federal officers persevering over violent anarchists, not their reactions to protesters, much less protest medics like Plaintiffs.  None of these statements provide any sanction to the specific alleged conduct at issue in the isolated incidents to which Plaintiffs point.  Plaintiffs also quote parts of the Executive Order that criticize the violent anarchists and the cities that fail to restore order in their wake.  Opp. at 9-10.  As already noted, the Order has nothing to do with law enforcement conduct, and it does not provide official sanction to any practices.[3]

At bottom, Plaintiffs maintain that they can draw from isolated incidents to establish standing for hypothetical future injuries attributable to Federal Defendants.  There is no basis for this speculation.  Plaintiffs therefore lack standing, and this action should be dismissed.

---

[2] As Federal Defendants noted in their motion, Mot. at 11, the Complaint misquotes President Trump's statement from the news article that it incorporates by reference in order to make it appear as if he is claiming that protests will be quelled rather than violence.  In their Opposition, Plaintiffs quote this misquotation from their Complaint without any clarification or comment.  Opp. at 12 (quoting Compl. ¶ 177).

[3] In a footnote in their Opposition, Plaintiffs request that this Court take judicial notice of statements contained in a filing by the plaintiffs in another case.  Opp. at 10 n.3.  That filing is a motion for a temporary restraining order.  Apart from the questionable propriety of taking judicial notice of statements contained in an advocacy document in another case, Plaintiffs provide no comment at all on what those statements are intended to show or how they are relevant to this case.  They also provide no reason that they could not have included those statements in their Complaint if they were relevant.

II.     **Plaintiffs Do Not Address the Insufficiency of Their Pleadings**

Even if Plaintiffs somehow establish standing, their claims are without merit.  Federal

Defendants' motion carefully explained a key deficiency in Plaintiffs' Complaint.  Whereas the

Complaint defined Federal Doe Defendants as being sued in only their individual capacities,

Plaintiffs' constitutional claims were pleaded in the headings against only those defendants (and not

the federal agency defendants, who are the defendants for the APA claim) in both their individual

and official capacities.  Mot. at 13-15.  Additionally, Plaintiffs split the Federal Doe Defendants into

officers on the ground who "directly assaulted Plaintiffs" and supervisory officials but provided no

allegations against the latter at all.  *Id.* at 15-16.  Even if something could be made of Plaintiffs'

allegations, an official capacity suit is a suit against the office rather than the individual, and

injunctive relief runs against that office.  *See, e.g.*, *Brandon v. Holt*, 469 U.S. 464, 471 (1985);

*Acierno v. Cloutier*, 40 F.3d 597, 608 (3d Cir. 1994) (en banc) ("a defendant who loses a claim for

injunctive relief is simply ordered to refrain from taking certain action in his or her official

capacity.").  Yet, by functionally having claims against only a handful of line-level officers (those

who previously allegedly injured Plaintiffs, *but see* Part III, *infra* (discussing lack of specific

allegations against federal officers)) in their official capacities, it is unclear what Plaintiffs hope to

obtain through injunctive relief.  Mot. at 15.

Plaintiffs chose not to address any of these issues in their opposition.  Instead, they provide a

footnote apparently conceding that there are inconsistencies in their allegations and noting that they

would be willing to amend the Complaint to remedy them.  Opp. at 15 n.5.  They also argue that they

can maintain their claims against the federal agencies through the official-capacity claims against

officers under *Ex parte Young*, 209 U.S. 123 (1908).  *Id.*

Regarding Plaintiffs' legal point, they are simply incorrect.  The *Ex parte Young* doctrine is

concerned solely with suits for injunctive relief under federal law against state officials in their

official capacities.  *See, e.g.*, *Hason v. Med. Bd. of California*, 279 F.3d 1167, 1171 (9th Cir. 2002).

Indeed, the whole point of the doctrine is that it serves as a workaround to the immunity provided by the Eleventh Amendment—a specific state official can be sued and enjoined without that injunction running against the state itself. *See Ex parte Young*, 209 U.S. at 149-159. Even if Plaintiffs could rely on that doctrine, it would merely intensify the limitation of the suit being against only certain offices and not the agency or federal government generally.

Plaintiffs' suggestion that they could amend the Complaint to remedy obvious inconsistencies is inappropriate. Federal Defendants identified the contradictions, which appeared to be obvious drafting errors, prior to filing their motion to dismiss as part of their obligation under the local rules. *See* Local Rule 7-1. Plaintiffs nevertheless indicated that they intended to proceed with the Complaint as drafted. Rather than seeking amendment prior to filing their Opposition, Plaintiffs have again indicated that they wish to proceed with their Complaint as inconsistently drafted. If, as Plaintiffs have indicated, they wish to proceed with this Complaint, they should be held to account for why their Complaint entitles them to relief. If they expect Federal Defendants and the Court to treat the Complaint as if it was intentionally drafted the way it is, Plaintiffs should have to explain that rationale. As discussed, the inconsistencies create substantial complications for their legal theories, and Plaintiffs fail to address them at all. If, however, Plaintiffs already acknowledge that the Complaint has mistakes that affect their legal theories and they are already looking to amendment, then they should seek leave to amend now rather than having Federal Defendants and this Court expend resources to consider those convoluted claims. It is simply inappropriate for Plaintiffs to expect Federal Defendants and the Court to figure out whether their poorly drafted pleading somehow survives to save them from attempting an amendment that they already recognize may be necessary. And although Plaintiffs presume that they should be given an opportunity to amend, failing to make such a fix earlier in the litigation is an appropriate reason to deny later amendment. *See, e.g.*, *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990).

III.    **Plaintiffs' Constitutional Theories Are Baseless**

Plaintiffs present two claims against Federal Doe Defendants.  For purposes of Federal Defendants' motion, however, those claims are relevant only to injunctive relief, and Plaintiffs are not entitled to a declarative judgment of whether individual defendants violated their rights on specific occasions in the past unless that proves relevant to such relief—which it largely does not.[4] At the same time, if they cannot clearly demonstrate past injury or a put forward a legal theory that demonstrates that such injury violates their rights, that further undermines any basis for an entitlement to injunctive relief because there is no wrong to recur.  In this situation, it is necessary, but not sufficient, that Plaintiffs demonstrate a past injury.  Plaintiffs cannot do so.

A.    **Plaintiffs' First Amendment Theories Are Foreclosed**

Plaintiffs also advance a First Amendment retaliation theory against Federal Defendants. They claim that they were participating in the protests generally but also engaging in particular protected expression as protest medics, and accordingly that Federal Defendants violated their rights by dispersing non-violent protesters generally and targeting Plaintiffs as protest medics particularly. Plaintiffs advance largely the same arguments that have already been addressed by Federal Defendants and rejected by this Court.  *See* Mot. at 16-21.

On the question of whether Plaintiffs' speech was protected, Plaintiffs concede that law enforcement had issued dispersal warnings during at least some of the incidents that Plaintiffs alleged, and they do not dispute that such orders had been issued during the four main incidents. Opp. at 17-18.  Plaintiffs also do not squarely contest the legality of those dispersal orders.  They instead cite a single case for the proposition that Federal Defendants somehow violated Plaintiffs'

---

[4] Similarly, even though Plaintiffs have alleged individual capacity claims under *Bivens*, there are multiple hurdles to those claims, including that any individual defendant would be able to assert qualified immunity, which could be resolved on whether any rights were clearly established rather than the specific facts in each incident.  *See generally Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

rights because Plaintiffs were not violent, and a police response should be confined to violent rioters. Opp. at 18.  That case did not deal with dispersal orders.  *See Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1213 (W.D. Wash. 2020) (citing *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996)).  Also, that case relies on a Ninth Circuit case involving non-violent protests, but in *Menotti v. Seattle*, the Ninth Circuit made clear that a "pattern of chaotic violence" (which also resulted in a forceful police response) can justify wide-ranging prophylactic restrictions on speech—in *Menotti*, an order shutting down large portions of downtown Seattle—far more substantial than the temporary orders to disperse here.  409 F.3d 1113, 1128-42 (9th Cir. 2005).  As Federal Defendants already noted, the Complaint avoids characterizing the crowds facing federal officers as nonviolent, even while it does so for some of the crowds facing Portland Police, and what little detail the Complaint contains suggests that violence was indeed prevalent at the protests.  Mot. at 20.

In any event, Plaintiffs provide no support for the proposition that lawful dispersal orders do not apply to everyone—which is the whole point of such an order—or that police must segregate violent rioters from peaceful protesters after giving such a lawful dispersal order, in contrast to the cases cited in support of Federal Defendants' motion, *see* Mot. at 18.  *See also Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977) (noting that if "the demonstration as a whole . . . is substantially infected with violence or obstruction the police may act to control it as a unit" and if "any demonstrator or bystander refuses to obey" or order to disperse, he may be arrested even if he was not previously "violent or obstructive").  Similarly, as this Court has already held, Dkt. No. 49 at 14, Plaintiffs have no right generally or as protest medics to ignore the dispersal orders and continue expressing themselves.  Plaintiffs have had ample opportunity to provide some other explanation for how their conduct was protected expression at the time that federal officers used force, and they have simply not done so.

With regard to retaliatory animus, Plaintiffs suggest that federal officers attacked the crowds of nonviolent protesters (including them) indiscriminately with tear gas, showing general animus toward protesters, but then attacked Plaintiffs in particular with projectiles, showing specific animus toward them.  Opp. at 20.  Plaintiffs do not seriously attempt to stake out a claim that the actions of federal officers toward the crowds generally constituted First Amendment retaliation—their claims are clearly cabined to harm to themselves as protest medics.  *See* Compl. ¶¶ 211, 223, 239-40. Moreover, as noted above, Plaintiffs have put forward no allegations that the crowds facing federal officers were nonviolent or that any dispersal orders were unlawful, meaning that there is no basis to infer that federal officers' use of force toward the crowds was aimed toward shutting down protected expression rather than quelling violence and enforcing dispersal orders.  Also, Plaintiffs themselves note that the alleged "indiscriminate" use of force was also against non-protesters, including legal observers and journalists, Compl. ¶ 152, further demonstrating that the purpose was to disperse those who refused to leave.

To demonstrate particular animus towards Plaintiffs, they try to recast the incidents involving federal officers as being ones in which they "were attempting to comply with law enforcement dispersal orders or under circumstances in which they clearly did not pose a threat to law enforcement."  Mot. at 22.  None of the four incidents fit Plaintiffs' characterization.  As already explained, Mot. at 19-20, in all four incidents Plaintiffs failed to comply, and in several they pointedly advanced toward federal officers even as officers were attempting to disperse crowds. There is no reasonable inference to be drawn for Plaintiffs on this point because the allegations and video they incorporate make clear that they were not complying with lawful orders.  *Id*.  Additionally it is simply unreasonable to assume that federal officers could tell that Plaintiffs posed no threat, even as they refused instructions, advanced toward officers, attempted to assist protesters who had also refused to disperse, kicked a tear gas canister, and held objects up towards officers as they were pushed back.  *Id.*  And regardless, their continued presence itself presented safety concerns—the

purpose of dispersal is to clear the area of all individuals so that officers can secure the area, stop

attacks, and safely make arrests.  When individuals refuse to leave the area, they directly frustrate

those goals.

> **B.    Plaintiffs Do Not Explain How They Have Sufficiently Alleged a Fourth Amendment Claim**

Plaintiffs' primary argument for why their Fourth Amendment claims should survive is that a

Fourth Amendment "reasonableness" inquiry "is a fact-intensive inquiry that cannot be determined at

[the motion to dismiss] stage."  Mot. at 23 (citing. *Meyer v. City of Washington*, No. CIV. 07-1127-

HA, 2008 WL 5156481, at *3 (D. Or. Dec. 8, 2008)).  Plaintiffs do not note that the pre-*Iqbal*

opinion from which that quote was sourced was reversed by the Supreme Court so that the courts

below could consider the effect of *Iqbal*.  *Hydrick v. Hunter*, 500 F.3d 978, 993 (9th Cir. 2007), *cert.*

*granted, judgment vacated*, 556 U.S. 1256 (2009).  Post-*Iqbal*, courts do test whether a complaint has

stated a plausible claim for relief, even for excessive force claims.  *See, e.g.*, *Rodriguez v. City of*

*Modesto*, 535 F. App'x 643, 645-46 (9th Cir. 2013).  Plaintiffs do not cite any case regarding a

motion to dismiss a claim for excessive force, much less one in which the court denied such a motion

for a complaint having the same omissions as Plaintiffs' has.[5]

Plaintiffs do not explain how their Complaint can survive such omissions, including the

omission of the "most important" factor in the balancing test, the "immediate threat to the safety of

the officers or others."  *See* Mot. at 22.  Plaintiffs assert that they alleged that they "did not commit

any crimes, pose any threat to any officers or any other person, or resist arrest," Opp. at 24 (citing

---

[5] Plaintiffs' proposition is also generally incorrect because most excessive force claims are individual capacity claims and, as a threshold legal matter, federal officials sued under *Bivens* may have qualified immunity.  *Harlow*, 457 U.S. at 818. The Supreme Court "repeatedly h[as] stressed" that courts should resolve qualified immunity "at the *earliest* possible stage in litigation."  *Hunter v. Bryant*, 502 U.S. 22, 227 (1991) (per curiam) (emphasis added).  The "basic thrust" embraced under this doctrine is "to free officials from the concerns of litigation, including 'avoidance of disruptive discovery.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009) (citation omitted).

Compl. ¶191), but, as Federal Defendants noted, that was only in regards to their conduct with respect to Portland Police, Mot. at 22.  Plaintiffs' admission that they seek to obtain discovery to substantiate their claims underscores the insufficiency of those claims, Mot. at 24, and demonstrates how far from being entitled to prospective relief they are.[6]  If they cannot show a common, clear violation in the past, they cannot demonstrate that a general policy or officially sanctioned pattern of behavior will result in a similar violation in the future.  Indeed, Plaintiffs are in a worse position than the plaintiff in *Lyons*, who articulated a simple excessive force claim that could be clearly enjoined in the future.  For purposes of the official capacity federal defendants, this claim must fail.

**IV.    Plaintiffs Have Failed to Allege a Viable APA Claim**

Plaintiffs take issue with Federal Defendants' motion regarding their APA claim on two points.  First, they assert that they have articulated a final agency action under challenge: "the decision to send federal law-enforcement personnel to Portland, Oregon, in order to engage in plenary policing, untethered to any risk to federal property."  Opp. at 26.  Second, they assert that that decision is ultra vires and otherwise violates the APA.  Opp. at 30-31.  They are incorrect on both points.

With regard to the purported final agency action, Plaintiffs have failed to define it with any precision.  As discussed in Federal Defendants' motion, Mot. at 26-27, the few public statements Plaintiffs rely on in their Complaint say nothing about "generalized" policing.  In their opposition, Opp. at 27-28, Plaintiffs include three additional public statements and request that judicial notice be taken of them (despite that the statements were made in June and Plaintiffs provide no explanation for why they were not included in their Complaint).  But those statements, again, say nothing about any specific actions being taken by federal officers and have nothing to do with Portland.  Two of

---

[6] A plaintiff "is not entitled to discovery" where, like here, the "complaint is deficient under Rule 8." *Iqbal*, 556 U.S. at 678-79, 686 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

them concern the possibility of invoking the Insurrection Act to restore order in Seattle, *see* 10 U.S.C. § 252-53, and all three were made before federal officers deployed in Portland.  Plaintiffs also recite some actions by individual federal officers described in the complaint, Mot. at 28-29, but these provide no evidence for an official policy, and Plaintiffs do not explain what "policing" actions they are supposed to represent.  None of the statements or allegations provide any support for the idea that any instruction to "generally police protesters," Opp. at 29, was given, much less what that means or what any more specific agency directives were.

Because Plaintiffs cannot define any specific policy, they cannot show that it is a final agency action.  *See Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013) (holding that "vague allegation" was insufficient because it did "not identify a discrete 'agency action' that fits within the APA's definition of that term").  As Plaintiffs' recitation of the definitions regarding "agency action" demonstrates, Opp. at 25, an agency action is the action at the level of the *agency*.  Some features of a final agency action include that it is the definitive position of the *agency*, not a decision by subordinate official, and it has a direct and immediate effect on the parties.  *See, e.g.*, *Abbott Labs. v. Gardner*, 387 U.S. 136, 11 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  The decision to deploy federal officers to Portland was not an "agency action" under the definitions noted by Plaintiffs; no rights or obligations were determined by it, *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  The specific directives given to officers could present a different question, but there is no way to know from Plaintiffs' allegations.  If federal officers were given general guidance, not specific directions foreclosing their law enforcement discretion, then there is no final agency action.  *See, e.g.*, *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014).  The vague allegation of a decision to have federal officers engage in "plenary policing," without any evidence of its existence, much less the specific content of that decision, fails to establish a reviewable agency action.  This is consistent with the general rule that enforcement operations cannot be challenged as final agency actions.  *See* Mot. at 27.

Even if Plaintiffs did successfully allege the existence of some final agency action, they have not shown that it was unlawful.  Plaintiffs' Complaint challenges the purported final agency action as inconsistent with only the Executive Order and an Oregon statute but, as Federal Defendants explained, the Order provides no enforceable right and does not constrain agency discretion.  Mot. at 25-26.  Plaintiffs simply ignore these arguments entirely.  They instead rely on an absurd chain of logic: 1) "Congress has not authorized the Federal Defendants to consider anything other than the protection of federal property when utilizing its domestic policing resources," 2) the Executive Order identified statutes that "relate only to the protection of federal property and other monuments," and 3) Federal Defendants decided to send law enforcement personnel to Portland "for factors other than the protection of federal property," so Federal Defendants violated the APA by considering inappropriate factors.  Opp. at 30.  This chain of logic stands on falsehoods.  Congress has authorized Federal Defendants to enforce federal criminal law, which concerns many issues other than the protection of federal property, a fact readily discernable because the Executive Order *cites statutes that have nothing to do with the protection of federal property*—including, for instance, 18 U.S.C. § 1952 (interstate travel for arson), 18 U.S.C. § 2101 (interstate travel to riot), and 18 U.S.C. § 247 (destruction of religious private property).  *See* Executive Order 13933, 85 Fed. Reg. 40081, 40082 (June 26, 2020).  Even if the purported final agency action did exist, Plaintiffs point to no "factors which Congress has not intended [Federal Defendants] to consider," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43 (1983).  Plaintiffs accordingly have no arbitrary and capricious claim.

In their Opposition, Plaintiffs also argue that "the decision to allow federal-law enforcement personnel to engage in plenary policing is *ultra vires*."  Opp. at 30.  They argue that "Federal Defendants are constrained by federal statutes and the APA, in a manner which authorizes them to engage only in the enforcement of federal laws."  *Id.*  But the APA itself does not do so, and Plaintiffs cite no other statutes.  It is clear that they are attempting to shoehorn in a Tenth

Amendment theory never stated in their Complaint, including because they cite a Tenth Amendment commandeering case. *Id.* (citing *City of Philadelphia v. Sessions*, 309 F. Supp.3d 271, 286-87 (E.D. Penn. 2018)). Plaintiffs cannot amend their complaint merely by discussing unpled claims in a response to a motion to dismiss. *E.g.*, *Piper v. Gooding & Co. Inc.*, No. CV-18-00244-PHX-DLR, 2018 WL 924947, at *4 (D. Ariz. Feb. 15, 2018). It is clear that Plaintiffs got this theory, and their use of the phrase "plenary policing," from a similar case filed against the same federal agencies regarding these same protests in Portland. Opp. at 30 (citing *Western States Center, Inc. v. United States Department of Homeland Security*, No. 3:20-cv-01175-JR, 2020 WL 6555054, at *1-2 (D. Or. Nov. 2, 2020)). The court in that case found the Tenth Amendment theory to be without merit. *See Western States Center*, 2020 WL 6555054, at *1. Even if Plaintiffs could pursue this claim, they have provided no explanation for how it could succeed, including what "plenary policing" actions supposedly authorized are unlawful under the Tenth Amendment and why. They accordingly have no such claim.

## <u>CONCLUSION</u>

For the foregoing reasons, all claims against the federal agencies and federal officers in their official capacities should be dismissed.

Dated: December 3, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Jeffrey A. Hall*
JEFFREY A. HALL (DC 1019264)
MICHAEL P. CLENDENEN
Trial Attorneys
United States Department of Justice
Civil Division
950 Pennsylvania Ave. NW
Washington, DC 20530
Tel: (202) 353-8679
Email: jeffrey.a.hall@usdoj.gov

*Attorneys for Defendants*