BRIAN M. BOYNTON
Acting Assistant Attorney General
SCOTT E. ASPHAUG
Acting United States Attorney
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
JASON LYNCH (D.C. Bar No. 1016319)
KERI BERMAN
JORDAN VON BOKERN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 514-1359
Fax:    (202) 616-8460

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| CHRISTOPHER WISE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF PORTLAND, *et al.*,<br><br>Defendants. | Case No. 3:20-cv-1193-IM<br><br>**FEDERAL DEFENDANTS' SUPPLEMENTAL BRIEF ON WHETHER PLAINTIFFS' EQUITABLE CLAIMS HAVE BECOME MOOT** |

DEFENDANTS' SUPPLEMENTAL BRIEF ON MOOTNESS

# FEDERAL DEFENDANTS' SUPPLEMENTAL BRIEF ON WHETHER PLAINTIFFS' EQUITABLE CLAIMS HAVE BECOME MOOT

Pursuant to the Court's January 22, 2021, minute order, Federal Defendants hereby submit this supplemental brief on the question whether Plaintiffs claims for equitable relief are now moot.

Dated: March 5, 2021

BRIAN M. BOYNTON
Acting Assistant Attorney General

SCOTT E. ASPHAUG
Acting United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Jason C. Lynch*
JASON LYNCH
KERI BERMAN
JORDAN VON BOKERN
Trial Attorneys
United States Department of Justice
Civil Division
1100 L Street NW, Rm. 11214
Washington, DC 20005
Tel: (202) 514-1359
Email: Jason.Lynch@usdoj.gov

*Attorneys for Defendants*

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................... 1

LEGAL STANDARD ............................................................................................................. 2

ARGUMENT ............................................................................................................................ 3

    I.   Former President Donald Trump and Former Acting Secretary of Homeland Security Chad Wolf Have Left Office.................................................................. 3

        A.   Plaintiffs' Claim to Equitable Relief Depends on Tweets and Other Statements by Former Federal Officers. .................................................................................. 3

        B.   The Change in Administration Renders Plaintiffs' Equitable Claims Moot. ........ 4

    II.   OTHER CHANGES IN FEDERAL POLICY FURTHER UNDERMINE PLAINTIFFS' FEAR OF FUTURE INJURY. ...................................................................................................... 6

    III.   THE PROTESTS ON WHICH PLAINTIFFS' EQUITABLE CLAIMS RELY HAVE ABATED. ..... 8

        A.   The Factual Basis for Plaintiffs' Equitable Claims—Frequent, Violent Interactions Between Protesters and Federal Law Enforcement—No Longer Exists. .. 8

        B.   Defendant U.S. Marshals Service Has No Role in the Present Protest Activity. 11

    IV.   THE VOLUNTARY-CESSATION EXCEPTION TO MOOTNESS DOES NOT APPLY. .............. 11

CONCLUSION ....................................................................................................................... 13

## INTRODUCTION

During the summer of 2020, frequent racial-justice-centered demonstrations took place in downtown Portland—specifically, near the Mark O. Hatfield U.S. Courthouse. At night, these largely peaceful demonstrations often turned violent, as opportunists and other agitators sought to damage buildings, destroy protective barriers, and attack local and federal officers dispatched to protect property. Plaintiffs are volunteer "protest medics" who sought to render medical services to participants in these protests. As against Defendants U.S. Department of Homeland Security and ("DHS") and U.S. Marshals Service ("USMS") (collectively "Federal Defendants"), Plaintiffs seek "prospective injunctive relief" against "so that they can continue their efforts to aid protesters," Compl. ¶ 5, ECF No. 1.[1]

In a motion to dismiss filed October 20, 2020, Federal Defendants argued that Plaintiffs lacked standing to pursue equitable relief. *See generally* Mot. to Dismiss 5-13, ECF No. 58. To obtain such relief, the "threatened injury must be *certainly impending*," and not merely "*possible*." *Id.* at 6 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). These Plaintiffs have not demonstrated that there is any certainly impending threat of prospective injury based on the past circumstances or conduct that they allege. *Id.* at 8-12. Without more, the points made in Federal Defendants' motion to dismiss are sufficient to dismiss Plaintiffs' equitable claims against Federal Defendants.

Whether or not Plaintiffs had standing to bring equitable claims, however, changed circumstances have now rendered those claims moot. Plaintiffs' alleged fear of future injury is

---

[1] Plaintiffs have also sued "John Does 61-100," ostensibly "individual and supervisory officers of the federal government." Compl. at 1. But Plaintiffs have not named or served those defendants, and counsel for the United States does not represent such defendants if sued in their individual capacities.

based almost entirely on statements ascribed to federal officers who are no longer in office. Other changes in federal policy further undermine any such fear. Finally, the protests that Plaintiffs wished to support have abated. Plaintiffs' equitable claims should therefore be dismissed.

## LEGAL STANDARD

"A request for injunctive relief remains live only so long as there is some present harm left to enjoin." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017) (quoting *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* (quoting *O'Neal v. Seattle*, 66 F.3d 1064, 1066 (9th Cir. 1995)). "Thus, a claim for injunctive relief becomes moot once subsequent events have made clear the conduct alleged as the basis for the requested relief could not reasonably be expected to recur." *Id.* (quoting *Ruiz v. City of Santa Maria*, 160 F.3d 543, 549 (9th Cir. 1998)).

Similarly, a plaintiff who cannot reasonably be expected to benefit from prospective relief ordered against the defendant, in light of intervening events, has no claim for an injunction. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 364-65 (2011) (concluding that plaintiffs whose employment ended after an action was filed had no claim for injunctive relief against their former employer concerning its employment practices); *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1036-37 (9th Cir. 2006) (concluding that a plaintiff requesting an injunction requiring her former employer to adopt and enforce lawful policies "lacked standing to sue for injunctive relief from which she would not likely benefit").

# ARGUMENT

## I. FORMER PRESIDENT DONALD TRUMP AND FORMER ACTING SECRETARY OF HOMELAND SECURITY CHAD WOLF HAVE LEFT OFFICE.

### A. Plaintiffs' Claim to Equitable Relief Depends on Tweets and Other Statements by Former Federal Officers.

To support their theory that future harm is certainly impending, Plaintiffs ascribed to Federal Defendants a "policy" of "generalized anti-protest law enforcement, including dispersal of crowds with uses of force such as deployment of chemical irritants and munitions to quell protest activity." Compl. ¶ 231. That purported policy was inferred from "Federal officials' public statements," which "indicate[d] that the anti-protest law enforcement authorized and directed pursuant to these policies and directives are without regard to the location or other nexus with federal monuments, memorials, statues, and property." *Id.* Plaintiffs have never asserted that federal officers may not defend federal property or use generally accepted law-enforcement tactics; rather, based on the alleged statements and imputed intent of former officials (former President Trump and former Acting Secretary of Homeland Security Chad Wolf), Plaintiffs claimed that federal officers were improperly using that authority and those tactics to impede protected activity and to target protesters of a certain viewpoint. *See* Compl. ¶¶ 40, 54, 176, 177 & n.6. Because neither Donald Trump nor Chad Wolf now directs or supervises federal agents in Portland, Plaintiffs' equitable claims would now be moot *even if* the former President and Acting Secretary had the intent ascribed to them by Plaintiffs.

For example, Plaintiffs "fear[ed] for their safety from the Federal Defendants' violence" because "President Trump ordered federal agents to go to Portland to quell protests." Compl. ¶ 173. To state the obvious, no federal law-enforcement agents in Portland (or anywhere else) remain under the command of any officials from the prior administration identified in Plaintiffs' complaint. Federal agents in Portland who may be involved in the protection of federal property are not following Donald Trump's orders; they are under the command of President Biden and

Secretary Mayorkas—neither of whom is accused by Plaintiffs of any intent to "quell protests." As such, Plaintiffs' speculation regarding future protest activities, even assuming it was once plausibly grounded in the rhetoric Plaintiffs cited, relies on facts that no longer exist.

In their opposition to Federal Defendants' motion to dismiss, Plaintiffs emphasized and reiterated that statements by Donald Trump and Chad Wolf justified Plaintiffs' fear of future injury. *See* MTD Opp'n 6, ECF No. 61 ("Plaintiffs have sufficiently alleged both that the Federal Defendants have repeatedly infringed Plaintiffs' rights and that the Federal Defendants have an official policy, as well as a pattern and practice, of engaging in unlawful conduct."). Plaintiffs' allegation that "Federal Defendants' infringing conduct was officially sanctioned" was based, in large part, on "pronouncements" by former President Trump and former Acting Secretary Wolf. *See id.* at 8-11 (quoting Compl. ¶¶ 40, 176). Those pronouncements, Plaintiffs stressed, "came straight from the top" and thus "carried the imprimatur" of the offices held by President Trump and Acting Secretary Wolf. *Id.* at 10, 11.

Any supposed imprimatur has since been shed. Thus, months-old tweets and other statements by former President Trump or former Acting Secretary Wolf no longer support any conclusions about *future actions*—which must be the basis of prospective equitable relief. Plaintiffs' operative complaint includes no allegations about the officials currently in charge of the federal officers and agents. Nor could there be, as the current officials have made no statements akin to those in the complaint.

### B.   The Change in Administration Renders Plaintiffs' Equitable Claims Moot.

Although Federal Rule of Civil Procedure 25 automatically substitutes new federal officers for their predecessors, that does not mean that injunctive relief against the former officers will be appropriate against their successors. The Supreme Court has long held that, upon "an intervening change in administration, the issuance of prospective coercive relief against the successor to the

office must rest, at a minimum, on supplemental findings of fact indicating that the new officer will continue the practices of his predecessor." *Philadelphia v. Educ. Equal. League*, 415 U.S. 605, 622 (1974) (citing *Spomer v. Littleton*, 414 U.S. 514 (1974)).

The Ninth Circuit adheres to this line of cases. *See Hoptowit v. Spellman*, 753 F.2d 779, 782 (9th Cir. 1985). That case presented a constitutional challenge to confinement conditions in the Washington State penitentiary system. Subsequent to a change in State administration, and the substitution of defendants under Rule 25, the State asked the district court to reopen the record before ruling on the merits. *Id.* at 781. The Ninth Circuit held that no such reopening was required in that case, for two reasons. First, the prior defendants, though technically substituted out of the case, "remain[ed] in control; they ha[d] simply been promoted." *Id.* Second, although there were newly substituted defendants, "most of the evidence d[id] not relate to the personal conduct of the principal named defendants," but rather "concern[ed] institutional practices . . . from which the continuation of the dispute is a reasonable inference." *Id.* at 782 (quoting *Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Commissioners, etc.*, 622 F.2d 807, 822 (5th Cir. 1980)).

Neither reason applies here. First, neither Donald Trump nor Chad Wolf remains "in control" of Federal Defendants. *Hoptowit*, 753 F.2d at 781. Second, Plaintiffs allegations comprise *entirely* evidence related to the individualized conduct—the "pronouncements" that came "straight from the top," *see* MTD Opp'n 8-11; Compl. ¶¶ 40, 176—of the since-replaced federal officers. And in stark contrast to *Hoptowit*, Plaintiffs have never identified any "institutional practices" untethered to the former president's and former Acting Secretary's statements. *Id.* at 782. Thus, Plaintiffs have alleged "merely 'idiosyncratic abuses of the particular members of the outgoing

administration.'" *Id.* (quoting *ACLU v. Finch*, 638 F.2d 1336, 1346-47 (5th Cir. 1981)).²

Other circuits similarly hold that, upon a change in administration, the Court must make supplemental findings in order to grant equitable relief. In *Finch*, the case cited by the Ninth Circuit in *Hoptowit*, "the only specific incidents mentioned in the complaint involved members of the outgoing administration." *Finch*, 638 F.2d at 1346. Thus, there was "no basis for construing the complaint to allege by implication that the challenged activities were a matter of state policy or a recurrent practice of Mississippi executive officials." *Id.* (citing *Spomer*, 414 U.S. at 521). "The general allegation that the plaintiffs 'will continue to be subjected to Defendants' unlawful governmental intrusions unless Defendants are enjoined,' made when the members of the old administration were the only defendants, is also insufficient to support any such inference." *Id.* at 1347. The same is true here: Plaintiffs built their equitable claims on a foundation of statements by officials who have since left office. Thus, the Court has no basis to infer that any institutional misconduct will continue on the new Federal Defendants' watch.

At bottom, Plaintiffs may not simply assert that the new Federal Defendants will act just like their predecessors. Instead, Plaintiffs must offer—and the Court must accept—some factual basis to believe that is so. Plaintiffs have offered no such basis.³

---

² Again, Federal Defendants maintain that Plaintiffs had never sufficiently alleged any such "abuses" in their complaint. But in any event, any such claims are now moot.

³ The Fifth Circuit in *Finch* added that "Rule 15(d) is particularly apt for cases where an intervening change in administration renders ambiguous a complaint seeking prospective relief against public officers." 638 F.2d at 1347. Should Plaintiffs desire to supplement their complaint through Rule 15(d), they must file a motion under that Rule. Federal Defendants would respond to such a motion in due course.

DEFENDANTS' SUPPLEMENTAL BRIEF ON MOOTNESS – 6

## II. OTHER CHANGES IN FEDERAL POLICY FURTHER UNDERMINE PLAINTIFFS' FEAR OF FUTURE INJURY.

Plaintiffs infer their supposed "policy" from, and base their claims for prospective relief on, certain *other* federal actions and policies. But those actions and policies have also abated since Plaintiffs filed suit.

Plaintiffs rely heavily on Executive Order 13,933, which directs the Department of Justice to prioritize investigation and prosecution of destruction of federal property related to public demonstrations, and temporarily authorizes certain agencies to request from each other assistance in protecting federal property. *See* Exec. Order No. 13,933, *Protecting American Monuments, Memorials and Statues and Combatting Recent Criminal Activity* (June 26, 2020); *see also* Compl. ¶¶ 39-41. In particular, Plaintiffs expressly cite that order as the basis for "deploy[ing] or operationaliz[ing] special forces in Portland." *Id.* ¶ 41. While it is true that Section 5 of that executive order allowed DHS to provide additional "personnel to assist with the protection of Federal monuments, memorials, statues, or property," that section expired on December 31, 2020. By definition, allegations based on the possibility of federal actions derived from this instruction can no longer support a claim of future injury.

Moreover, on February 25, 2021, President Biden revoked a September 2, 2020, presidential memorandum directing agencies to review funding to state and local governments that were "permitting anarchy, violence, and destruction in American cities."[4] Pursuant to that presidential memorandum, the City of Portland had been identified as such a local government. Office of the Attorney General, *Withdrawal of Designation of Anarchist Jurisdictions* (Feb. 25,

---

[4] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/24/executive-order-on-the-revocation-of-certain-presidential-actions/.

DEFENDANTS' SUPPLEMENTAL BRIEF ON MOOTNESS – 7

2021).[5] Because the September 2020 memorandum has been rescinded, Portland is no longer deemed by the federal government to permit "anarchy, violence, or destruction," and its federal funding is no longer jeopardized by the prior administration's contrary conclusion. *Id.*

### III.    THE PROTESTS ON WHICH PLAINTIFFS' EQUITABLE CLAIMS RELY HAVE ABATED.

Plaintiffs' speculation about what would happen at future protests has not come to pass. There have not been frequent violent clashes among protesters and law enforcement. Instead, the protests have declined precipitously, and USMS has not responded to any incidents of late. The incidents to which DHS has responded are markedly different from last summer's, and no longer support Plaintiffs' plea for equitable relief. Plaintiffs cannot continue to rely on predictions from last July, which have not come true, nor can the Court enter an injunction based on the *possibility* that something similar might recur at an unknown time, in an unknown place. The change in circumstances renders Plaintiffs' equitable claims moot.

#### A.    The Factual Basis for Plaintiffs' Equitable Claims—Frequent, Violent Interactions Between Protesters and Federal Law Enforcement—No Longer Exists.

The basis of Plaintiffs' fear of future harm was the near-constant protest activity between May and August of 2020, and the continuous contact between protestors and local and federal law enforcement during that specific period. For example, Plaintiffs alleged on July 22, 2020, that protests had "continued every night since—or for more than 50 days, as of the date of filing this Complaint." Compl. ¶ 30. Those protests had "grow[n] in size and strength in opposition to the growing presence of anonymous federal troops on the streets of Portland." *Id.* ¶ 180. Plaintiff Wise claimed, as of July 22, 2020, to have "attended the Portland Protests nearly every night since May

---

[5] https://www.justice.gov/ag/page/file/1371751/download. *See also* Office of Public Affairs, U.S. Dep't of Justice, *Update* (Feb. 25, 2021) (noting that the designations of New York, Portland, and Seattle had been withdrawn); Office of Management & Budget, *Memorandum M-21-16* (Feb. 26, 2021) (rescinding Memorandum M-20-36, issued Sept. 21, 2020).

29." *Id.* ¶ 65.

More to the point, for present purposes, Plaintiffs sought prospective equitable relief because "[t]here [we]re no signs that the violence showcased towards Plaintiffs w[ould] end." *Id.* ¶ 176. "As long as demonstrations persist," Plaintiffs alleged, "and Defendants continue to use the same levels of force, Plaintiffs and other medics will need to administer medical aid." *Id.* Thus, "Plaintiffs fear[ed] for their safety from police violence *because they ha[d] been attacked and injured repeatedly and without warning throughout the last approximately 50 days*." ¶ 178 (emphasis added).

The premises of these allegations are no longer true. Protest activity at federal property has been intermittent since November 2020, and the size and strength of the protests has been shrinking, not growing, for months. *See* Ex. 1, Russell Decl. ¶ 6 ("Since November 1, 2020, there has been a significant decline in violent activities associated with the protests around federal property . . . ."); Ex. 2, Cajigal Decl. ¶ 8 ("There has not been any protest or riot activity directed at the Hatfield Courthouse since November 11, 2020[.]"). Accordingly, engagement with protesters by federal agents has declined significantly. Russell Decl. ¶ 6; Cajigal Decl. ¶ 8 ("USMS District of Oregon officially shut down operations related to the protest activity on November 15, 2020.").

In the months of June, July, and August, demonstrations were far more frequent, and drew an augmented federal response. *See* Russell Decl. ¶¶ 4, 7; Cajigal Decl. ¶ 6. Conversely, over the past four months, there have been only eight protests declared unlawful due to violent activity, to which DHS responded with force. Russell Decl. ¶ 6. Only 15 individuals were arrested, and only for misdemeanor offenses. By comparison, between May 26, 2020, and October 31, 2020, federal and local law enforcement arrested more than 1,000 individuals. *Id.* ¶ 7.

Moreover, the nature of the protests has changed fundamentally. Last summer's protests

usually followed a pattern: larger, peaceful protests during the day, followed by smaller, more targeted violence late at night. Russell Decl. ¶ 3. Since November 1, 2020, the incidents have begun later at night and been much more likely to become violent. *Id.* ¶ 5. Recent incidents have also shifted in focus, from social justice to a more generally anti-government sentiment. *Id.*

Indeed, to the extent that there continues to be protest activity to which federal officers have responded or may respond, it has taken place at the Immigration and Customs Enforcement ("ICE") facility on South Macadam Avenue in Portland, and most recently at the United States Citizenship and Immigration Service ("USCIS") facility in Portland, neither of which was identified in Plaintiffs' complaint as a location where Plaintiffs sought to engage in protest activity or allegedly encountered violence from Defendants. Plaintiffs' complaint provides no basis for a free-range challenge to any and all federal law-enforcement activity in Portland. Plaintiffs have never claimed a desire—let alone a constitutional right—to participate in violent expression of protest against federal facilities generally, which is what DHS has seen most recently.

If Plaintiffs intend to challenge riot-control procedures at locations, and arising from circumstances, other than last summer's courthouse protests, they should either seek leave to amend their complaint (and therein establish standing to do so), or file a new lawsuit. The claims pending in *this* lawsuit, however, are moot.

Contrary to Plaintiffs' contention at the time they brought suit, Compl. ¶ 176, conflict between protesters and law enforcement has declined precipitously and bears no resemblance to the situation when Plaintiffs filed suit. The peaceful demonstrations that took place last summer, which Plaintiffs wished to continue supporting, are dramatically different—or at least, have shifted away from federal property. These dramatically changed circumstances reinforce that Plaintiffs' claims for equitable relief are moot.

**B.    Defendant U.S. Marshals Service Has No Role in the Present Protest Activity.**

Even if the Court were to find that the myriad changes in circumstance discussed above have not mooted all of Plaintiffs' claims, it should nevertheless find that the claims for equitable relief against USMS are moot.

USMS is charged with protecting federal courthouses, including the Mark O. Hatfield U.S. Courthouse. *See* Ex. 2, Cajigal Decl. ¶ 3. USMS is not charged with protecting federal property writ large, *cf. id.*, nor does USMS provide security outside the courthouse perimeter, *id.* ¶ 8.

Most of the protests last summer, insofar as they involved Federal Defendants, took place at the Mark O. Hatfield U.S. Courthouse. Of the four locations that Plaintiffs list as the principal focus of protests, the Hatfield courthouse is the only federal property. *See* Compl. ¶ 31. Last summer, during the protests cited by Plaintiffs in their Complaint, USMS augmented its presence to provide additional protective support to the Hatfield Federal Courthouse. *Id.* ¶ 6. But since November 9, 2020, that augmented staff has departed.

Currently there is no protest activity at the Hatfield Courthouse, and there has been no activity related to protests to which USMS has responded in the vicinity of the Courthouse since November 11, 2020. *Id.* ¶ 8. USMS has not participated in any law enforcement response at other locations in Portland. *Cf. id.* ¶¶ 6-9.

Therefore, independent of any other legal or factual issues remaining in this case, due to changes in the circumstances of the protest, there is no possible present or certainly impending harm caused by USMS that the Court can enjoin on behalf of the Plaintiffs. The Court should find that all claims against USMS are moot.

**IV.    THE VOLUNTARY-CESSATION EXCEPTION TO MOOTNESS DOES NOT APPLY.**

Plaintiffs may contend that the voluntary-cessation doctrine applies, such that their claims are not moot. *See, e.g.*, *Bell v. City of Boise*, 709 F.3d 890, 898 (9th Cir. 2013). However, Plaintiffs' only support for their central allegation—that Defendants established an unlawful policy or took

law-enforcement actions pursuant to an unlawful policy—is their reliance on the rhetoric of the prior administration. One could hardly imagine a more fundamental change than the replacement of the officials whose rhetoric gave rise to Plaintiffs' claims; Plaintiffs would be hard-pressed to contend that such rhetoric is likely to recur. Nor was that change in any sense voluntary; the officials who allegedly relied on that rhetoric were voted out of office and replaced by officials who Plaintiffs have not alleged, and cannot allege, to have espoused such views.

Apart from Plaintiffs' primarily grounding their claims in the actions of the prior administration, Plaintiffs have failed to identify any policing/use-of-force policy that is infirm in the first instance. Federal Defendants never had a policy, official or unofficial, of violating the First or Fourth Amendment rights of the Plaintiffs, nor did they violate the requirements of the Administrative Procedure Act. Federal Defendants have not changed their actual, longstanding policies regarding use of force and rules of engagement in situations involving crowd control or the protection of federal property. Thus, there has been no voluntary cessation, because there is no illegal policy to withdraw.

Additionally, as discussed *supra*, any changes that have occurred in the nature and frequency of engagement between Defendants' law enforcement officers and protesters have been a consequence of the change in protesters' activity. Neither the overall decline in protest activity nor the change in primary location of the protest activity is due to voluntary actions taken by the Defendants. To be clear, Plaintiffs allege that individual officers engaged with protestors in a manner to which they object. Assuming *arguendo* that Plaintiffs plausibly claim individual violations of law (which Federal Defendants do not concede), Plaintiffs fail to allege plausibly an extant *policy* to violate the law, as they must in order to obtain injunctive relief against the agencies.

In the absence of any extant policy or endorsed practice of violating protesters'

constitutional rights, there is no basis on which to award prospective injunctive relief, and therefore Plaintiffs' equitable claims are moot. To the extent Plaintiffs believe that their rights were violated by specific individuals on specific past occasions, there are myriad avenues through which such allegations may be investigated and addressed. Most notably, the Department of Justice Inspector General has opened at least two investigations, one of which is being coordinated with the DHS Inspector General.[6] These were in response to congressional requests, and Congress may conduct additional oversight. Additionally, individual plaintiffs have brought administrative tort claims and *Bivens* actions. *See, e.g., Clark v. Wolf*, No. 20-cv-1436 (D. Or.); *Pettibone v. Biden*, No. 20-cv-1464 (D. Or.); *Wolfe v. Portland*, No. 20-cv-1882 (D. Or.).[7]  As to this action, however, official-capacity claims for prospective injunctive relief do not offer an appropriate avenue for relief.

## CONCLUSION

Plaintiffs never had standing to bring their equitable claims, but those claims are moot in any event. For that reason, and those stated in Federal Defendants' motion to dismiss, Plaintiffs' equitable claims should be dismissed.

Dated: March 5, 2021

BRIAN M. BOYNTON
Acting Assistant Attorney General

SCOTT E. ASPHAUG
Acting United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Branch Director

---

[6] *See* U.S. Dep't of Justice, Office of Inspector General, *DOJ OIG Announces Initiation of Work* (July 23, 2020), *available at* https://oig.justice.gov/news/doj-oig-announces-initiation-work.

[7] Undersigned counsel do not represent the individual-capacity defendants in these *Bivens* actions. By noting these actions' pendency, Defendants neither suggest nor imply that the *Bivens* claims have any merit.

DEFENDANTS' SUPPLEMENTAL BRIEF ON MOOTNESS – 13

/s/ *Jason C. Lynch*
JASON LYNCH
KERI BERMAN
JORDAN VON BOKERN
Trial Attorneys
United States Department of Justice
Civil Division
1100 L Street NW, Rm. 11214
Washington, DC 20005
Tel: (202) 514-1359
Email: Jason.Lynch@usdoj.gov

*Attorneys for Defendants*

DEFENDANTS' SUPPLEMENTAL BRIEF ON MOOTNESS – 14