# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **CHRISTOPHER WISE**, **MICHAEL MARTINEZ, CHRISTOPHER DURKEE,** and **SAVANNAH GUEST**, | Case No. 3:20-cv-01193-IM |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **CITY OF PORTLAND,** a municipal corporation, **OFFICER STEPHEN B. PETTEY,** in his individual capacity, **JOHN DOES 1-60,** individual and supervisory officers of the Portland Police Bureau, **UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES MARSHALS SERVICE, JOHN DOES 61-100**, individual and supervisory officers of the federal government, | |
| Defendants. | |

Kelly K. Simon, ACLU of Oregon, P.O. Box 40585, Portland, OR 97240; Misha Isaak, Nathan R. Morales, Thomas R. Johnson, and Holly Jordan Martinez, Perkins Coie, LLP, 1120 N.W. Couch Street 10th Floor, Portland, OR 97209. Attorneys for Plaintiffs.

Jason C. Lynch, Andrew Warden, and Keri Lane Berman, U.S. Department of Justice, 1100 L Street N.W., Washington, D.C., 20005; Jeffrey Aaron Hall, U.S. Department of Justice, 950 Pennsylvania Ave., Washington, D.C., 20530. Attorneys for Federal Defendants.

**IMMERGUT, District Judge.**

This matter comes before the Court on Federal Defendants'[1] Motion to Dismiss Agency and Official Capacity Claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), ECF 58, and the parties' supplemental briefs concerning whether Plaintiffs' claims for equitable relief are now moot, ECF 70; ECF 77; ECF 85. Federal Defendants challenge Plaintiffs' claims against Federal Agency Defendants and Federal Doe Defendants sued in their official capacities for prospective relief only. ECF 70 at 4 n.1. As such, Plaintiffs' claims for damages against Federal Doe Defendants sued in their individual capacities under *Bivens* are not at issue.

This Court finds it does not have jurisdiction to hear Plaintiffs' claims for equitable relief against Federal Defendants sued in their official capacities both because Plaintiffs have not shown that they have standing for such relief and, even assuming they did, their claims for prospective relief are now moot. Plaintiffs' claims for equitable relief against Federal Defendants are therefore dismissed on those grounds.

## BACKGROUND

George Floyd's murder on May 25, 2020 sparked national and international protests in support of Black lives and against police brutality. *See* ECF 1 at ¶¶ 23–27. The protests in Portland started within days of Mr. Floyd's death, beginning on May 29, 2020, and continued every night through the filing of Plaintiff's Complaint on July 22, 2020. ECF 1 at ¶ 30. As alleged in Plaintiff's Complaint, the protests were concentrated in Chapman and Lownsdale

---

[1] Federal Defendants include the U.S. Department of Homeland Security, the U.S. Marshals Service ("Federal Agency Defendants"), and John Does 61–100 ("Federal Doe Defendants"), individual and supervisory officers of the federal government. Federal Doe Defendants are sued in their individual and official capacities. Federal Doe Defendants have not yet been named or served by Plaintiffs.

Squares, city parks bordered by government buildings, including the Mark O. Hatfield U.S. Courthouse and the Multnomah County Justice Center. *Id.* at ¶ 31.

According to the Complaint, Plaintiffs Christopher Wise, Michael Martinez, Christopher Durkee and Savannah Guest are four individuals who serve as "protest medics" while attending these protests in support of the Black Lives Matter movement. *Id.* at ¶ 55. The protest medics allegedly "deliver medical care in furtherance of the anti-racist ideals at the core of the protests." *Id.* The protest medics offer a variety of services, including distributing eye wash and eye wipes to protesters in anticipation of tear gas, offering personal protective equipment so that protesters can observe COVID-19 safety protocols, ensuring protesters remain adequately hydrated and fed, and rendering direct care. *Id.* at ¶ 56.

Plaintiffs come from a diverse array of backgrounds and medical training. Plaintiff Wise is a former emergency medical technician ("EMT"). *Id.* at ¶ 65. Plaintiff Martinez is a graduate student at Oregon Health Sciences University ("OHSU") with basic-first aid training. *Id.* at ¶¶ 96, 124. Plaintiff Durkee is trained as an EMT and is a mental-health professional. Plaintiff Guest is a former emergency medical services (EMS) volunteer. *Id.* at ¶¶ 145–46. None of the Plaintiffs allege they are currently licensed medical professionals in the state of Oregon.

While working as protest medics, Plaintiffs identify themselves to others through the insignia they place on their clothing. For example, Plaintiff Wise wears a black denim jacket with the words "medic" and the medic symbol painted in red across the back, as well as brightly colored duct-taped medic symbols on both of his upper arms and chest. He also carries medical supplies on his person. *Id.* at ¶ 66. When Plaintiffs Guest and Durkee volunteer as protest medics they wear dark-colored clothes with high-gloss red duct tape in the shape of crosses on their front

and back. They also wear dark backpacks, helmets and shoulder patches with red crosses. *Id.* at ¶ 149.

Plaintiffs "view what they do as an act of protest, and a form of speech and expression" in and of itself. *Id.* at ¶ 58. As alleged in their Complaint:

> By their presence, [the protest medics] send a message to all protesters, journalists, and neutral legal observers that someone will be there to care for them, even when the Portland Police and the Federal Defendants are actively harming them. The protest medics work to prevent all who attend the demonstrations from developing illness or injury, so they can continue protesting, documenting the protests, or providing legal observation at the protests.

*Id.*

## A.  Allegations of Intentional Targeting and Retaliation

Plaintiffs allege that about a month after the Black Lives Matter protests in Portland began, former President Donald Trump issued an Executive Order about "Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence."[2] *Id.* at ¶ 39. Plaintiffs allege under the color of that Executive Order, the Department of Homeland Security ("DHS") and the United States Marshals Service ("USMS"), Agency Defendants in this case, "deployed or operationalized special forces in Portland" to respond to the protests. *Id.* at ¶ 41. Plaintiffs allege these special forces were members of "rapid response teams" that included members of USMS, as well as DHS's Customs and Border Protection, Immigration and Customs Enforcement, the Transportation Security Administration, the Coast Guard, and the Federal Protective Service. The agents also included specially trained tactical units such has the Border

---

[2] Plaintiffs incorporated the Executive Order by reference into their Complaint. *See id.* at ¶ 39 & n.4.

Patrol Tactical Unit ("BORTAC"), normally tasked with investigating violent drug smuggling organizations. *Id.* at ¶ 42.

Plaintiffs allege upon their arrival, these federal officers waged "war on Portland's citizens protesting widespread police brutality" *id.* at ¶ 54, and engaged in a pattern of intentional "targeting and retaliat[ion]" against the protest medics specifically, *id.* at 20. Plaintiffs further allege the targeting was part of a "longstanding pattern of assaulting and threatening protest medics to prevent them from rendering aid to protesters, journalists, neutral legal observers, and their fellow protest medics." *Id.* at ¶ 64.

Plaintiffs specifically allege the following five[3] instances of intentional targeting and retaliation from Federal Doe Defendants in their Complaint:

- On July 14, 2020, as Portland Police tear gassed protesters in an apparent attempt to disperse the area, Plaintiff Wise stood in the middle of Lownsdale Square to watch for any potential medical complications protesters might experience. As he stood there, some Federal Doe Defendants repeatedly shot him in the legs with pepper balls. *Id.* at ¶¶ 89–92.

- Without specifying a date, timeframe, or any of the surrounding context, Plaintiffs generally allege Federal Doe Defendants "have thrown or shot flashbang grenades and teargas canisters directly at Plaintiff Wise." *Id.* at ¶ 93.

---

[3] Plaintiffs allege another incident of targeting occurred on March 11, 2021 in support of their supplemental mootness briefing. *See* ECF 78 at ¶¶ 6–7. Because standing turns on the facts as they existed at the time the complaint is filed, *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007), that incident is discussed only in the mootness section of this opinion.

- Sometime on July 11, into the morning of July 12, 2020, Federal Doe Defendants fired pepper balls at Plaintiffs Durkee and Guest while they were moving injured protesters away from protest activity toward federal agents "approaching from multiple directions." *Id.* at ¶¶ 156, 159.

- Sometime on July 11, into the morning of July 12, 2020, as Plaintiff Guest was kneeling to help an injured protester, a Federal Doe Defendant "threw a tear gas canister at her and the injured protester." Plaintiff Guest then kicked the tear gas canister away from her, "at which point Defendant began shooting her with rubber bullets . . . leaving abrasions and bruises on her feet and ankles." *Id.* at ¶¶ 156, 160.

- On July 12,[4] 2020 around 2 a.m., following a dispersal order from Portland Police and a "large push" from Federal law enforcement to clear the area in front of the Mark O. Hatfield U.S. Courthouse, Plaintiffs Durkee and Guest attempted to provide medical aid to a person lying down on the street. Before they could do so, some of the Federal Doe Defendants began rushing them and then instructing them to move north. As Plaintiff Durkee and Guest complied, one of the Federal Doe Defendants forcefully shoved Plaintiff Durkee, causing both him and Plaintiff Guest to fall to the ground. Some of the Federal Doe Defendants then struck both of them with truncheons multiple times. *Id.* at ¶¶ 162–69.

---

[4] The Complaint alleges this incident occurred on July 5, 2020 but also suggests that it was the same night as July 11–12, 2020. *Id.* at ¶¶ 161–62. Federal Defendants note that in other submissions to the Court Plaintiffs allege these events occurred in the early morning of July 12, 2020. ECF 58 at 27 n.8. July 5 therefore appears to be a typographical error.

## B.  Procedural History

Based on these allegations and others asserted against the Portland Police, on July 22, 2020 Plaintiffs filed this lawsuit. ECF 1. Plaintiffs allege Federal Doe Defendants violated their First and Fourth Amendment rights through their intentional targeting and retaliation against them as protest medics. *Id.* at ¶¶ 201–225. Plaintiffs further allege Federal Defendants adopted a policy of "generalized anti-protest law enforcement" in violation of the Administrative Procedure Act ("APA"). *Id.* at ¶¶ 226–234. Although not at issue in this motion, Plaintiffs also bring First and Fourth Amendment claims under 42 U.S.C. § 1983 against the Portland Police and the Municipal Doe Defendants. *Id.* at ¶¶ 182–200.

On July 24, 2020, Plaintiffs filed for a Temporary Restraining Order ("TRO") against both Federal and Municipal Defendants. ECF 4. Plaintiffs withdrew their TRO motion on August 2, 2020, based on the understanding that Federal Defendants would be reducing the presence of federal officers in Portland. ECF 24. On August 21, 2020, Plaintiffs filed a second motion for a TRO solely against Municipal Defendants, which this Court denied. ECF 35; ECF 49. Thereafter, Municipal Defendants filed an Answer to Plaintiffs' Complaint. ECF 57. On October 20, 2020, Federal Defendants filed the present Motion to Dismiss, asking this Court to dismiss Plaintiffs' claims against Federal Agency and Federal Doe Defendants sued in their official capacities for injunctive and declaratory relief. ECF 58.

On January 22, 2021, this Court requested additional briefing from Federal Defendants and Plaintiffs to address whether Plaintiffs' claims for equitable relief against Federal Defendants are now moot. ECF 66; ECF 70; ECF 77; ECF 85. This Court held a hearing on Federal Defendants' Motion to Dismiss on April 30, 2021. ECF 86.

## DISCUSSION

### A. Standing

Federal Defendants move under Federal Rule of Civil Procedure 12(b)(1) for dismissal of Plaintiffs' claims for injunctive and declaratory relief for lack of standing. ECF 58 at 12–20; *see also Chandler v. State Farm Mutual Auto. Ins. Co.*, 598 F.3d 1115, 1121–22 (9th Cir. 2010) (a challenge to standing is appropriately raised under Rule 12(b)(1)). Federal Defendants argue Plaintiffs lack standing to obtain equitable relief against them because Plaintiffs have not demonstrated a substantial risk of future harm of the same kind alleged in the Complaint. ECF 58 at 12–20. This Court agrees.

Article III of the Constitution confers limited authority on federal courts to hear only active cases or controversies brought by persons who demonstrate standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546–47 (2016). Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* at 1547. To have standing, a plaintiff must have "personal interest . . . at the commencement of the litigation." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). To demonstrate this personal interest, a plaintiff must show: (1) he has suffered an "injury in fact"; (2) "the injury is fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 180–81, 189; *see also Spokeo*, 136 S. Ct. at 1547.

Here, "injury in fact" is the main concern. An "injury in fact" means an invasion of the plaintiff's legally protected interest that, among other things, is "concrete and particularized." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (internal quotation marks omitted). To be "particularized," an injury "must affect the plaintiff in

a personal and individual way." *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1). To be "concrete," the injury "must actually exist"—an abstract, theoretical concern will not do. *Id.*

When a plaintiff seeks prospective relief in the form of an injunction or a declaratory judgment, a plaintiff must show "injury in fact" by "demonstrat[ing] 'that he is realistically threatened by a repetition of [the alleged violation].'" *Armstrong v. Davis*, 275 F.3d 849, 860–61 (9th Cir. 2001) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)) *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005)); *see also Mayfield v. United States*, 599 F.3d 964, 969 (9th Cir. 2010) (noting a declaratory judgment is a form of prospective relief). "A plaintiff threatened with future injury has standing to sue 'if the threatened injury is certainly impending, or there is a substantial risk the harm will occur.'" *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, (2014)). "The burden of showing a likelihood of recurrence is firmly on the plaintiff." *Nelsen v. King Cnty.*, 895 F.2d 1248, 1251 (9th Cir. 1990).

### 1.  Past Alleged Harms

Plaintiffs argue their allegations of past targeting and retaliation from Federal Doe Defendants show "the threat of future harm [is] all but certain." ECF 61 at 13–15. Plaintiffs specifically allege five[5] instances of past intentional targeting and retaliation involving Federal Doe Defendants which are alleged to have occurred during two days in July 2020. *See* ECF 1 at

---

[5] Plaintiffs assert some very general allegations about Federal Doe Defendants, *see, e.g.*, ECF 1 at ¶¶ 62–63, and describe an incident that could have involved either Federal Doe Defendants or the Portland Police, *id.* at ¶ 153. These allegations are too vague and conclusory to support Plaintiffs' standing for prospective relief. *See Thomas v. Mundell*, 572 F.3d 756, 762–63 (9th Cir. 2009) (rejecting a plaintiff's vague and conclusory allegations as insufficient to establish standing); *see also Mann v. City of Tucson*, 782 F.2d 790, 793 (9th Cir. 1986) (per curiam) ("Although we must, in general, accept the facts alleged in the complaint as true, wholly vague and conclusory allegations are not sufficient to withstand a motion to dismiss").

¶¶ 90–93, 159–60, 164–69. The Court finds that these incidents do not demonstrate a substantial risk of targeting or retaliation in the future.

First, Plaintiffs' Complaint does not show that "protest medics" are a readily identifiable and distinct group capable of being "targeted" by law enforcement. As alleged, Plaintiffs lack a distinct uniform, possess varying degrees of medical training, and offer a wide array of services, from providing water to rendering direct care. None of the Plaintiffs allege to be licensed medical providers in Oregon.

The context surrounding Plaintiffs' allegations further undercut any plausible inference of targeting. In many instances alleged Plaintiffs were not actively providing medical aid when they were harmed. In those circumstances, Plaintiffs' unique roles as protest medics would not be obvious to the outside observer. *See, e.g.*, *id.* at ¶ 93 (alleging Federal Doe Defendants have thrown or shot flashbang grenades and teargas canisters at Plaintiff Wise without providing any further context); *id.* at ¶ 160 (alleging Plaintiff Guest was shot with rubber bullets immediately after kicking a tear gas canister away). Plaintiffs admittedly position themselves right next to protesters in areas which pose the most risk of harm, rather than standing apart from the crowd, undermining the suggestion their harm was the result of intentional targeting. *See id.* at ¶ 155 (alleging on July 4, 2020, law enforcement "deployed tear gas indiscriminately" and explaining that because Plaintiffs Durkee and Guest position themselves near the police line to keep a watchful eye for potential injured protesters, they experience the brunt of the tear gas); *see also id.* at ¶¶ 90–91.

Perhaps most importantly, over half of the incidents of alleged targeting and retaliation described appear to have occurred after Plaintiffs resisted law enforcement efforts to disperse an area. *See id.* at ¶¶ 90–91 (alleging Plaintiff Wise "stood in the middle of Lownsdale Square" as

Portland Police deployed tear gas and some Federal Doe Defendants repeatedly shot him in the legs with pepper balls); *id.* at ¶ 159 (alleging Plaintiffs Durkee and Guest were shot with pepper balls while moving injured people toward federal agents as they approached from multiple directions); *id.* at ¶¶ 161–69 (alleging Plaintiffs Durkee and Guest were shoved and struck with truncheons while attempting to help a civilian following a dispersal order). Plaintiffs do not squarely contest the legality of those dispersal orders, and the Court is not aware of any established legal authority suggesting that Plaintiffs, as protest medics, were entitled to ignore those orders. Based on the facts alleged, Federal Doe Defendants' conduct is more plausibly attributed to a general effort to disperse a crowd, rather than any invidious discriminatory or retaliatory intent against protest medics as a group. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) ("As between that 'obvious alternative explanation' for the arrests, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion." (citation omitted)).

Even if this Court were to consider Plaintiffs' allegations as evidence of past targeting and retaliation, the allegations fail to demonstrate a substantial or certainly impending risk that Plaintiffs will be intentionally targeted and retaliated against in the future. Although "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," *O'Shea v. Littleton*, 414 U.S. 488, 496 (1983), "past wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy," *Lyons,* 461 U.S. at 103. The five incidents alleged occurred on only two distinct nights, at a time when daily protests had persisted for fifty straight days in Portland. ECF 1 at ¶ 178. The incidents involved only three of the four Plaintiffs in this case—Plaintiff Martinez has no allegations against federal law enforcement, despite attending several protests each week as a protest medic. *Id.* at ¶ 142.

Plaintiffs' allegations do not suggest any ongoing or sustained pattern of targeting and retaliation sufficient to show a real and immediate future threat. *See O'Shea*, 414 U.S. at 496.[6]

### 2.  "Officially Sanctioned" Conduct

Plaintiffs further insist they are at risk of future constitutional harm because the Federal Defendants' "infringing conduct was officially sanctioned." ECF 61 at 15–18. Plaintiffs point to the alleged policy of "generalized anti-protest law enforcement" asserted under their APA claim in support of this argument. *Id*; *see also* ECF 1 at ¶ 231. Plaintiffs appear to ask this Court to infer from such a policy a likelihood that Plaintiffs will endure future targeting and retaliation based on their role as protest medics.

As alleged in the Complaint and described in Plaintiffs' response, the precise nature of this policy of "generalized anti-protest law enforcement" is entirely unclear. Plaintiffs' Complaint states:

> Federal Defendants have adopted a policy and have given direction to federal officers to engage in generalized anti-protest law enforcement, including dispersal of crowds with uses of force such as deployment of chemical irritants and munitions to quell protest activity. Federal officials' public statements indicate that the anti-protest law enforcement authorized and directed pursuant to these policies and directives are without regard to the location or other nexus with federal monuments, memorials, statues, and property.

ECF 1 at ¶ 231.

---

[6] Plaintiffs' reliance on *Thomas v. County of Los Angeles*, 978 F.2d 504 (9th Cir. 1992) is misplaced. *Thomas* involved 75 plaintiffs who alleged they were all victims of police misconduct within a small section of the city and that some class members were allegedly victimized repeatedly. *Id.* at 507. Such a pervasive pattern of conduct is nothing like what is alleged here. Additionally, the court in *Thomas* relied on more than just past alleged harms to find standing, including the fact that class members alleged retaliation for the lawsuit itself as evidence of "continuing, present adverse affects" and that the police misconduct was "condoned and tacitly authorized by department policy makers." *Id.* at 508. *Thomas* provides no basis to transform Plaintiffs' five allegations of past injuries into a risk of future harm sufficient to confer standing.

In their briefs, Plaintiffs variously refer to this policy as a "policy of unlawful conduct," an "order to infringe on the rights of protesters" and a policy to "crack down on the lawful exercise of free speech by going further than local law-enforcement agencies had been willing or able to go." ECF 61 at 16–17. At oral argument, Plaintiffs repeatedly described this policy as a "policy of plenary policing" "untethered" to any federal building. Plaintiffs have never asserted that federal officers may not defend federal property or use generally accepted-law enforcement tactics to disperse crowds where necessary. Accordingly, it is unclear what "policy of unlawful conduct" Plaintiffs actually seek to challenge, or how any such policy connects specifically to the constitutional harms allegedly suffered by Plaintiffs. Such a nebulous and ill-defined concept cannot establish a substantial or certainly impending risk of intentional targeting and retaliation against protest medics as required for prospective relief standing.

Plaintiffs rely on an executive order and public statements from former President Trump and former Acting Secretary of DHS Chad Wolf as their primary proof this "policy of unlawful conduct" exists. *See* ECF 61 at 16–18. For example, Plaintiffs cite President Trump's Executive Order on "Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence." ECF 1 at ¶ 41; ECF 61 at 16–17. Plaintiffs contend the Executive Order "vilified the protesters' political views" and permitted Federal Defendants to "crack down on the lawful exercise of free speech." ECF 61 at 16–17. But that Executive Order does not appear to apply to federal law enforcement's use of force. The Executive Order deals primarily with enforcing laws prohibiting the "desecration of public monuments" and "the vandalism of government property." Exec. Order No. 13933, 85 Fed. Reg. 40,083 (June 26, 2020). The "policy" recognized in the Order is for the United States "to prosecute to the fullest extent permitted under Federal law, and as appropriate," persons who destroy or vandalize monuments,

memorials, statues, or religious property, and to "withhold Federal support" to State and local governments if "they fail to protect such properties." *Id.* at 40,082. The Executive Order, thus, only concerns priorities in prosecution and federal funding. The Order does not speak to law enforcement dispersal tactics or general crowd-control methods. It does not mention Portland, the Mark O. Hatfield U.S. Courthouse, the Black Lives Matter movement, or "protest medics" at all.[7]

Plaintiffs also point to Chad Wolf's tweets as evidence of Federal Defendants' "unlawful policy." ECF 61 at 17–18. Plaintiffs cite two tweets featuring photos of Chad Wolf addressing federal law enforcement agents at the Mark O. Hatfield U.S. Courthouse on July 17, 2020. The tweets state: "We will never surrender to violent extremists," "valiant men and women have defended our institutions of justice against violent anarchists for 48 straight days," and "we will prevail." ECF 1 at ¶ 176.[8] Plaintiffs also cite a quote from then President Trump stating: "Portland was totally out of control . . . . And we very much quelled it. And if it starts again,

---

[7] Plaintiffs specifically rely on this Executive Order in other parts of their response brief to argue that it concerns only the protection of federal property and *not* the conduct they challenge. ECF 61 at 27–28. Plaintiffs cannot also simultaneously ask this Court to infer that the challenged conduct flows directly from this Order.

[8] Plaintiffs also ask this Court to take judicial notice of additional public statements cited by a party in another case in this District, *Western States Center, Inc. v. Dep't of Homeland Security*, Case No. 3:20-cv-1175. ECF 61 at 17 n.3. Plaintiffs provide no information to the Court about the content of those statements or their relevance to this case. Therefore, the Court denies Plaintiffs' request. *See Assurance Co. of Am. v. Nat'l Fire & Marine Ins. Co.*, 595 F. App'x 670, 672 (9th Cir. 2014) (holding the district court properly refused to notice documents where proponent failed to show they met the requirements of Rule 201(b)(2)); *see also Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 272 F.R.D. 505, 516 (E.D. Cal. 2011) ("[A] party requesting judicial notice bears the burden of persuading the trial judge that the fact is a proper matter for judicial notice.").

we'll quell it again very easily. It's not hard to do if you know what you're doing." ECF 61 at 19–20.[9]

These statements do not reveal any type of official policy of "unlawful conduct," or "order to infringe on the rights of protesters" or policy to "crack down on the lawful exercise of free speech." *Id.* at 16–17. They do not purport to condone the suppression of peaceful protests or First Amendment rights, nor do they speak to the specific means by which Federal Defendants were instructed to "quell" protests. Most importantly, these public comments have no apparent nexus to Plaintiffs' allegations of past targeting and retaliation against them as protest medics, and therefore cannot suggest that any such harms were officially sanctioned or ordered by members of the Trump Administration.[10]

A plaintiff may not rely "on mere conjecture about possible governmental actions" to demonstrate injury, and must instead present "concrete evidence to substantiate their fears." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013). By basing their allegations on an ill-defined "policy of unlawful conduct" with no clear basis and no apparent nexus to Plaintiffs' past alleged harms, Plaintiffs have attempted to do just that. Plaintiffs have not plausibly pled any "specific [] policies and practices" sufficient to suggest they are at substantial risk of experiencing intentional targeting and retaliation as protest medics again. *Updike v. Multnomah Cnty.*, 870 F.3d 939, 948 (9th Cir. 2017).

_____

[9] Plaintiffs incorporated the online news story by reference into their Complaint. *See* ECF 1 at ¶ 177 & n.6.

[10] Indeed, Plaintiffs concede as much by asserting in their mootness briefing that the change in presidential administration has "not seemed to have any impact on the behavior of officers in Portland." ECF 79 at ¶ 8; *see also* ECF 78 at ¶ 11 ("[T]he election of President Biden has not made a meaningful change in behavior of the officers in Portland. In fact, I cannot perceive any change in how officers act."); ECF 80 at ¶ 7 ("The election of President Biden has not eased my discomfort or seemed to have any impact on the behavior of officers in Portland.").

### 3. Continuing, Present Adverse Effects

Plaintiffs further contend they have standing for prospective relief because they continue to suffer "continuing, present adverse effects" from Federal Defendants' conduct. ECF 61 at 18. Plaintiffs argue Federal Defendants' conduct has so chilled their exercise of free speech that Plaintiffs "feel that they cannot safely attend the protests anymore." *Id.*

A chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not "based on a plaintiff's fear of future injury that itself [is] too speculative to confer standing." *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015) (citing *Clapper*, 568 U.S. at 417–18). Plaintiffs' alternative theory of injury fails because the alleged deterrent effect from attending protests is ultimately based on their fear of an injury this Court already determined is too speculative to confer standing. *See id.*

In sum, because Plaintiffs have not pled facts sufficient to demonstrate their threatened injury, i.e. intentional targeting and retaliation of protest medics at the hands of Federal Defendants, "is certainly impending, or there is a substantial risk the harm will occur," *In re Zappos.com*, 888 F.3d at 1024 (internal quotation marks omitted), their claims for prospective, equitable relief against Federal Defendants must be dismissed for lack of standing.

## B. Mootness

Even if this Court were to assume that Plaintiffs had standing to bring their claims for equitable relief, changed circumstances have rendered Plaintiffs' equitable claims against the Federal Defendants moot. *See Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 66–67, 117 (1997) (courts may assume that standing exists in order to analyze mootness).

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting

*Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). It is not enough that a case presents a live controversy when it is filed. *FEC v. Wisc. Right To Life, Inc.*, 551 U.S. 449, 461 (2007). An actual controversy must exist at all stages of federal court proceedings. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). This means that, at all stages of the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant [that is] likely to be redressed by a favorable judicial decision." *Id.* (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)) (internal quotation marks omitted).

"The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008) (internal quotation marks and citation omitted). "[T]he judicial branch loses its power to render a decision on the merits of [a] claim," *Nome Eskimo Cmty. v. Babbitt*, 67 F.3d 813, 815 (9th Cir. 1995), when a federal court can no longer effectively remedy a "present controversy" between the parties, *Doe No. 1 v. Reed*, 697 F.3d 1235, 1238 (9th Cir. 2012) (quoting *Feldman*, 518 F.3d at 642).

Outside of the few instances of past constitutional harms alleged, which in and of themselves are insufficient to demonstrate substantial risk of future harm, Plaintiffs' claims for prospective relief against Federal Defendants are premised upon an alleged policy of "generalized anti-protest law enforcement," which in turn was inferred from "Federal officials' public statements." ECF 1 ¶¶ 231, 39–40, 176; *see also* ECF 61 at 15–18. The officials who made such statements, former President Trump and former Acting Secretary Chad Wolf, no longer hold office. No federal law-enforcement agents remain under their control.

"A request for injunctive relief remains live only so long as there is some present harm left to enjoin." *Bayer v. Neiman Marcus Grp.*, 861 F.3d 853, 864 (9th Cir. 2017) (quoting *Taylor*

*v. Resol. Trust Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995). Thus, a claim for injunctive relief

becomes moot once subsequent events have made clear the conduct alleged as the basis for the

requested relief "could not reasonably be expected to recur." *Id.* (quoting *Ruiz v. City of Santa*

*Maria*, 160 F.3d 543, 549 (9th Cir. 1998)). There is no evidence in the record to indicate that

President Biden and Secretary Alejandro Mayorkas have made any such equivalent statements to

support Plaintiffs' theories. Therefore, Plaintiffs' speculations regarding future actions of federal

law enforcement, even assuming they were once plausibly grounded in the rhetoric Plaintiffs

cited, rely on facts and circumstances that could not reasonably be expected to recur. *See Mayor*

*of City of Phil. v. Edu. Equal. League*, 415 U.S. 605, 622 (1974) ("Where there have been prior

patterns of discrimination by the occupant of [an executive office] but an intervening change in

administration, the issuance of prospective coercive relief against the successor to the office must

rest, at a minimum, on supplemental findings of fact indicating that the new officer will continue

the practices of his predecessor."); *see also W. States Ctr., Inc. v. U.S. Dep't of Homeland Sec.*,

No. 3:20-cv-01175-JR, 2021 WL 1896965, at *1 (D. Or. May 11, 2021) (finding plaintiffs'

prospective relief claims challenging federal law enforcement activities outside the Mark O.

Hatfield U.S. Courthouse moot because "there is a new [presidential] administration" and the

collection of tweets from Acting Secretary Wolf and President Trump that the plaintiffs relied on

to demonstrate prospective relief standing were "not only erased but utterly repudiated by [the]

change in administration").

      Further changes to written federal policy undermine any credible threat of future injury.

Most notably, Plaintiffs allege that the Executive Order on "Protecting American Monuments,

Memorials, and Statues and Combating Recent Criminal Violence" was the basis for

"deploy[ing] or operationaliz[ing] [federal] special forces in Portland." ECF 1 at ¶¶ 39–41. The

Executive Order allowed DHS to provide additional "personnel to assist with the protection of Federal monuments, memorials, statutes, or property," but that particular provision expired by its own terms on December 31, 2020. Exec. Order No. 13933, 85 Fed. Reg. 40,083 (June 26, 2020). On May 14, 2021, President Biden revoked the Executive Order in its entirety.[11] There is no basis in the record before this Court to suggest the Executive Order will be reinstated in the future.

Plaintiffs insist their claims remain live because Federal Defendants continue to target them for their work as protest medics. ECF 77 at 3–5. In support of this assertion, however, Plaintiffs cite to a single incident that occurred at a protest on March 11, 2021. Plaintiff Wise alleges he and another protest medic were "targeted" by Federal Defendants outside the Mark O. Hatfield U.S. Courthouse when they were struck by impact munitions while medically assisting other protesters caught in tear gas. ECF 78 at ¶¶ 4, 6–7. Again, however, these incidents appear to have occurred in the context of a dispersal effort close to the courthouse, as tear gas had been deployed by the officers. *Id.* at ¶ 6. Consequently, it does not support Plaintiffs' claim that the so-called targeting and retaliation of protest medics continues. Plaintiffs offer no other evidence in their supplemental mootness briefing of alleged targeting and retaliation in recent history.[12]

---

[11] The Court takes judicial notice of President Biden's "Executive Order on the Revocation of Certain Presidential Actions and Technical Amendment" pursuant to Fed. R. Civ. P. 201(c)(1). *See Executive Order on the Revocation of Certain Presidential Actions and Technical Amendment* (May 14, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/05/14/executive-order-on-the-revocation-of-certain-presidential-actions-and-technical-amendment/.

[12] Outside of the March 11 incident, Plaintiffs continue to allege they are experiencing an ongoing "chilling effect" preventing them from attending protests as they would like. ECF 78 at ¶ 3; ECF 80 at ¶ 5; ECF 79 at ¶ 7. Again, a chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not "based on a fear of future injury that itself [is] too speculative to confer standing." *Munns*, 782 F.3d at 410. Absent any concrete evidence

"A plaintiff who cannot reasonably be expected to benefit from prospective relief ordered against the defendant has no claim for an injunction." *Bayer*, 861 F.3d at 864; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 364–65 (2011) (concluding plaintiffs whose employment ended after an action was filed had no claim for injunctive relief against their former employer concerning its employment practices). The frequent protests on which Plaintiffs' equitable claims rely have also abated, further suggesting Plaintiffs' need for equitable relief has waned. Defendants submitted evidence to this Court indicating that the protests in Portland have continued, but are markedly distinct from the protests that occurred daily when Plaintiffs brought their Complaint. They have decreased in size, frequency, and even in location, shifting from the federal courthouse downtown to the Immigration and Customs Enforcement building two miles away. ECF 70-1 at ¶ 5. They are motivated by more of a "general anti-government sentiment" than the earlier protests of the summer. *Id.* As a result, engagement with protesters by federal agents has declined significantly. *Id.* at ¶ 6. In fact, Defendant USMS has shut down operations related to protest activity and is no longer providing staff to secure the perimeter of the federal courthouse, the only federal building mentioned in Plaintiffs' Complaint. ECF 70-2 at ¶¶ 7–8.

Plaintiffs insist that the racial justice protests of last summer "will continue" and even increase as the weather improves and important anniversaries come to pass. ECF 80 at ¶ 7 ("I anticipate that protests will continue this year"); ECF 79 at ¶ 11 ("I anticipate that protests will continue this year. The weather is improving and the murder trial of Derek Chauvin will prompt further protests."); ECF 78 at ¶ 11 ("I anticipate that protests will continue this year as the weather improves"). Plaintiffs Durkee and Guest, residents of Eugene, Oregon, also state they

---

to substantiate these fears, the alleged chilling is not sufficient to save Plaintiffs' equitable claims from mootness. *See Clapper*, 568 U.S. at 418.

intend to move from Eugene to Portland "soon" to serve as protest medics more often. ECF 79 at ¶ 11; ECF 80 at ¶ 2.

Plaintiffs must have "a reasonably certain basis" for needing the prospective relief they seek for such claims to remain live. *See Bayer*, 861 F.3d at 865. A plaintiff's declaration of intent as to his or her own future conduct may be sufficient to "establish a reasonable expectation that he will be subjected to the same action or injury again." *Wolfson v. Brammer*, 616 F.3d 1045, 1054–55 (9th Cir. 2010). But "absent any indicia of concreteness, such a declaration is insufficient to support a finding that an actual or imminent injury exists." *Bayer*, 861 F.3d at 865; *see also Bain v. Cal. Teachers Assoc.*, 891 F.3d 1206, 1213 (9th Cir. 2018) (citing *Lujan*, 504 U.S. at 564) ("The assertion that [plaintiff] could *conceivably* return to her old job, without more, is precisely the type of speculative 'some day' intention the Supreme Court has rejected as insufficient to confer [Article III jurisdiction]."). Plaintiffs' vague intentions to attend as-yet undefined future protests in Portland, "without any description of concrete plans . . . do not support a finding of the 'actual or imminent' injury" Article III requires. *Lujan*, 504 U.S. at 564.

The basic question in determining mootness is whether there is a present controversy as to which "effective relief can be granted." *Feldman*, 518 F.3d at 642 (quotation marks omitted). When asked at oral argument, Plaintiffs could not articulate to this Court what such relief would look like today. To the extent Plaintiffs intend to challenge Federal law enforcement's general riot-control procedures at locations, and arising from circumstances wholly distinct from last summer's racial justice protests surrounding the Mark O. Hatfield U.S. Courthouse, they have no basis for such relief based on the Complaint before this Court. Moreover, this Court could never issue an injunction so patently broad. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (an injunction must be "tailored to remedy the specific harm alleged." (internal

quotation marks omitted)); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992) ("An overbroad injunction is an abuse of discretion."). Plaintiffs cannot rely on the general assumption that protests of some kind will continue to occur in Portland to save their own claims from mootness.

### 1. The "Voluntary Cessation" and "Capable of Repetition, Yet Evading Review" Exceptions to Mootness Do Not Apply

Plaintiffs' legal arguments are premised entirely upon the assumption that the voluntary cessation exception to mootness applies to this case. It is true that "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued" and such a defendant "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Pierce v. Ducey*, 965 F.3d 1085, 1090 (9th Cir. 2020) (quoting *Already, LLC*, 568 U.S. at 91) (internal quotation marks omitted). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC*, 568 U.S. at 91.

That doctrine, however, does not apply here. The changed circumstances mooting Plaintiffs' claims were entirely out of Federal Defendants' control. President Trump and Acting Secretary Chad Wolf—the source of the alleged policy causing Plaintiffs' risk of future harm— no longer hold office. This is not a case where wrongdoers are free to resume their activities once an action is dismissed. *See Pierce*, 965 F.3d at 1090. Indeed, the alleged wrongdoers no longer hold any authority over Federal Defendants.[13]

---

[13] Plaintiffs' undercut their own argument by framing the mootness question under the voluntary cessation exception and simultaneously asserting that Federal Defendants continue to target them. *See* ECF 77 at 4 ("Plaintiffs believe that they continue to be targeted by police and federal officers despite the election of a new president because *the policies and practices of officers on the ground in Portland haven't changed*.") (emphasis added). The voluntary cessation

Plaintiffs also contend that even if their claims have been mooted, the harms perpetrated by Federal Defendants fall under the "capable of repetition, yet evading review" exception to mootness. ECF 77 at 12–13. This exception applies where two criteria are met: "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (internal quotation marks and citation omitted). The exception applies only in "extraordinary cases." *W. Coast Seafood Processors Ass'n v. Nat. Res. Def. Council*, 643 F.3d 701, 704 (9th Cir. 2011) (internal quotation marks and citation omitted).

This exception does not apply here because Federal Defendants' alleged unlawful conduct does not "evade review" as currently framed by Plaintiffs. Controversies that are not of "inherently limited duration" do not create "exceptional situations" justifying the rule's application, because, even if a particular controversy evades review, there is no risk that future repetitions of the controversy will necessarily evade review as well. *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 837 (9th Cir. 2014). As the Ninth Circuit has explained, "[t]he exception was designed to apply to situations where the type of injury involved inherently precludes judicial review, not to situations where . . . [review is precluded as a] practical matter." *Id.* (quoting *Matter of Bunker Ltd. Partnership*, 820 F.2d 308, 311 (9th Cir. 1987)) (alterations in original).

---

exception to mootness, by definition, is premised upon the notion that a defendant's unlawful conduct has *ceased*—at least temporarily so. *See Pierce*, 965 F.3d at 1090; *see also Center for Biological Diversity v. Lohn*, 511 F.3d 960, 965 (9th Cir. 2007) (holding the voluntary cessation doctrine did not apply where defendant did not cease applying the challenged policy but rather continued to apply it according to the legal standard imposed by a lower court).

This Court cannot discern why the alleged unlawful federal policies and practices relating to racial justice protests in Portland—which are themselves allegedly recurring and ongoing—constitutes a controversy of "inherently" limited duration sufficient to invoke the exception. *See id.* at 836 (The "exception is concerned not with particular lawsuits, but with classes of cases that, absent an exception, would *always* evade judicial review."). Indeed, Plaintiffs instead argue that Federal Defendants' challenged conduct has not ceased or expired, but is merely at a low ebb because Plaintiffs' protests have waned with the seasons. ECF 77 at 13. Because Federal Defendants' challenged conduct is not "inherently limited in duration" nor "likely always to become moot before federal litigation is completed" the exception cannot apply. *Lohn*, 511 F.3d at 965.

Plaintiffs' claims for equitable relief against Federal Defendants are moot. Accordingly, this Court lacks jurisdiction to consider their merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–94 (1998).

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims for equitable relief against Federal Defendants must be dismissed. Plaintiffs' alleged harms occurred in the past and are not reasonably expected to recur. Plaintiffs still have a remedy in damages should they succeed on their *Bivens* claims.

**IT IS SO ORDERED**.

DATED this 15th day of May, 2021.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge